## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
### Newport News Division

| | | |
|---|---|---|
| STRATA SOLAR, LLC<br>800 Taylor St. Ste. 200<br>Durham, NC 27701 | ) ) ) ) ) | |
|      Plaintiff, | ) ) | |
|      v. | ) ) | Case No.: 4:22-cv-106 |
| FALL LINE CONSTRUCTION, LLC,<br>260 Wilson Rd.<br>Butler, GA 31006 | ) ) ) ) | |
| SERVE: | ) ) | |
| Northwest Registered Agent, LLC<br>4445 Corporation Ln Ste 264<br>Virginia Beach, VA 23462-0000 | ) ) ) ) | |
|      and | ) ) | |
| ARCH INSURANCE COMPANY,<br>Harborside 3<br>210 Hudson Street, Suite 300<br>Jersey City, NJ 07311 | ) ) ) ) ) | |
| SERVE: | ) ) | |
| Corporation Service Company<br>100 Shockoe Slip Fl. 2<br>Richmond, VA 23219-4100 | ) ) ) ) | |
|      Defendants. | ) ) | |

## **COMPLAINT**

Plaintiff Strata Solar, LLC ("Strata"), by and through its undersigned counsel, hereby files this Complaint against Defendants Fall Line Construction, LLC ("Fall Line") and Arch Insurance Company ("Arch") and in support thereof, states the following:

## NATURE OF THE ACTION

This is an action for breach of contract arising out of Fall Line's failure to adequately perform its obligations pursuant to an engineering, procurement, and construction subcontract for a utility-scale solar photovoltaic project in Williamsburg, Virginia. In particular, Fall Line failed to procure specified materials and substituted materials without obtaining prior written approval from Strata pursuant to the subcontract; failed to adequately staff the work and failed to perform the work in accordance with the subcontract; submitted incomplete payment applications and failed to pay its lower-tier subcontractors, suppliers and vendors; failed to perform work safely or comply with safety directives after a "near-miss" safety incident; and ultimately abandoned the work. Despite Fall Line's defaults and Strata's notice of these defaults to Arch, Fall Line's performance bond surety, Arch failed and refused to take any action to remedy or correct the defaults, which is a material breach of the performance bond.

## PARTIES

1.      Strata is a North Carolina limited liability company with its principal office in Durham, North Carolina. Strata's sole member is a North Carolina limited liability company. That limited liability company's sole member is also a North Carolina limited liability company, whose sole member is also a North Carolina limited liability company. The two individual members of the latter North Carolina limited liability company are Mr. Markus Wilhelm and Ms. Cathy Wilhelm, who are residents and citizens of the State of North Carolina.

2.      Fall Line is a Georgia limited liability company with its principal office in Butler, Georgia. Upon information and belief, Fall Line's sole member is Ryan Pounds, a citizen of the State of Georgia.

2

3.      Arch is a corporation incorporated in the State of Missouri with its principal office in Jersey City, New Jersey. Arch is a commercial surety company that issues surety bonds on construction projects.  Arch is registered to conduct business in Virginia.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a), because there is diversity between the parties and the amount in controversy exceeds $75,000.

5.      Venue is proper in this judicial district under 28 U.S.C. § 1391, in that a substantial part of the events giving rise to the claims at issue in this case took place in this judicial district.

## FACTS RELEVANT TO ALL COUNTS

6.      Strata serves as engineering, procurement, and construction ("EPC") contractor to Virginia Electric and Power Company ("Owner") pursuant to an EPC agreement dated December 20, 2019 ("Prime Contract") for the Rochambeau Solar Project in Williamsburg, Virginia ("Project"). The Project involves development and construction of a new, approximately 28 megawatt (direct current) solar photovoltaic power plant.

7.      Strata, as Contractor, and Fall Line, as Subcontractor, entered into an EPC Subcontract Agreement dated November 4, 2020 ("Subcontract") in which Fall Line agreed to perform, among other things, the civil scope of work on the Project for an original lump sum price of $2,800,000.00 ("Subcontract Price"). The Subcontract Price increased to $2,915,917.33 pursuant to bilateral Subcontract Change Order no. 1 dated April 14, 2021, which compensated Fall Line for additional costs resulting from permitting delays at the beginning of the Project.

8.      In connection with the Subcontract, Strata required Fall Line to obtain a performance bond for the benefit of Strata, guaranteeing performance of the Subcontract. On December 9, 2020, Arch, as Surety, issued Subcontract Performance Bond no. SU 1162164

("Performance Bond") naming Fall Line, as Principal, and Strata, as Obligee, for the penal sum of

$2,000,000.00. The Subcontract is incorporated by reference in the Performance Bond. A true and

correct copy of the Performance Bond is attached hereto as <u>Exhibit A</u> and incorporated herein by

reference.

9.       Section 17.2.1 of the Subcontract sets forth certain occurrences that each constitute

a "Subcontractor Default:"

> Subcontractor shall be in default of its obligations pursuant to this
> Agreement upon the occurrence of any one or more of the following
> circumstances (each a "Subcontractor Default"): (a) Subcontractor breaches
> any material terms or conditions of the Contract Documents (subject to any
> applicable cure period expressly provided in this Agreement or by written
> agreement of the Parties); (b) Subcontractor fails to provide a Change Order
> Proposal as set forth in Section 7.3; (c) Subcontractor fails to timely provide
> a Recovery Plan as set forth in Section 6.5, or Subcontractor fails to perform
> the Work in accordance with a Recovery Plan as set forth in Section 6.5; (d)
> Subcontractor fails to achieve Substantial Completion within sixty (60)
> days after the Guaranteed Substantial Completion Date, or Subcontractor
> fails to achieve Final Completion within sixty (60) days after the
> Guaranteed Final Completion Date; (e) Subcontractor fails to pay, or admits
> in writing its inability to pay, its debts as they become due, or shall
> voluntarily file any petition under any bankruptcy or similar law seeking
> dissolution, liquidation or reorganization or the appointment of a receiver,
> trustee, custodian, or liquidator for itself or a substantial portion of its assets
> or business, or is adjudicated bankrupt, or makes a general assignment for
> the benefit of creditors; or (f) involuntary proceedings or any involuntary
> petition is commenced or filed against Subcontractor under any bankruptcy
> or similar law seeking the dissolution, liquidation, or reorganization of
> Subcontractor, or any writ, judgment, warrant of attachment, execution, or
> similar process is issued or levied against a substantial part of the assets, or
> business of Subcontractor.

10.      Section 17.2.2 of the Subcontract also provides that:

> Upon the occurrence of a Subcontractor Default, Contractor shall have any
> or all of the following rights and remedies: Contractor may (a) suspend
> Subcontractor's performance, in whole or in part, under this Agreement by
> delivery of a written notice of suspension to Subcontractor; (b) supplement
> Subcontractor's workforce or hire a separate subcontractor to take over and
> perform any portion or all of the Work as Contractor deems necessary to
> cure the Subcontractor Default; (c) terminate Subcontractor's performance,

4

in whole or in part, under this Agreement by a written notice of termination for default to Subcontractor; (d) seek equitable relief, including injunctive relief, to cause Subcontractor to take action, or refrain from taking action, or to make restitution of amounts improperly retained or received under this Agreement; (e) seek all other remedies at law or in equity, including proceeding against any security given by or for the benefit of Subcontractor for its performance of the Work; and (f) withhold any payments due and owing to Subcontractor until the Subcontractor Default is cured, or as necessary to assure payment for completion of Subcontractor's Work by others. If it is finally determined that no Subcontractor Default existed after Contractor terminated or suspended Subcontractors performance under this Agreement based on such alleged Subcontractor Default, such termination or suspension will be deemed to be a termination for convenience pursuant to Section 17.1 of this Agreement and Subcontractor's sole and exclusive remedy, whether in tort, contract or otherwise shall be strictly limited to those afforded by the termination for convenience pursuant to Section 17.1 of this Agreement.

11. Section 17.4 of the Subcontract provides that:

In the event (a) Subcontractor is performing Work contrary to the requirements of the Agreement; (b) Subcontractor is performing Work that if continued, could cause damage, preclude necessary inspection, or render remedial action ineffective for any portion of the Project; **(d) there exists an actual or potential safety issue that is an imminent threat to Person(s) or property**; (e) there exists a violation of applicable Laws or Government Approvals, or such violation is likely to result from continued performance; or (f) there exists interference with the existing operation of the Facility, **Contractor may order Subcontractor to suspend all or any portion of Subcontractor's performance of the Work**. In the event of a suspension pursuant to this Section 17.4, Subcontractor shall not be entitled to a Change Order.

(emphasis added).

12. Section 27.5 of the Subcontract provides that:

The prevailing Party in any dispute arising pursuant to this Agreement shall be entitled to award of its reasonable attorneys' fees and other expenses incurred in asserting or defending the dispute.

13. All conditions precedent to bring this action, if any, have been satisfied or have been waived or otherwise excused.

5

## COUNT I
### (Breach of Contract Against Fall Line)

14.     Strata incorporates all allegations in the foregoing Paragraphs by reference as if fully stated herein.

15.     Section 3.2 of the Subcontract states:

> Performance of Work. Subcontractor shall diligently, duly and properly perform and complete the Work and its other obligations under this Agreement consistent with and ensure that all Work shall conform to all Prudent Industry Practices, all applicable Law, all requirements of this Agreement (including all Exhibits) and the approved Contract Documents. Subcontractor shall be responsible, at its own cost, for any re-Work and for all construction means, methods, techniques, sequences, procedures, safety and quality assurance, and quality control programs in connection with the performance of the Work. In the event Contractor identifies any defective or nonconforming Work, Subcontractor shall, at its sole cost and expense (as appropriate and subject to Contractor's approval), reperform, repair, or replace the defective or nonconforming Work at Subcontractor's cost. Subcontractor shall also repair or replace any property, work, or portion of the Project damaged by the defective or nonconforming Work, at Subcontractor's cost.

16.     Section 6.1 of the Subcontract includes the following language:

> Subcontractor shall diligently and continuously complete the Work in cooperation and coordination with the other work being performed on the Project so as not to delay the commencement, progress, or completion of the Work or of the Project. Subcontractor agrees that the Work will be performed as required by Contractor, promptly and efficiently, and without delaying other aspects of the Work or the Project; and if necessary, certain parts of the Work shall be completed in preference to others. Subcontractor shall provide requested input into, will be bound by, and shall perform its work in compliance with the Project Schedule, as such schedule may be subsequently modified.

17.     Section 6.2 of the Subcontract provides in part that "Time is of the essence with respect to performance of the Work."

## **Fall Line's Failure to Procure Appropriate Materials**

18.     Pursuant to Section 3.1 of the Subcontract, Fall Line explicitly agreed to provide the services and materials described in Exhibit A to the Subcontract. Section 1(a) of Exhibit A to the Subcontract required Fall Line to provide all labor, equipment and materials necessary and as required to provide the complete civil works for the Project in accordance with the Contract Documents.

19.     Pursuant to Section 3.2 of the Subcontract, Fall Line was required to properly perform and complete the work and its other obligations under the Subcontract and ensure that all work conformed to the Contract Documents. Furthermore, Fall Line agreed to be responsible, at its own cost, for any re-work in connection with the performance of the work and to reperform, repair, or replace any defective or nonconforming work at its cost.

20.     The Subcontract also required Fall Line to construct, in accordance with the Project's land disturbance permit and "Erosion and Control Sediment Plan," sediment control basins throughout the Project site.

21.     The Subcontract's drawings and specifications (specifically, the documents listed as C9.03 and C9.04 in Exhibit A-1 to the Subcontract) also required Fall Line to procure 48" x 48" and 60" x 60" square concrete risers to control basin water levels.

22.     Section 3.11 of the Subcontract requires Fall Line to obtain Strata's prior written approval "[p]rior to placing orders for the Subcontractor-Supplied Materials and Equipment..." listed in Exhibit A-3 of the Subcontract.

23.     The 48" x 48" and 60" x 60" square concrete risers were "Subcontractor-Supplied Materials and Equipment" pursuant to the Subcontract.

7

24.     Exhibit A-3 to the Subcontract lists specified materials "required to be Submitted to CONTRACTOR for Approval prior to being ordered or installed by SUBCONTRACTOR," such specified materials including "Permanent Concrete Structures."

25.     The 48" x 48" and 60" x 60" square concrete risers were also Permanent Concrete Structures listed in Exhibit A-3 to the Subcontract.

26.     The Subcontract provides, in Exhibit G-2, a submittal process for Fall Line to obtain Strata's prior written approval of Subcontractor-Supplied Materials and Equipment.

27.     Exhibit G-2 of the Subcontract also provides a process for Fall Line to submit requests for information (RFIs) in the event Fall Line needed any clarification of procurement or construction requirements.

28.     Fall Line failed to follow the submittal and/or RFI process and failed to obtain Strata's prior written approval for procurement of the 48" x 48" and 60" x 60" square concrete risers pursuant to Sections 3.11 and Exhibit A-3 of the Subcontract and, accordingly, failed to follow the submittal process set forth in Exhibit G-2 of the Subcontract. Fall Line also did not follow the RFI submittal process set forth in Exhibit G-2 of the Subcontract and it did not submit any RFIs relating to the 48" x 48" and 60" x 60" square concrete risers.

29.     Without Strata's prior written approval, Fall Line procured and installed circular concrete risers (instead of the specified square concrete risers) for the Project.

30.     As a result of Fall Line's failure to install the square risers as required by the Subcontract, on June 21, 2021, James City County, Virginia (the "County"), as the authority having jurisdiction over the Project, directed Fall Line to stop work of additional installation of non-compliant circular risers on the Project pending completion of calculations for a redesign to accommodate the circular risers.

31.     The required redesign to accommodate Fall Line's circular risers delayed Fall Line's performance of work and therefore delayed the Project. The delays and costs arising out of the redesign to accommodate the circular risers were Fall Line's responsibility under the Subcontract.

32.     The Subcontract's drawings and specifications (specifically, the document listed as C9.03 in Exhibit A-1 to the Subcontract) required the use of Flexamat, a vegetated form of concrete that is necessary for erosion control.

33.     Flexamat was a Subcontractor-Supplied Material pursuant to the Subcontract which required Strata's prior written approval to order pursuant to Section 3.11 of the Subcontract.

34.     As an "Erosion Control Material" pursuant to Exhibit A-3 of the Subcontract, Flexamat was a specified material for which Fall Line was required to obtain Strata's prior written approval by submittal.

35.     Again, without obtaining Strata's prior written approval in violation of the Subcontract, Fall Line procured and installed rip-rap instead of Flexamat.

36.     Strata and Fall Line entered into a valid and enforceable Subcontract in which Fall Line agreed to obtain prior written approval from Strata before substituting materials specified in the Subcontract.

37.     Fall Line's procurement and installation of circular concrete risers instead of square concrete risers and rip-rap instead of Flexamat constituted material breaches of the Subcontract, resulting in increased costs, delays, permit violations, and additional scrutiny from the County of Fall Line's performance of work on the Project.

**Fall Line's Failure to Staff the Project and
Failure Perform Work in Accordance with the Subcontract**

38.    Section 6.2 of the Subcontract provides that time is of the essence with respect to Fall Line's performance of the work.

39.    Section 6.3 of the Subcontract requires Fall Line to provide a Subcontract Schedule, and to regularly update the Subcontract Schedule.

40.    Fall Line failed to provide a Subcontract Schedule in accordance with the Subcontract, and also therefore failed to regularly update the Subcontract Schedule.

41.    Section 6.4 of the Subcontract requires Fall Line to provide daily, weekly, and monthly reports, with updates reflecting Fall Line's actual progress of the work and plan for performance of the work.

42.    Fall Line failed to provide the reports required by Section 6.4 of the Subcontract, and failed to provide Strata with updates reflecting its actual progress of the work or plan for performance of the work.

43.    The Subcontract requires Fall Line to perform the work in accordance with applicable "Laws and "Government Approvals," including all permits for the Project.

44.    The Subcontract requires Fall Line to perform its work in compliance with the Project's stormwater protection and pollution prevention plan ("SWPPP"), which includes responsibility for erosion and sediment control on the Project.

45.    Fall Line's scope of work pursuant to the Subcontract included all "labor, equipment and materials necessary and as required to provide the complete civil works for the Project." Subcontract, Exhibit A, Section 1(a). It expressly included the following:

> a.   all temporary and permanent site entrances and turnarounds. Subcontract, Exhibit A, Section 1(a)(ix).

10

b. Provide all certified documentation and reports pertaining to the installation of each basin as well as upland disturbance to support James City County As-Built Approval and Certification process. Inspections, documentation and reports shall be in accordance with the following: Detention Basin Interim As-Built Assessment Checklist, James City County Stormwater Conveyance and Stormwater Management / BMP Facilities Record Drawing and Construction Certification Forms (Storm Systems), James City County Stormwater Conveyance and Stormwater Management / BMP Facilities Record Drawing and Construction Certification Forms (Temporary Basins) and Sequence of Events – Rochambeau Basins. Subcontract, Exhibit A, Section 1(a)(xxii).

c. SUBCONTRACTOR shall be responsible for installation and maintenance of all Project site access points/entrances, site roads, turnouts, laydown yards and turnarounds for the duration of the Project meeting all specifications of the Contract Documents, ensuring they are passable in wet or dry conditions, without assistance, for all Project equipment and vehicles including but not limited to all concrete trucks and material delivery vehicles, and for CONTRACTOR's other subcontractors for deliveries and installation throughout the duration of the Work. Subcontract, Exhibit A, Section 1(h).

d. SUBCONTRACTOR shall furnish, install, implement, repair, maintain and ultimately remove where necessary the appropriate measures to prevent erosion and control sediment for the Project as shown in the Contract Documents. Best management practice for controls are included in the SWPPP. SUBCONTRACTOR shall be responsible for supplying, installing and enforcing these measures, as well as executing all requirements of the SWPPP, the National Pollutant Discharge Elimination System ("NPDES"), VDEQ Standards, VDEQ ES&C Manual, and the Contract Documents. All construction, maintenance, monitoring and reporting required by the SWPPP and as identified in the Contract Documents for the duration of the construction of the Project, including achieving completion and approval of all requirements from the notice-of-intent to the notice-of-termination, shall be the responsibility of SUBCONTRACTOR. SUBCONTRACTOR shall repair all maintenance and corrective action items within (5) calendar days of the items being noted on the SWPPP inspection report or the Owner ECC audit report. SUBCONTACTOR shall alert CONTRACTOR of any items identified on the SWPPP inspection report or the Owner ECC audit report that are at risk of taking more than five (5) calendar days to repair. Subcontract, Exhibit A, Section 5(b).

e. SUBCONTRACTOR will own 100% of the SWPPP maintenance scope until Final Completion. Subcontract, Exhibit A, Section 5(c).

11

f.   SUBCONTRACTOR shall abide by all applicable permits for site entrances and local, county and state road improvements required to access the Project site. SUBCONTRACTOR shall provide all materials for and install all site entrances as shown in the Contract Documents to include, but is not limited to, all culverts (as required), materials surfacing, compaction, and grading, all of which shall be constructed at locations and per the specifications of the Contract Documents and all applicable laws, codes, standards and regulations. Subcontract, Exhibit A, Section 10(a) and (b).

g.   Maintenance: SUBCONTRACTOR shall be responsible for maintaining all site roads, Laydown/Parking Area(s), SWPPP measures, graded areas, sediment basins, permanent ponds, sediment traps, drainage ditches, areas within the solar array and all other civil works and infrastructure of the Project, including repair, sediment removal, resurfacing and re-grading as necessary to provide for safe passage in wet or dry conditions, without assistance, for all Project vehicles, personnel and equipment including, but not limited to, all concrete trucks and material delivery vehicles for the full duration of the construction of the Project. Subcontract, Exhibit A, Section 15(d).

h.   Completion of all civil scope Work to close the Land disturbance and Stormwater permits with AHJ and VADEQ. Scope includes, but is not limited to, removal of temporary controls, 100% sign off of functioning permanent controls and 100% stabilization of project site. Furthermore, completion of all civil scope Work necessary, per VADEQ permits, to obtain Notice of Termination from the VADEQ. Subcontract, Exhibit A, Section 28.

i.   SUBCONTRACTOR shall cause it employees and subcontractors for the Work to be present for such safety training, meetings and other Project related safety gatherings as may be required by the CONTRACTOR or Owner. This shall include before and during construction monthly site safety meetings as may be required by Owner or CONTRACTOR. Subcontract, Exhibit A, Section 23(b).

46.   Fall Line failed to construct the Project site entrance in accordance with Subcontract requirements (as provided above in Paragraph 45(a), (c), (f), and (g)), resulting in standing water and drainage issues.

47.   As a result of Fall Line's failure, Strata was forced to remediate the Project site entrance to ensure proper drainage and comply with Subcontract requirements.

12

48.     Fall Line also failed to timely provide as-built documentation and reports required to support County approvals in accordance with Subcontract requirements (as provided above in Paragraph 45(b)).

49.     Fall Line's failure to timely provide as-built documentation caused delays to Fall Line's performance of work.

50.     Fall Line failed to adequately staff the Project to comply with applicable Laws, Government Approvals, and the SWPPP, such that multiple sediment releases occurred on the Project due to Fall Line's failure to properly maintain disturbed areas.

51.     Fall Line's failure to adequately staff the Project caused significant delays in Fall Line's performance of work.

52.     Section 6.5 of the Subcontract requires Fall Line to provide to Strata a detailed, resource-loaded Recovery Plan within two (2) days of Fall Line's failure to make sufficient progress in performance of its work.

53.     Fall Line failed to make sufficient progress in performance of its work, and Strata on multiple occasions demanded Fall Line provide a Recovery Plan.

54.     For the duration of its performance on the Project site, Fall Line failed to provide a Recovery Plan in accordance with the Subcontract.

55.     Fall Line failed to provide SWPPP maintenance, including erosion and sediment control, through Strata's achievement of Final Completion of the Project and in accordance with Subcontract requirements (as provided above in Paragraph 45(e), (f), (g), and (h)).

56.     Strata and Fall Line entered into a valid and enforceable Subcontract in which Fall Line agreed to comply with all Project specifications and to provide adequate manpower for timely

performance of its work in accordance with applicable Laws, Government Approvals, and the SWPPP.

57.     Fall Line's failures to comply with all Project specifications and to provide adequate manpower for timely performance of its work in accordance with applicable Laws, Government Approvals, and the SWPPP constitute material breaches of the Subcontract.

**Fall Line's Incomplete Invoices and Failure to Pay Subcontractors, Suppliers and Vendors**

58.     Section 5.1.2 of the Subcontract specifies requirements for Fall Line to submit invoices to Strata for performance of its work ("Subcontractor Invoices"), including the following requirements:

> Each Subcontractor Invoice must include supporting documentation, satisfactory to Contractor, showing that the invoiced amount is properly due. In addition, each Subcontractor Invoice MUST include corresponding Lien Waivers from Subcontractor, all sub-subcontractors, and all suppliers. **A Subcontractor Invoice that is incomplete or inaccurate or lacks sufficient supporting documentation required by this Agreement shall not, to the extent of such deficiency, constitute a valid request for payment.** Contractor may reject any incomplete or unsupported Subcontractor Invoice. Subcontractor shall pay for: labor, materials, and equipment used in connection with the performance of this Agreement through the completed Milestone covered by previous payments received from the Contractor, and shall furnish satisfactory evidence in each Subcontractor Invoice to verify compliance with the above requirements.

(emphasis in original).

59.     Fall Line's Subcontractor Invoices contain a "Subcontractor Payment Certification" signed by Fall Line, stating that:

> The undersigned Subcontractor certifies that to the best of the Subcontractor's knowledge, information, and belief the work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Subcontractor for work for which previous Subcontractor Invoices were issued and payments received from the Contractor, and that current payment shown herein is now due. The undersigned Subcontractor also certifies that it has

paid all downstream parties in accordance with Section 5.4 of the Agreement.

60.     Section 5.4 of the Subcontract requires Fall Line to "pay, and shall ensure its sub-subcontractors pay, all subcontractors, suppliers, vendors, and third parties of all tiers for labor, services, materials, equipment, and/or supplies provided in performance of the Work, or related to the Project."

61.     Section 5.4.1 of the Subcontract permits Strata to issue a joint check to any unpaid sub-subcontractors, suppliers, or vendors of Fall Line and to "withhold from Subcontractor an administrative fee of fifteen percent (15%) of the amount of the joint check."

62.     Section 5.4.2 of the Subcontract requires Fall Line to keep the Project and Project site free and clear of all liens or other claims asserted against Strata or the Owner arising out of Fall Line's performance of work.  That section requires Fall Line to,  "within five (5) Days of becoming aware of the Lien, pay, satisfy, release and/or discharge the Lien."  In addition, Section 15.1.1 of the Subcontract requires Fall Line to defend, indemnify, and hold harmless Strata and the Owner against "any Liability arising out of or resulting from claims for payment or compensation for the work performed, including but not limited to Liens."

63.     Section 5.1.5 of the Subcontract permits Strata to withhold from any payment due to Fall Line for certain reasons and states in relevant part:

> Contractor may withhold from any Progress Payment otherwise due to Subcontractor, any amount reasonably necessary in Contractor's opinion to protect it from loss due to Subcontractor's failure to fully comply with any requirement of this Agreement, including but not limited to: (a) defective Work not remedied; (b) third party claims filed or reasonable evidence indicating probable filing of such claims, including but not limited to Liens; (c) failure of Subcontractor to make proper and timely payments for labor, materials, or equipment; (d) an administrative fee of fifteen percent (15%) of the amount of any joint check issued pursuant to Section 5.4.1; (e) reasonable evidence that Work cannot be completed for the unpaid balance of the Subcontract Price; (f) reasonable evidence that the Work will not be

completed within according to the schedule; or (g) failure to carry out Work in accordance with the Agreement.

64.     Contrary to the Subcontract's requirements, Fall Line failed to submit complete Subcontractor Invoices, and in particular, failed to submit the required lien waivers from its subcontractors and suppliers.

65.     Strata repeatedly requested Fall Line provide lien waivers from its subcontractors and suppliers, and Fall Line failed to do so.

66.     As detailed in the foregoing Paragraphs, Fall Line failed to perform its obligations in accordance with the Subcontract.

67.     Over the course of Fall Line's performance of the work, many subcontractors, suppliers, and vendors to Fall Line notified Strata of Fall Line's nonpayment, including Fortiline, Cardinal Transport, Inc., Project Freight, LLC, Lovin Contracting Company, Inc., TEC: The Erosion Company, Ballentine, Engineering Consulting Services, Environmental Construction Solutions, and Ram Tool.

68.     At all appropriate times, Strata provided notice to Fall Line of these claims of nonpayment, and demanded Fall Line pay its subcontractors, suppliers, and vendors in accordance with the terms of the Subcontract.

69.     In a letter dated July 28, 2021 Strata notified Fall Line and Arch of a Subcontractor Default pursuant to the Subcontract due to Fall Line's failure to make payments to its vendors and subcontractors, stating that:

> Strata has repeatedly requested Fall Line provide invoices that comply with the terms of the Agreement, and Fall Line has repeatedly failed to do so or respond to these requests by Strata. Specifically, Fall Line has not provided lien waivers for its sub-subcontractors, or the information requested in our July 20, 2021 letter. We again request Fall Line immediately provide:

1. A full list of all sub-subcontractors providing labor, materials, or equipment to the Site;

2. Confirmation of payment status to sub-subcontractors; and

3. All Lien Waivers from sub-subcontractors for pending invoices.

As you are aware, several of Fall Line's sub-subcontractors have informed Strata that they remain unpaid by Fall Line for work performed relating to the Rochambeau Project. Under the terms of the Agreement, Fall Line is obligated to pay for all labor, materials, and equipment furnished in the performance of the Work for the Rochambeau Project and is obligated to keep the Project free and clear of all Liens. Despite notice and demand by Strata, Fall Line has failed to pay its sub-subcontractors for labor, materials or equipment furnished on the Project.

Due to this nonpayment, Fall Line's sub-subcontractors have now informed Strata that mechanic's lien filings are imminent. The purpose of this letter is to formally notify Fall Line of a Subcontractor Default pursuant to Section 17.2.1 of the Agreement. Once again, we urgently request Fall Line move forward to make sure these sub-subcontractors are paid.

A true and accurate copy of the July 28, 2021 letter is attached hereto as <u>Exhibit B</u> and incorporated herein by reference.

70.     Fall Line failed to provide the information Strata requested in its July 28, 2021 letter. The Subcontract required Fall Line to provide the information Strata requested in the July 28, 2021 letter.

71.     Sections 5.4 and 19 of the Subcontract allow Strata to directly pay any unpaid subcontractor of Fall Line asserting a claim against Strata or the Project, including mechanic's liens, which Fall Line fails to pay, satisfy, release or discharge within five (5) days, and to offset or backcharge Fall Line for the costs thereof, plus an administrative fee of fifteen percent (15%).

72.     On or about August 10, 2021, following Fall Line's confirmation that its subcontractor Fortiline remained unpaid, and in accordance with Subcontract Section 5.4.2, Strata issued payment directly to Fortiline in the amount of $202,201.07.

73.      On or about October 14, 2021, Fall Line's subcontractor Landscape Supply, Inc. filed a mechanic's lien against the Project in the amount of $27,105.12.

74.     On or about October 8, 2021, Fall Line's subcontractor Ram Tool filed a mechanic's lien against the Project in the amount of $15,388.24.

75.     Strata provided Fall Line and Arch with notice of these claims and Fall Line failed to pay, satisfy, release or discharge the claims asserted by Landscape Supply, Inc. and Ram Tool within five (5) days as required by the Subcontract.

76.     Strata and Fall Line entered into a valid and enforceable Subcontract in which Fall Line agreed to timely pay its lower-tier subcontractors, and timely submit complete payment applications to Strata that included lien waivers and releases demonstrating that Fall Line had paid its subcontractors, suppliers, and vendors.

77.     Fall Line's failures to submit complete payment applications and to pay its subcontractors, suppliers, and vendors constitute material breaches of the Subcontract.

78.     For the reasons detailed in the foregoing Paragraphs, Fall Line's representations in each signed "Subcontractor Payment Certification" of its Subcontractor Invoices were false.

79.     Fall Line's misrepresentations in the "Subcontractor Payment Certifications" constitute material breaches of the Subcontract.

**Fall Line's Failure to Perform Work Safely**

80. Section 11.1 of the Subcontract provides in part:

> Subcontractor shall be responsible for initiating, maintaining and supervising all safety precautions and programs in connection with its performance of this Agreement, including appropriate precautions and programs for areas in, or in the vicinity of, the Project. Without limiting the generality of the foregoing, Subcontractor shall comply with all applicable Laws, and Subcontractor shall be solely responsible for the safety of, and prevention of accident or injury on or about the Project and related to its Work. Subcontractor agrees that it and its subcontractors, suppliers, employees, agents and guests of any of them will at all times comply with all Contractor's safety and security regulations/standards in effect from time to time on the Project, including, but not limited to, the Subcontractors Quality Assurance Program (Exhibit D), and the Safety Plan (Exhibit E, including for the avoidance of doubt Exhibit E-1 and Exhibit E-2). Subcontractor shall bear sole responsibility for the safety of its Work on the Project, its sub-subcontractors, suppliers, employees, agents and guests of any of them.

81. Exhibit E-1 of the Subcontract contains Contractor's Safety Plan, which includes "deviating from procedures or agreed practices to for any reason," "supervision that fails to implement and enforce any of the items in this list," "working or walking under suspended load," and "insubordination or unprofessional behavior towards Owner representatives" as serious violations/infractions.

82. Exhibit E-2 of the Subcontract contains Owner's Safety and Environmental Requirements, which lists "working or walking under suspended load" and "insubordination or unprofessional behavior towards Owner representatives" as serious violations/infractions.

83. Exhibits E-1 and E-2 each provide that the "consequence for the first offense of a Serious violation/infraction is removal from the Site and access denial to all Owner Premises for 5-years."

84.    On August 3, 2021, the Owner issued a stop work order to Strata after its site representative observed a Fall Line load operator lifting pipe down on Basin #12 on the site, with a Fall Line employee standing underneath a trackhoe while trying to install the pipe.

85.    At an August 3, 2021 meeting immediately following the safety incident, Fall Line employees agreed that the Fall Line employee was, and should not have been, underneath the suspended load.

86.    As a result of the safety incident, the Owner demanded that the Fall Line load operator be removed from the Project. Despite the Owner's direction to remove the load operator, Fall Line refused and failed to remove the load operator from the Project.

87.    The Owner requested Fall Line produce a Job Safety Analysis for the work pursuant to Strata's Safety Plan and the Owner's Safety and Environmental Requirements incorporated into the Subcontract and Fall Line did not have one.

88.    The Owner and Strata proceeded with the customary site safety investigation following the incident, in accordance with Exhibits E-1 and E-2 of the Subcontract.

89.    Fall Line refused to participate in the investigation in violation of Subcontract requirements (as provided above in Paragraph 45(i) and Exhibits E-1 and E-2 of the Subcontract).

90.    Fall Line's refusal to participate in the investigation constitutes a material breach of the Subcontract.

91.    Strata and Fall Line entered into a valid and enforceable Subcontract in which Fall Line agreed to comply with the Safety Plan.

92.    Fall Line's failures to comply with Subcontract obligations (including the Safety Plan) and applicable Laws to ensure safe performance of the work constitute material breaches of the Subcontract.

### Fall Line's Abandonment of the Project and Removal from the Project Site

93.     Following the August 3, 2021 serious safety violation/infraction, instead of participating in the ensuing investigation, Fall Line's superintendent directed Fall Line's crews to depart the site.

94.     Fall Line abandoned performance of the work and failed to return to the Project site after August 3, 2021.

95.     Following Fall Line's abandonment, on August 5, 2021, Strata notified Fall Line and Arch of another Subcontractor Default based on Fall Line's material breaches as outlined in in the foregoing Paragraphs, suspending Fall Line for cause. A true and correct copy of the August 5, 2021 letter is attached hereto as Exhibit C and incorporated herein by reference.

96.     Section 3.1 of the Subcontract provides that "Subcontractor shall be bound to Contractor to the same extent Contractor is bound to Owner by the terms of the Prime Contract, as those terms may apply to the portion of the Work to be performed by Subcontractor."

97.     Section 5.4 of the Prime Contract provides that "Owner may request and Contractor shall (i) remove any Contractor Personnel from the Work," where "Personnel" includes Strata's subcontractors.

98.     In a letter dated August 5, 2021, the Owner issued a directive to Strata to remove Fall Line from the Project site due to Fall Line's failure to comply with safety directives and permits.

99.     Strata and Fall Line entered into a valid and enforceable Subcontract in which Fall Line agreed to perform the work in accordance with the requirements of the Subcontract, including being bound by the terms of the Prime Contract.

100.   Fall Line's abandonment of the Project constitutes a material breach of the Subcontract.

101.   For the reasons set forth in the above Paragraphs, Fall Line materially breached the Subcontract.

102.   As a result of Fall Line's material breaches of the Subcontract, Strata was forced to remediate, supplement and complete performance of Fall Line's scope of work on the Project with other subcontractors, at significantly increased cost in excess of the balance of funds remaining on the Subcontract.

103.   To date, Strata has incurred damages in excess of $6,000,000.00 due to Fall Line's material breaches of the Subcontract.

WHEREFORE, Strata requests this Court to enter judgment in its favor and against Fall Line in excess of $6,000,000.00, in an amount to be proven at trial, for all damages, costs, and expenses, plus interest and attorneys' fees, incurred by as a result of Fall Line's material breaches of the Subcontract, and for such further and different relief as the Court deems just and proper.

## COUNT II
**(Breach of Performance Bond Against Arch)**

104.     Strata incorporates all allegations in the foregoing Paragraphs by reference as if fully stated herein.

105.     Paragraph 1 of the Performance Bond states:

**SCOPE OF BOND.** The Principal and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Obligee for the performance of the Subcontract, which is incorporated in this bond by reference. In no event shall the Surety's total obligation exceed the penal amount of this bond.

106.     Paragraph 4 of the Performance Bond states:

**PRINCIPAL DEFAULT.** Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:

**4.1     COMPLETE SUBCONTRACT.** Complete the Subcontract in accordance with its terms and conditions; or

**4.2     OBTAIN NEW CONTRACTORS.** Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and upon determination by the Surety of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, upon determination by the Obligee and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee. The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price. The cost of completion includes responsibilities of the Principal for correction of defective work and completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

**4.3     PAY OBLIGEE.** Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

**4.4     DENY LIABILITY.** Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.

23

107.     For the reasons set forth in the above Paragraphs, Fall Line materially breached the Subcontract, resulting in multiple Subcontractor Defaults under its terms.

108.     On August 6, 2021, Strata provided additional notice to Arch of Fall Line's Subcontractor Defaults, demanding Arch respond in accordance with its obligations under the Performance Bond.

109.     Strata continued communication with Arch regarding Fall Line's Subcontractor Defaults, including providing all requested documentation to Arch.

110.     Strata repeatedly requested that Arch promptly take action to fulfill its obligations under the Performance Bond and provide support for completion of Fall Line's Work.

111.     Strata notified Arch of its plan to proceed to complete performance of Fall Line's work and continued to update Arch regarding necessary actions to complete Fall Line's work, including detailing to Arch Strata's efforts to solicit competitive bids and providing estimated costs received from potential replacement subcontractor(s).

112.     In response to these notices, and in breach of its obligations pursuant to the Performance Bond, Arch failed to promptly remedy Fall Line's Subcontractor Defaults, complete the Subcontract, obtain new contractors, pay Strata, or deny liability with an adequate explanation.

113.     As a result of Arch's failure to comply with the Performance Bond, Strata had no choice but to engage other subcontractors to complete Fall Line's remaining work, at its own cost.

114.     To date, Arch has failed to honor its obligations under the Performance Bond.

115.     As a result of Fall Line's Subcontractor Defaults and Arch's failure to comply with its obligations pursuant to the Performance Bond, Strata has incurred damages in excess of $6,000,000.00, and will continue to incur damages, including mitigation, completion, correction, administrative, overhead, and other costs, plus interest and attorneys' fees.

116.    Fall Line and Arch are jointly and severally liable under the Performance Bond to Strata for the damages incurred.

117.    Strata has performed all the terms and conditions required of it under the Subcontract and Performance Bond and/or is otherwise excused from its performance obligations because of Fall Line's breaches of its obligations to Strata and/or Arch's breaches of its obligations to Strata.

118.    Arch's failure to perform its obligations under Paragraph 4 of the Performance Bond to promptly remedy Fall Line's Subcontractor Defaults, complete the Subcontract work or obtain bids for the completion of that work constitutes a material breach of the Performance Bond.

119.    Arch's failure to reimburse Strata for the costs resulting from Strata's completing Fall Line's work is a material breach of Arch's obligation under the Performance Bond to guarantee performance of the Subcontract.

120.    Arch's failure and refusal to perform its obligations under the Performance Bond constitutes a breach of its duty of good faith and fair dealing.

121.    As a result of Arch's material breach of the Performance Bond, Strata has suffered, and will suffer, damages.

122.    Strata is entitled to an award of interest, costs, and attorneys' fees against Arch.

WHEREFORE, Strata demands judgment in its favor and against Arch in excess of $6,000,000.00, in an amount to be proven at trial, for all damages, costs, and expenses, plus interest and attorneys' fees, incurred by Strata as a result of Arch's material breach of the Performance Bond, and for such further and different relief as the Court deems just and proper.

Date: October 11, 2022                    Respectfully submitted,


                                          /s/ Amy E. Garber
                                          Amy E. Garber (Va. Bar No. 83908)
                                          Lee-Ann Brown (Va. Bar No. 90019)
                                          Bradley Arant Boult Cummings LLP
                                          1615 L Street, NW Suite 1350
                                          Washington, DC 20036
                                          Tel: (202) 719-8237
                                          Fax: (202) 719-8337
                                          Email: agarber@bradley.com
                                                 labrown@bradley.com

                                          *Counsel for Plaintiff*
                                          *Strata Solar, LLC*