UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Norfolk Division

STRATA SOLAR, LLC,

      Plaintiff/Counterclaim
      Defendant,

v.                               Civil No. 4:22cv106

FALL LINE CONSTRUCTION, LLC,

      Defendant/Counterclaim
      Plaintiff,

and

ARCH INSURANCE COMPANY,

      Defendant.

## OPINION AND ORDER

This matter is before the Court on a Rule 12(c) motion for partial judgment on the pleadings, filed by Counterclaim Defendant Strata Solar, LLC ("Strata"). ECF No. 33. Counterclaim Plaintiff Fall Line Construction, LLC, ("Fall Line"), filed a brief in opposition, ECF No. 35, and Strata filed a reply, ECF No. 36. For the reasons set forth below, Strata's motion is **GRANTED in part** and **DENIED in part**.

### I. FACTUAL AND PROCEDURAL BACKGROUND

#### A. Factual Background

Fall Line is a "full-service site work contractor specializing in land clearing, excavation, erosion control, and underground utility construction." Countercl. ¶ 8, ECF No. 11.

Strata is a "contractor specializing in full-scale utility solar projects." Id. ¶ 9. Dominion Energy, Inc. ("Dominion") is the owner of the 28 MW solar power plant project at issue in this case ("the Project"), and Dominion hired Strata "to provide a 'turnkey'" solar power plant. Id. ¶¶ 10-13. In early November 2020, Strata entered into a subcontract with Fall Line for work on the Project, with "Fall Line's scope of work related to site work, including clearing, grading, and installation of retention ponds and certain roads." Id. ¶¶ 14-15. Pursuant to the "project schedule" as outlined in the subcontract, it was anticipated that Fall Line would begin work on October 26, 2020, and reach the milestone of "substantial completion" on April 5, 2021. Id. ¶ 17.

Notwithstanding the planned timing of performance, "Fall Line was not permitted to begin work until March 2021 because Strata was delayed due to issues that Strata caused for itself," to include permitting delays caused by Strata. Id. ¶¶ 18-19. After Fall Line began work, Strata purportedly "caused further costly delays" due to Strata's failure to timely submit paperwork to James City County officials (the "County"). Id. ¶¶ 20-21, 34-37. After the County discovered Strata's "2nd Design Violation" on the Project, the County suspended portions of the work, and Strata "tried to silence communications" between Fall Line and the County. Id. ¶¶ 37-38. As a result, Fall Line sent Strata a "notice of delay" in May of 2021, referencing the rework that was necessary

2

due to delays caused by Strata.  Id. ¶ 40.  Although Strata knew
that it was responsible for the costly delays, Strata "worked to
conceal its known failures from Fall Line so that it could attempt
to push all of the financial consequences" of the delays onto Fall
Line.  Id. ¶ 41.  As time progressed, Strata continued to "blame
Fall Line for the delays" and also improperly withheld money from
Fall Line that Strata "knew was due and owing," in a further
attempt to "extract undue commercial concessions from Fall Line
and to have Fall Line clean up Strata's mistakes at no charge to
Strata."  Id. ¶¶ 43-45.

In addition to the above, Fall Line contends that "throughout"
the course of the Project, Strata: (1) engaged in "highly abusive
conduct toward Fall Line employees"; and (2) "interfered with Fall
Line's progression of work."  Id. ¶¶ 50, 57.  The abusive conduct
purportedly included "repeatedly" abusing Fall Line's African
American project superintendent Rico Harris ("Mr. Harris"), with
a Strata employee calling Mr. Harris the n-word on "at least one
occasion."  Id. ¶¶ 51-52.  Fall Line further asserts that Mr.
Harris was continually "belittled" by Strata, though Fall Line
offers no context regarding whether such conduct was related to
Mr. Harris's race.[1]  Id. ¶ 54.  Fall Line separately alleges that

---

[1] Portions of Fall Line's accusations are worded very broadly and are not
supported by well-pled facts.  For example, Fall Line makes references to
Strata "repeatedly attempting to humiliate Fall Line employees" and the fact
that Strata "repeatedly interfered with Fall Line's work on a nearly daily
basis," Countercl. ¶¶ 57-58, but Fall Line offers no supporting facts:

Mr. Harris and his son, "the other African American Fall Line employee at the site," were singled out for non-random serial drug testing, with Mr. Harris's son being required to supply a witnessed urine sample and then being sent home "for several days under a [baseless] presumption of guilt." Id. ¶¶ 54-55. "Other Fall Line employees also complained of Strata's abusive conduct," id. ¶ 56, though Fall Line does not provide any well-pled facts indicating who these employees were, whether the complaining employees were minorities, and/or whether the employee "complaints" were predicated on the improper drug testing or other purported race-based conduct.

Beginning in late May or early June of 2021, Strata stopped paying Fall Line's invoices, and "started generating late excuses to withhold payment," with the "real motivation" for withholding payment being a "technique sometimes employed by contractors known as 'starve the subcontractor.'" Id. ¶¶ 60-63. The ultimate goal of this technique was to "put Fall Line in a financially weak position" in order to "extract as much free work from Fall Line" as possible, hoping that Fall Line would "either capitulate to unreasonable demands or simply go bankrupt and go away." Id. ¶ 63.

_____

(1) linking such allegations of constant abuse or humiliation to race; or (2) suggesting that the "daily" interference with Fall Line's work was motivated by racial animus or even that it was directed at Fall Line's minority employees as contrasted with being directed generally at Fall Line in its role as subcontractor.

4

As the Project continued, by July 29, 2021, Strata still had failed to secure County approval for "the vast majority of Fall Line's scope of work." Id. ¶¶ 65-66. Furthermore, Strata refused "to pay Fall Line for work in place with the intent of causing Fall Line harm and refused to engage in meaningful discussions about the mistreatment of Fall Line employees or paying Fall Line for all of the Strata-Caused Rework." Id. ¶ 67. Accordingly, on August 2, 2021, Fall Line sent Strata a letter "imploring Strata to engage in meaningful discussions about their inhumane treatment of Fall Line employees and the logical and orderly completion of work." Id. ¶ 68. A review of the letter reveals that Fall Line reported race-based harassment of Mr. Harris and his son (one-time use of the n-word "earlier" on the Project,[2] non-random serial drug testing occurring five days apart in mid-July of 2021) as well as amorphous allegations of "harassment" and "disrespect" of Mr. Harris as well as his crew, though the race of Mr. Harris's "crew" is not mentioned. ECF No. 11-6, at 1-2. The letter further indicates that Fall Line was being asked to stay on the Project indefinitely without pay, and was being forced to do little more than act as a "maintenance crew" as Strata's failure to secure

---

[2] Another exhibit to the counterclaim indicates that the n-word was used in December of 2020, more than 7 months before the contract was terminated. ECF No. 11-2. Such date is not, however, included in the counterclaim or the August 2, 2021 letter that is focused on in the briefs before the Court.

County approvals prevented Fall Line from performing the actual work required under the subcontract. Id. at 2.

After the letter was sent, Strata did not engage in "realistic discussions about the completion of the Project, and the horrendous working conditions," but instead "proceeded with its 'starve the subcontractor' scheme and kicked Fall Line off the Project." Countercl. ¶ 69. Specifically, Fall Line alleges that, the day after the letter was sent, Strata manufactured an alleged safety incident whereby a Fall Line employee was falsely accused of working underneath an excavator boom. Id. ¶¶ 69, 72-74. As a result of the false allegation, Strata initially sought to suspend one Fall Line employee from the job site for three days,[3] but instead, just three days after the letter was sent, Strata "declared a Subcontractor Default and improperly suspended Fall Line" for cause. Id. ¶¶ 74, 77-79. Strata thereafter created an "After-the-Fact Incident Report" that falsely accused Mr. Harris of being "combative" about the safety incident when Mr. Harris was actually "the victim" of a Strata employee's aggression. Id. ¶¶ 81-82. Fall Line asserts that the false characterization of an African American male as "a violent man" is a "manifestation of racist attitudes" and that the affirmance of this stereotype by

---

[3] There is no allegation in the counterclaim that the false safety incident implicated the safety practices of any minority employee, and the Fall Line employee blamed for the dangerous incident was not Mr. Harris or his son.

Strata's senior management "reveal Strata's racist intentions and motivations." Id. ¶ 83.[4]

### B. Procedural Background

In late 2022, Strata filed a breach of contract action in this Court. ECF No. 1. Based on the version of the facts recounted above, Fall Line thereafter filed a counterclaim asserting that Strata breached the subcontract in numerous ways, including through its persistent "abuse of Fall Line employees," its interference with Fall Line's sequencing of work, the delays caused by Strata, Strata's failure to pay Fall Line for work performed, and Strata's improper suspension of Fall Line following the manufactured safety incident. Countercl. ¶¶ 84-89. Among other claims, Fall Line's counterclaim advances a claim for breach of the subcontract (Count One), a claim for "racial discrimination" in violation of 42 U.S.C. § 1981 (Count Four), and a claim for "unlawful retaliation" in violation of 42 U.S.C. § 1981 (Count Five). Strata's pending Rule 12(c) motion seeks dismissal of Counts Four and Five, asserting that: (1) Fall Line, as a business entity without an imputed racial identity, lacks standing to bring

---

[4] A portion of the counterclaim consists of an excerpt from an affidavit of a Strata "Construction Manager" who worked on the Project, and it indicates that, following the safety incident, Strata told Mr. Harris not to return to the job site. Countercl. ¶ 80. Though uncited and not relied on by the Court, an earlier portion of the same affidavit, which is attached to the counterclaim, suggests that Mr. Harris and his team left the Project site in protest after Strata suspended the Fall Line employee blamed for the safety incident. ECF No. 11-2, at 13 ¶ 25.

a § 1981 discrimination claim; (2) that Fall Line fails to allege that it was retaliated against as a result of "protected activity"; and (3) that Counts Four and Five fail to allege that race or protected activity was a "but for" cause of the alleged adverse action. ECF No. 34, at 2.

## II. STANDARD OF REVIEW

Similar to motions to dismiss for failure to state a claim filed under Federal Rule of Civil Procedure 12(b)(6), motions for judgment on the pleadings filed pursuant to Rule 12(c) seek to challenge the legal viability of a cause of action as stated in a complaint or counterclaim.[5] A motion for "judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c)" is analyzed under the same familiar standard applicable to Rule 12(b)(6) motions. Butler v. United States, 702 F.3d 749, 751-52 (4th Cir. 2012). The Rule 12(b)(6) standard permits dismissal of a claim when the complaint does not allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Though a complaint need not be detailed, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." Id. at 555; see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

---

[5] Rule 12(c) provides: "After the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Fed. R. Civ. P. 12(c).

A Rule 12(b)(6) motion tests the sufficiency of a complaint without resolving factual disputes, and a district court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." Kensington Volunteer Fire Dep't v. Montgomery Cty., 684 F.3d 462, 467 (4th Cir. 2012) (quotation marks omitted). Although the truth of the well-pled facts is presumed, district courts are not bound by the "legal conclusions drawn from the facts" and "need not accept as true unwarranted inferences, unreasonable conclusions, or arguments." E. Shore Mkts., Inc. v. Assocs. Ltd. P'ship, 213 F.3d 175, 180 (4th Cir. 2000); see Iqbal, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678. "In other words, a complaint must include 'more than an unadorned, the-defendant-unlawfully-harmed-me accusation.'" Johnson v. Am. Towers, LLC, 781 F.3d 693, 709 (4th Cir. 2015) (quoting Iqbal, 556 U.S. at 678).

### III. DISCUSSION

#### A. Section 1981 Discrimination Claim (Count Four)

##### 1. Corporate Statutory Standing

Strata first argues that Fall Line lacks statutory standing to advance a discrimination claim pursuant to 42 U.S.C. § 1981 because Fall Line is neither a natural person nor a corporation with an "imputed" racial identity. Fall Line does not disagree

9

with these factual contentions, arguing instead that controlling law does not require Fall Line to demonstrate an imputed racial identity in order to establish § 1981 statutory standing.

Section 1981 protects against purposeful race-based discrimination with respect to the formation, execution, and termination of contracts, and "the origins of the law can be traced to both the Civil Rights Act of 1866 and the Enforcement Act of 1870." Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania, 458 U.S. 375, 389 (1982). The 1866 Act attempted to secure "equal rights for the freedmen following the formal abolition of slavery effected by the Thirteenth Amendment," and the 1870 Act "was enacted as a means of enforcing the recently ratified Fourteenth Amendment." Id. More than a century later, § 1981 was amended by the Civil Rights Act of 1991 in response to the Supreme Court's decision in Patterson v. McLean Credit Union, 491 U.S. 164 (1989), which narrowly interpreted § 1981's protections with respect to the execution of existing contracts. The 1991 amendment added a subsection broadly defining the phrase "make and enforce contracts" to ensure that § 1981's protections against purposeful race-based discrimination extend to the performance of a contract and the enjoyment of the benefits of the contractual relationship. Spriggs v. Diamond Auto Glass, 165 F.3d 1015, 1017-18 (4th Cir. 1999). In its current form, § 1981 provides as follows:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

42 U.S.C. § 1981.

Although the phrasing of subsection (a) of the statute arguably suggests that relief under § 1981 is only available to non-white persons, it is now well-established that § 1981 relief is available to all natural persons regardless of their race. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273, 295-96 (1976) ("[T]he statutory structure and legislative history persuade us that the 39th Congress was intent upon establishing in the federal law a broader principle than would have been necessary simply to meet the particular and immediate plight of the newly freed Negro slaves," and the 1866 "Act was meant, by its broad terms, to

proscribe discrimination in the making or enforcement of contracts against, or in favor of, any race.");[6] <u>Gen. Bldg. Contractors Ass'n</u>, 458 U.S. at 387, 391 ("[B]oth § 1981 and § 1982 prohibit <u>all</u> racial discrimination, whether or not under color of law, with respect to the rights enumerated therein," and the Acts of 1866 and 1870 were both "directed at the same evil[]" — purposeful discrimination. (emphasis added) (quotation marks omitted)).

In addition to the fact that all natural persons, regardless of race, have statutory standing to sue under § 1981, the Fourth Circuit has twice recognized that a corporation with a racial identity that is "imputed" based on proven minority ownership may bring a civil rights claim under § 1981 or Title VII of the Civil Rights Act of 1964 ("Title VII"). <u>See</u> <u>Carnell Const. Corp. v. Danville Redevelopment & Hous. Auth.</u>, 745 F.3d 703, 714-15 (4th

---

[6] With the vast majority of § 1981 cases involving discrimination against minorities, some federal courts continue to identify "racial minority" membership as an element of a § 1981 claim, <u>see, e.g.</u>, <u>Silva v. Farrish</u>, 47 F.4th 78, 90 (2d Cir. 2022), and this Court is aware of at least one case where a § 1981 claim was deemed invalid for failing to satisfy this element, <u>see</u> <u>Mitchell v. CNO Fin. Grp., Inc.</u>, No. CV 16-1072, 2017 WL 3610542, at *2 (D.N.M. Feb. 23, 2017) (indicating that the plaintiffs' § 1981 claim "fails as a matter of law" because the plaintiffs "are both white men"). However, the Supreme Court's <u>McDonald</u> decision clarifies that being a member of a racial minority is not an element of a § 1981 claim, with § 1981 protecting <u>all persons</u> from race-based discrimination, including white persons. <u>See</u> <u>Woods v. City of Greensboro</u>, 855 F.3d 639, 646 n.7 (4th Cir. 2017) (citing <u>McDonald</u> for the proposition that "§ 1981 protects from race discrimination all persons, whites as well as blacks"). The elements of a § 1981 claim as filed by a person of <u>any race</u> may therefore be better described as requiring a plaintiff to "establish both that the defendant intended to discriminate on the basis of race, and that the discrimination interfered with a contractual interest." <u>Nadendla v. WakeMed</u>, 24 F.4th 299, 305 (4th Cir. 2022) (quoting <u>Denny v. Elizabeth Arden Salons, Inc.</u>, 456 F.3d 427, 434 (4th Cir. 2006)).

Cir. 2014) (holding that, notwithstanding the contrary "dictum from the Supreme Court's decision in Village of Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 263, (1977)," a "minority-owned corporation may establish an imputed racial identity for purposes of demonstrating standing to bring a claim of race discrimination under federal law" (quotation marks omitted)); Woods v. City of Greensboro, 855 F.3d 639, 646 (4th Cir. 2017) (finding that a corporation "owned and led by a protected minority group" had an "imputed racial identity" that satisfied the § 1981 statutory standing requirements even though it was not "certified" under state law as a minority-owned company). The Fourth Circuit's express recognition that a corporation can have an "imputed" racial identity such that it can demonstrate "statutory standing" to bring a § 1981 claim will be referred to herein as "Avenue A standing."[7]

Several published circuit court cases favorably cited by the Fourth Circuit in Carnell and Woods have long-recognized the validity of another avenue for a corporation to establish § 1981 standing. In order to establish standing on this alternative

---

[7] In this Court's view, because these precedential opinions establish that a "minority" race can be imputed to a corporation, when they are read in conjunction with the Supreme Court's McDonald decision, they must allow for the possibility that, in the right circumstances, a "majority" race could similarly be imputed to a corporation. However, as discussed below, the standing issue before this Court is slightly different as it turns on whether a corporation without a racial identity has statutory standing to sue under § 1981 based on harm suffered by the corporation as a result of its employee's racial identity.

13

basis, a corporation must demonstrate that it suffered corporate harm with respect to a contract to which the corporation was a party or potential party as a result of animus toward the race of a corporate representative or employee (hereinafter, "Avenue B standing"). See Gersman v. Group Health Ass'n, 931 F.2d 1565, 1568 (D.C. Cir. 1991) ("Rather than assume that [corporate] racial identity is a predicate to discriminatory harm, we might better approach the problem by assuming that, if a corporation can suffer harm from discrimination, it has standing to litigate that harm."), vacated on other grounds, 502 U.S. 1068 (1992); Thinket Ink Info. Res., Inc. v. Sun Microsystems, Inc., 368 F.3d 1053, 1060 (9th Cir. 2004) (adopting as an "independent standing rationale" the Gersman reasoning that "when a corporation experiences direct discrimination injury, it falls within the prudential zone of interest protected under § 1981"); Guides, Ltd. v. Yarmouth Grp. Prop. Mgmt., Inc., 295 F.3d 1065, 1072 (10th Cir. 2002) ("We agree that [the plaintiff corporation] has standing to assert discrimination claims under § 1981 and § 1982 where such discrimination is based on the race of one of its employees.").

However, Strata argues that in recognizing Avenue A standing, the Fourth Circuit has necessarily rejected Avenue B standing as an alternative basis for § 1981 corporate standing. A careful reading of the Fourth Circuit's opinions in Carnell and Woods suggests that the Fourth Circuit has neither embraced nor expressly

rejected Avenue B standing, with the Fourth Circuit holding that a corporation "may" satisfy statutory standing requirements through Avenue A, but not directly commenting on the possibility of Avenue B standing.

Lacking clear direction from the Fourth Circuit, and "[t]here being no dispute in this case as to whether the requirements of a constitutional 'case or controversy' are present," the test for determining whether Fall Line has statutory standing "is whether both [Fall Line] itself and its particular claim fall within the zone of interest protected by § 1981." Woods, 855 F.3d at 644 (citing Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118, 127 (2014)). "Whether a plaintiff comes within the zone of interests is an issue that requires [the court] to determine, using traditional tools of statutory interpretation," whether the plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue under § [1981]." Lexmark, 572 U.S. at 127-28 (quotation marks omitted). Furthermore, as recognized by the Supreme Court, the "breadth of the zone of interests varies according to the provisions of law at issue." Id. at 130.

The interests sought to be protected by § 1981 are not difficult to discern, with the Supreme Court repeatedly recognizing § 1981's expansive protections against purposeful race-based discrimination in contracting. See Jones v. Alfred H.

Mayer Co., 392 U.S. 409, 422, 435 (1968) (explaining that "§ 1 of

the Civil Rights Act of 1866," which encompassed both § 1981 and

§ 1982, was "cast in sweeping terms," and that it "appears that,

when the House passed the [1866] Civil Rights Act . . . it did so

on the same assumption that had prevailed in the Senate: It too

believed that it was approving a comprehensive statute forbidding

all racial discrimination affecting the basic civil rights

enumerated in the Act"); Comcast Corp. v. Nat'l Ass'n of Afr. Am.-

Owned Media, 140 S. Ct. 1009, 1020 (2020) (Ginsburg, J., concurring

in part) (resisting the defendant's attempt to cabin the breadth

of    §    1981,    "a    'sweeping'    law    designed    to    'break

down all discrimination between black men and white men' regarding

'basic civil rights'" (quoting Jones, 392 U.S. at 432-33));

McDonald, 427 U.S. at 295-96 (explaining that the 1866 Civil Rights

Act, and § 1981 as ultimately codified, intended to proscribe

discrimination in the enforcement of contracts "against, or in

favor of, any race")[8]; see also Spriggs, 165 F.3d at 1018

(indicating that a § 1981 claim "must be founded on purposeful,

---

[8] Consistent with the above-cited Supreme Court cases, and to the extent it
is appropriate to consider legislative history, when Congress amended § 1981
to legislatively "overrule" the Supreme Court's narrow interpretation of
the statute's application to the enforcement of existing contracts, the
relevant committee reports referenced the broad intended purpose of § 1981.
See H.R. REP. 102-40, 92, 1991 U.S.C.C.A.N. 549, 630 (indicating that
amendments were needed to "ensure that federal law prohibits all race
discrimination in all phases of the contractual relationship"); id. at 92-
93, 1991 U.S.C.C.A.N. at 630-31 (discussing the fact that the Supreme Court's
recent narrow reading of the statute would result in "no adequate deterrent"
against "highly offensive forms of discrimination").

16

racially discriminatory actions that affect at least one of the contractual aspects listed in § 1981(b)").

Though the Fourth Circuit has not addressed the validity of Avenue B standing, it has "observe[d]" that Title VI, which precludes discrimination in federally funded programs as to "person[s] in the United States," may by its terms confer standing on a corporation because: (1) the statutory term "person" extends to corporations under the "Dictionary Act"[9]; (2) Title VI "prohibits a 'person' from being discriminated against on the ground of race, color, or national origin, not on the ground of his or her race, color, or national origin"; and (3) the Supreme Court has recognized that the word "person" as used by Congress often means something different than an "individual." Carnell, 745 F.3d at 714 n.4 (emphasis added) (quotation marks omitted).[10]

---

[9] The "Dictionary Act" provides that "unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals." 1 U.S.C. § 1. Here, the operative statutory language protects "[a]ll persons, within the jurisdiction of the United States." 42 U.S.C. § 1981 (emphasis added).

[10] Though § 1981, in its original form, was enacted shortly prior to the Dictionary Act of 1871, § 1981 was codified in 1874. Jones, 392 U.S. at 422 n.28. Furthermore, more than a century after the Dictionary Act's passage, and when modifying the statute to clarify its extensive application and protections, Congress did not act to cabin § 1981's facially broad application to "all persons" to only "natural persons." See Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 11 F.4th 1266, 1281 (11th Cir. 2021) (analyzing whether the word "person" as used in § 1983 extends beyond corporations to also include an unincorporated "association," and finding that "[w]hatever 'person' meant in 1871, its meaning included unincorporated associations by the time Congress 'perpetuated' the word 'person' in new versions of § 1983" passed decades after the Dictionary Act was modified to include associations). It is also notable that the 1991 revision to § 1981 occurred more than a decade after the First Circuit concluded that a

17

Finally, though the case involved a third-party beneficiary contract, the Fourth Circuit has expressly found that an individual contracting with a business has standing to bring a § 1981 claim when the beneficiary of the contract was discriminated against based on the beneficiary's race. Denny v. Elizabeth Arden Salons, Inc., 456 F.3d 427, 436 (4th Cir. 2006) ("Seandria Denny, the purchaser, wanted to buy her mother a gift and was refused that opportunity on race-based grounds. If the salon refused to contract with Seandria Denny because of her mother's race, that is all that § 1981 requires." (emphasis added)).[11]

In addition to the Avenue B cases that predate the Fourth Circuit's ruling in Carnell and Woods, Fall Line cites to the Fifth Circuit's recent holding in White Glove Staffing, Inc. v. Methodist Hosps. of Dallas, 947 F.3d 301 (5th Cir. 2020). White Glove

corporation "has in the statutory sense standing to sue" under § 1981 because "to invoke § 1981 or § 1982 one need not be a member of the racial class protected by the statute and one need not even be able to identify any specific member of the class who suffered or may suffer discrimination." Des Vergnes v. Seekonk Water Dist., 601 F.2d 9, 13-14 (1st Cir. 1979). Finally, even absent reliance on the Dictionary Act, the legal term "person" was generally understood to extend to corporations in 1866. See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 273 (2012) (explaining that "[t]raditionally the word person . . . denotes not only natural persons (human beings) but also artificial persons such as corporations," indicating that "this legal meaning is age-old," and providing citations to caselaw from 1838 and 1848 as well as the 1770 Blackstone Commentaries on the Laws of England).

[11] As "it is settled that . . . taking adverse action against a white person because of his association with blacks falls under § 1981," Fiedler v. Marumsco Christian Sch., 631 F.2d 1144, 1150 (4th Cir. 1980), it appears to be a logical extension of § 1981 that taking adverse action against a corporation because it employs minority workers would similarly fall within the "zone of interests" protected under § 1981, especially if the corporation is the only contracting entity that suffers a compensable harm.

18

appears to be the most recent published appellate case taking up this issue, and it expressly adopts Avenue B standing in a case where the plaintiff corporation alleged that it lost a contract to supply kitchen staff to the defendant because the defendant did not approve of the race of the employee the plaintiff corporation was supplying. In reaching this conclusion, the Fifth Circuit noted that "the circuit decisions [like the Fourth's in Carnell] holding that corporations with imputed racial identities may assert § 1981 claims do not mean that a corporation must have a racial identity to assert such a claim." Id. at 306 (first emphasis added).

Having carefully considered the parties' detailed arguments on this issue, the Courts notes the apparent appeal of adopting what may be an emerging trend toward recognizing that Avenue B standing falls within § 1981's "zone of interests," with the statute aimed at both preventing all race-based discrimination that materially harms a contracting "person" (corporate or individual) and providing an adequate deterrent against the same.[12]

---

[12] In Domino's Pizza, Inc. v. McDonald, the Supreme Court explained that a § 1981 plaintiff must assert that their contractual rights were impaired and that it "should be obvious from reading the text of the statute" that § 1981 "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." 546 U.S. 470, 476 (2006) (emphasis added). The Court further found that a corporation's sole shareholder and president, who suffered racial animus, lacked standing to bring a § 1981 "personal capacity" discrimination claim because he could not identify a contract to which he, rather than his corporation, was a party. Id. at 477-80. This ruling left the contracting

See 1 Guide to Employment Law and Regulation § 2:66.50 ("A corporation does not need a racial identity to have standing to assert a § 1981 racial discrimination claim."); 9 Fletcher Cyc. Corp. § 4227 ("Today, corporations have standing to sue in instances that formerly belonged only to natural persons. For example, a corporation has standing to sue for discrimination as long as it suffered injury from an allegedly discriminatory action."); Recent Case, 134 Harv. L. Rev. 872, 872 (2020) ("A 'racial identity requirement' for § 1981 standing is inherently ill defined and contradicts the statute's plain text and broad remedial purpose. The Fifth Circuit's harm-based standard [articulated in White Glove] more faithfully adheres to these principles without engaging in unnecessary race construction."). However, here, this Court goes no further than assuming, without deciding, that Avenue B applies in this Circuit. The Court need not directly resolve the statutory standing issue because, in stark contrast to the facts of White Glove or similar hypothetical fact patterns,[13] Fall Line's counterclaim fails to allege well-pled

corporate entity as the only potential § 1981 plaintiff, but the Supreme Court had "no occasion" to address corporate standing because the corporation had already settled its claim. Id. at 473 n.1. The Supreme Court did "note, however, that the Courts of Appeals to have considered the issue have concluded that corporations may raise § 1981 claims." Id.

[13] A hypothetical where a corporate claim would appear within the § 1981 zone of interest, but may not otherwise be protected by contract or civil rights laws, is a situation where a corporation that lacks an "imputed" race remotely negotiates the terms of contract with a would-be customer, later physically sends a corporate vice-president to obtain the customer's signature on the written contract, but the customer refuses to sign due to

20

facts demonstrating that it is plausible that the race of Fall Line's employees was a "but for" cause of the contractual harm suffered by Fall Line.

## 2. "But for" Causation

Although discrimination claims under Title VII and § 1981 are frequently litigated in tandem when discrimination occurs in the employment context, the causation standard applicable to such claims differs. Comcast, 140 S. Ct. at 1017-19. Title VII requires a plaintiff to prove that race is one of several "motivating factors" behind a challenged adverse employment action, but to prevail on a § 1981 discrimination claim "a plaintiff must initially plead and ultimately prove that, but for race, it would not have suffered the loss of a legally protected right." Id. at 1019.

Here, a review of Fall Line's allegations plainly reveals that, on three or four identified occasions during the multi-month performance of the subcontract, Fall Line's African American employees (Mr. Harris and his son) were mistreated based on their race. Fall Line's allegations, accepted as true at the Rule 12 stage, demonstrate that none of these incidents would have occurred "but for" the individual victims' race. However, Mr. Harris and

---

the fact that the corporate vice-president is a minority. In such situation, the defendant "refused to contract with [the corporation] because of [its vice-president's] race," which if Avenue B is accepted, is "all that § 1981 requires." Denny, 456 F.3d at 436.

his son are not the plaintiffs in this case, nor is there a Title VII or § 1981 hostile work environment cause of action before this Court. Rather, the corporate entity — Fall Line — is the sole plaintiff, and the cause of action at issue is racial discrimination in the execution of a contract. Accordingly, Fall Line must at a minimum allege that race discrimination directed at Fall Line or its employees was a "but for" cause of actionable harm suffered by the corporate entity, and on this requirement, Fall Line comes up short.

Here, Fall Line's counterclaim very effectively documents deterioration of the contractual relationship over the course of many months, with Strata's failures delaying the project start date from October of 2020 until March of 2021 and later creating issues and obstacles (unrelated to race) that prevented Fall Line from fully performing between March and July of 2021. Strata is alleged to have engaged in ongoing conduct to interfere with Fall Line's performance, shift blame for delays to Fall Line, and toward the end of the period of performance, improperly withhold payments owed to Fall Line as part of Strata's concerted efforts both to "starve the contractor" and to hide Strata's own culpability for Project delays.[14] Because they are not "well-pled" facts, the

---

[14] There are no well-pled facts suggesting that race played any part in Strata's failure to timely obtain approvals from the County, its failure to allow Fall Line to start its work, its failure to pay Fall Line in a timely manner, or its decision to shift the blame for the delayed Project to Fall Line. Rather, the race-based allegations are almost exclusively limited to

Court does not afford credence to Fall Line's conclusory assertions of ongoing "abusive conduct" and "harassment" directed at Fall Line employees, to include mistreatment of Mr. Harris's "team" of undisclosed individuals of undisclosed races. Rather, it focuses on Fall Line's well-pled race-based allegations, which are limited to the following events: a single, though odious, racial slur made "earlier" in the project, and improper drug testing occurring on two occasions during a single week in mid-July of 2021.[15] The only well-pled fact asserting that the race-based conduct impacted Fall Line's contract performance is the fact that "Strata sent Rico Harris' son home for several days under a presumption of guilt" after his second drug test. Countercl. ¶ 55. Fall Line, however, does not assert, nor does it present well-pled facts plausibly suggesting, that such temporary suspension proximately caused harm to Fall Line as a corporate entity.

_____

actions by Strata workers on the jobsite, not decisions by Strata executives with contracting authority.

[15] Fall Line also alleges that a race-based stereotype was used by Strata as part of the justification for the suspension of Fall Line from the Project following Strata's falsely manufactured "safety incident." What Fall Line does not allege, however, are any well-pled facts supporting an inference that Mr. Harris's race, or the race of any other Fall Line employee, was a "but for" motivation for Strata manufacturing the safety incident or for suspending Fall Line from further work on the project. Rather, at best Fall Line has alleged that a race-based stereotype and false facts about Mr. Harris's "combative" reaction to the safety incident were leveraged by Strata to bolster Strata's false version of events. Though Fall Line plausibly alleges that it was the victim of deceit committed to insulate Strata, it does not plausibly allege that Strata would not have engaged in these acts of self-preservation "but for" the race of Fall Line's employees.

23

These limited race-based allegations, especially when read in the context of Strata's multi-month effort both to use Fall Line as a scapegoat and to "starve" the subcontractor, fall far short of plausibly alleging that race was a "but for" cause of any harm suffered by Fall Line, even accepting that Mr. Harris and his son experienced personal suffering on at least three or four occasions as a result of racially motivated harassment. See Lemon v. Myers Bigel, P.A., 985 F.3d 392, 400 (4th Cir. 2021) (explaining that the plaintiff failed to satisfy § 1981's "but for" causation standard because she had alleged only one "factually-specific, non-conclusory allegation of racially-motivated conduct," which occurred approximately four months prior to the defendant's challenged action, resulting in the "district court aptly observ[ing]" that the plaintiff "failed to allege any facts linking these two events, leaving any potential connection a matter for speculation"); see also Ali v. BC Architects Engineers, PLC, 832 F. App'x 167, 172-73 (4th Cir. 2020) (noting, in the context of a § 1981 retaliation claim, that the inference of "but for" retaliation was "further weakened" by the fact that the complaint provided an alternative reason for the adverse employment action).

Notably, Count Four of the counterclaim not only includes conclusory statements of mistreatment devoid of factual support, but it often alleges mistreatment of Fall Line employees that, even when read in Fall Line's favor, does not suggest any racial

component. For example, Fall Line alleges that Mr. Harris and his son were "mistreated while on the job site," that the mistreatment "was often overtly racist," and that they were "targeted" with "objectively egregious conduct." Countercl. ¶¶ 123-25. The counterclaim, however, only specifically describes one instance of a racial slur being used by a single Strata employee, without providing a date for such conduct, and otherwise relies almost exclusively on allegations of unfair drug testing occurring in July of 2021. Fall Line's facts do plausibly allege that these specific discriminatory acts "contributed to a breakdown of relations on the job site," id. ¶ 129 (emphasis added), but even accepting that this allegation would satisfy the Title VII "motivating factor" standard, it falls short of satisfying the "but for" § 1981 causation test, with the counterclaim instead painting a compelling picture that Strata wrongfully terminated the subcontract for other reasons.

Fall Line's efforts to outline race-based contractual harm suffered by the corporation in the final paragraphs of Count Four fares no better than the preceding statements of fact. To the extent Fall Line asserts that the race-based conduct deprived Mr. Harris and his son of their contractual rights, id. ¶ 129, Strata correctly argues that such derivative claim may not be asserted by Fall Line. To the extent Fall Line asserts that it was deprived of its contractual right to employ African Americans, id. ¶¶ 129,

131, this conclusory statement is simply not supported by any well-pled facts.

Finally, though this Court has assumed that a valid corporate § 1981 cause of action can be predicated on a contracting party's "refusal to perform in good faith with a company choosing to employ African Americans" if the refusal was because that company employed African Americans, id. ¶ 130, here, Fall Line does not offer well-pled facts suggesting that the race of any of its employees was a "but for" cause of any harm suffered by Fall Line. In fact, Fall Line expressly alleges that throughout the Project, Fall Line maintained a "Near Perfect Record" in performing its contractual obligations, and that it was able to do so "while Strata was abusive toward Fall Line's crews." Id. ¶ 49 (emphasis added). Additionally, as discussed above, Fall Line advances well-pled facts alleging that Strata's failure to secure necessary County approvals, desire to shift blame for its own failure to its subcontractor, and the benefits Strata believed it could secure through its "starve the contractor" scheme were the real root causes of both Strata's failure to perform in good faith and the resulting harm suffered by Fall Line. The fact that Fall Line seeks compensatory damages including "all applicable back and front pay" as relief in Count Four, but fails to offer facts describing how a single racial slur, unfair drug testing, or post-hoc blame of "aggression" on a Fall Line employee was the cause of

such damage, further underscores Fall Line's failure to plead a plausible claim for relief. See Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 14-15 (1st Cir. 1999) (indicating, in the context of a § 1981 claim predicated on a hostile work environment, that while the on-site worker "offered evidence that he had suffered emotional harm" from racial harassment, there "does not appear to be evidence that [the corporation], as distinct from [the worker], was measurably damaged by the racial incidents").

In summary, the Court **GRANTS** Strata's motion for judgment on the pleadings as to Count Four, as Fall Line fails to plausibly allege that race was a "but for" cause of any contractual harm suffered by Fall Line as a corporate entity.[16]

### B. Section 1981 Retaliation Claim (Count Five)

"Section 1981 encompasses retaliation claims for opposing race discrimination in employment," and opposing race

---

[16] As previously noted, the Supreme Court has expressly stated that "but for" causation not only must be proven, but also must be pled. Comcast, 140 S. Ct. at 1019. To be clear, this Court applies the Iqbal/Twombly pleading standard, which does not strictly require element-by-element pleading, but instead, requires only that sufficient facts are pled to plausibly state a § 1981 discrimination claim. See Woods, 855 F.3d at 648 ("[The plaintiff] need not plead facts sufficient to establish a prima facie case of [§ 1981] race-based discrimination to survive a motion to dismiss."). Here, nowhere in the counterclaim are there facts suggesting that there was a material impact on the contractual relationship as a result of any racial animus from Strata, Strata's upper management, or anyone making decisions directly impacting the viability of the ongoing contractual relationship between Strata and Fall Line. Thus, in contrast to the facts of White Glove, here, Fall Line has at best provided a handful of examples of race-based mistreatment of its employees that overlaps with a contractual relationship that was failing for reasons unrelated to race. What Strata is missing is a "link" between the race-based mistreatment and the harm to Fall Line's rights under the contract.

discrimination includes communicating a belief "that the employer has engaged in [race-based] discrimination." Ali, 832 F. App'x at 172 (quotation marks omitted). Protected complaints include complaints about both "employment actions actually unlawful under § 1981" and those actions the complainant "reasonably believes to be unlawful" under § 1981. Id. (cleaned up). Consistent with the rule applicable to § 1981 discrimination claims, "to state a § 1981 retaliation claim, a plaintiff must allege facts rendering it plausible that, but for her participation in protected activity, she would not have suffered a materially adverse action." Id. at 172-73.

Here, as outlined above, Fall Line sent Strata a letter on August 2, 2021, "imploring Strata to engage in meaningful discussions about their inhumane treatment of Fall Line employees" and the "logical and orderly completion of work." Countercl. ¶ 68. The very next day after the letter was sent, Strata is alleged to have manufactured a safety incident purportedly committed by Fall Line, and just two days later, Strata used the incident as an excuse to suspend Fall Line from further work on the Project. Notwithstanding such well-pled allegations, Strata contends that Fall Line fails to allege facts that state a plausible § 1981 retaliation claim.

## 1. Standing

Contrary to the legal dispute over whether Fall Line, as a corporation without an imputed racial identity, has standing to bring a § 1981 discrimination claim, the law is well-established that a plaintiff has standing to bring a § 1981 retaliation claim irrespective of their race or racial identity. This is true because a plaintiff can be discriminated against for engaging in protected activity directed at quashing the racial mistreatment of a different person. See Aleman v. Chugach Support Servs., Inc., 485 F.3d 206, 213-14 (4th Cir. 2007) (explaining that a plaintiff "can challenge as discriminatory actions that were taken against them for reporting unlawful discrimination, even if the plaintiffs were not subject to discrimination based upon their own race, gender, or similar protected status"). Strata therefore does not advance a statutory standing challenge as to Fall Line's retaliation claim.

## 2. Race-Based Conduct

Strata first argues that the August 2, 2021 letter did not "purposely oppose or even reference any kind of discriminatory conduct." ECF No. 34, at 9. As highlighted by Fall Line, the factual basis for such contention is difficult to discern (the letter expressly discusses use of the n-word), and the Court easily rejects Strata's argument on this point. See Pryor v. United Air Lines, Inc., 791 F.3d 488, 496 (4th Cir. 2015) (explaining that

29

the use of the n-word "is pure anathema to African-Americans as it is to all of us" and "is the kind of insult that can create an abusive working environment in an instant" (cleaned up)). The allegations in the letter go far beyond what Strata characterizes as a "generalized grievance" lacking any allegation of "race-based discrimination," id. at 14, and were plainly sufficient to announce the race-based nature of Fall Line's complaint.

## 3. Protected Activity

The Court similarly rejects Strata's contention that Fall Line fails to plausibly allege that it engaged in "protected activity" by writing a letter to a Strata Vice President and Strata's corporate counsel complaining about race-based discrimination committed by Strata employees on the Project site. According to Strata, "Strata could not have reasonably believed that Fall Line was reporting an actionable discrimination claim" as Strata "had no employment relationship with the African American employees on whose behalf Fall Line claimed to be complaining" because Strata did not employ or jointly employ Mr. Harris or his son. ECF No. 34, at 14. However, Fall Line is correct that, unlike Title VII's strict application to the employment context whereby an "employer" of a statutorily-mandated size is the only proper defendant, § 1981 applies to race-based discrimination that materially interferes with the performance of a contract regardless of whether there is a traditional "employment"

30

relationship. See, e.g., Webster v. Fulton Cnty., Ga., 283 F.3d 1254, 1256 (11th Cir. 2002) (holding that an "independent contractor" stated a valid § 1981 retaliation claim based on its allegation that it was denied a contract "in retaliation for the contractor's filing of a lawsuit" alleging a "custom or policy of disparate-treatment racial discrimination"); McClain v. Avis Rent A Car Sys., Inc., 648 F. App'x 218, 222 (3d Cir. 2016) ("Independent contractors may pursue relief under § 1981 for discriminatory and retaliatory acts that occurred during the course of their independent contractor relationship."); Jones v. A.W. Holdings LLC, 484 F. App'x 44, 48 (7th Cir. 2012) ("Although her independent-contractor status defeats her Title VII claim, Jones may still proceed on her claims of discrimination and retaliation under § 1981, which is not limited to employees."); Proa v. NRT Mid Atl., Inc., 618 F. Supp. 2d 447, 472 (D. Md. 2009) (finding that an independent contractor could proceed on her § 1981 retaliation claim and describing protected activity as "acts and statements in opposition to policies or practices that discriminated against any person on the basis of race"); see also CBOCS West, Inc. v. Humphries, 553 U.S. 442, 455 (2008) (discussing the permissible "overlap" of Title VII and § 1981 in the employment context as well as § 1981's application to discrimination claims and retaliation claims both in the employment context and "in respect to non-employment contracts").

Furthermore, as discussed above in detail when analyzing Count Four, multiple circuits have recognized a corporation's right to bring a § 1981 claim when <u>its contract rights</u> are harmed by discrimination targeted at its employees, and the Fourth Circuit has not expressly rejected the existence of such a corporate claim. Moreover, the Dictionary Act provides at least facial support for Fall Line's "reasonable" belief that it was a legally protected "person" under § 1981 and was reporting race-based interference with its own contract. Therefore, even if such belief was erroneous, Fall Line could have reasonably believed that the expansive reach of § 1981 protected it from being retaliated against based on its formal written complaint seeking to <u>stop the race-based targeting</u> of its African American employees — targeting that manifested itself through the one-time use of the n-word and improper drug testing, including humiliating witnessed urine collection and a false accusation of a faked urine sample.[17] Accordingly, based on the arguments Strata has advanced at this time, and Fall Line's well-argued response, Strata fails to demonstrate at the Rule 12 stage that Fall Line did not "reasonably

---

[17] To the extent Strata's reply brief references the standard for claims alleging a "hostile work environment," ECF No. 36, at 12-13, this was not raised in Strata's opening brief, and nothing before the Court suggests that Fall Line is proceeding on a hostile work environment theory. Notably, to the extent Strata did argue in its opening brief that it was not a "joint employer" of Fall Line's workers, ECF No. 34, at 14-15, Fall Line labeled this argument a "red herring" that should be ignored by the Court. ECF No. 35, at 21.

believe" that its written complaint to Strata and its corporate counsel identified potentially actionable race-based discrimination. Based on the nature of Fall Line's written complaint about race-based acts creating a highly stressful and charged work environment that was impacting morale, as well as the "context in which [the complaint] was made," Fall Line has pled facts sufficient to demonstrate at the Rule 12 stage that Strata "should have understood, that the plaintiff was opposing discriminatory conduct." Burgess v. Bowen, 466 F. App'x 272, 282 (4th Cir. 2012); see McClain, 648 F. App'x at 220, 224 (finding, in a case where a minority-owned independent contractor corporation pursued a § 1981 retaliation claim against the company it had contracted with, that a letter sent to the defendant by the lawyer for the two minority owners "was protected activity" as it explicitly asserted that the defendant's district manager was discriminating against the two minority owners "due to their race").

### 4. "But for" Causation

Turning to the issue of causation, Fall Line's well-pled facts alleging retaliation, unlike its allegations of direct discrimination, plausibly support Fall Line's ultimate ability to prove "but for" causation. As Fall Line argues, it need not expressly plead all elements of a retaliation claim to survive a Rule 12 motion, but rather must "'allege facts that, if accepted

33

as true, allow the court to draw a reasonable inference as to [the] legal requirements' for a § 1981 claim." Brown v. Harford Bank, No. CV ELH-21-0096, 2022 WL 657564, at \*11 (D. Md. Mar. 4, 2022) (alteration in original) (quoting Nadendla, 24 F.4th at 305). Here, the applicable Rule 12 standard requires this Court to accept as true the factual assertions that: (1) Strata manufactured a safety incident and created a false narrative regarding Fall Line's reaction to such incident; (2) Strata did so the very next day after Fall Line sent its letter complaining of race-based discrimination; and (3) Strata effectively terminated its contract with Fall Line later that same week.

These facts, considered in a vacuum, are clearly sufficient at this early stage in the case to satisfy the "but for" causation element of a § 1981 claim due to the close-in-time temporal link. See Ali, 832 F. App'x at 173 (finding, in a § 1981 case, that an adverse employment action committed "a mere two weeks" after an oral report of discrimination was a sufficiently "close temporal proximity" to support "an inference of causation"); Burgess, 466 F. App'x at 283 ("Very little evidence of a causal connection is required to establish a prima facie case of retaliation; temporal proximity between the protected activity and the employer's adverse action alone will suffice." (cleaned up)). Strata nevertheless argues that the allegations in the counterclaim revealing that Strata and Fall Line's contractual relationship was

34

deteriorating for reasons unrelated to retaliation at the time Fall Line sent the letter undercut Fall Line's ability to demonstrate "but for" causation.

Even though Fall Line's own facts allege that the parties' contractual relationship was spiraling downward at the time the August 2, 2021 letter was delivered, it remains plausible on the instant record that "but for" the letter, the contract would not have been terminated or, at a minimum, would not have been terminated at that time.[18]  The Court agrees with Strata that the inference of retaliation is "weakened" by the counterclaim's alternative or overlapping "starve the contractor" theory; but on this record, Strata fails to demonstrate that such fact "weakens" the inference of retaliation to such a degree that Count Five fails at the pleading stage.

First, the temporal link at issue here could not possibly be any stronger as the challenged retaliation began the very next day after the letter was sent and was concluded later the same week. Second, although Fall Line can only succeed on its § 1981 retaliation claim if it proves that the letter was a "but for" cause of the contract termination, "a cause need not work in isolation to be a but-for cause." Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216-17 (4th Cir. 2016). That is, the

---

[18] Presumably, the quantum of damages suffered by Fall Line as a result of it being improperly terminated from the contract that it was actively performing is dependent on when it was terminated.

35

plaintiff bears the burden "only to show that the protected activity was a but-for cause of [the contract] termination, not that it was the sole cause." Id. at 218. Third, in Guessous, when describing a plaintiff's "but for" burden on a retaliation claim pursued under either Title VII or § 1981, the Fourth Circuit favorably cited the Sixth Circuit's finding that "in retaliation cases, courts must determine what made the employer fire the employee when it did." Id. (emphasis in original) (cleaned up) (citing Montell v. Diversified Clinical Servs., Inc., 757 F.3d 497, 507 (6th Cir. 2014)). In Montell, the Sixth Circuit addressed the impact of an employer's "previously contemplated" plan to terminate a plaintiff prior to the occurrence of the protected activity to determine its bearing on the inference to be drawn from the short time span between the protected activity and the employee's termination. Montell, 757 F.3d at 505. The court ultimately held that when, shortly after the protected activity occurs, the employer merely follows a previously contemplated course, "then temporal proximity is not evidence of causality, but if the adverse employment action is unlike the action previously contemplated or does not occur on the schedule previously laid out, then the temporal proximity of the adverse action to the protected conduct is certainly evidence of causation." Id. at 507 (emphasis added).

Here, at this early stage of the case, there is no evidence of a "course previously contemplated" by Strata, beyond the fact that Strata may have continued to seek additional "maintenance" work from Fall Line for minimal or no pay. Stated another way, there are no facts in the counterclaim demonstrating that, before the letter was sent, Strata had both decided to terminate its subcontract with Fall Line and had decided that it would do so during the first week of August. Furthermore, the fact that there are allegations that Strata banned Mr. Harris from the Project site the day after the letter was sent also supports the inference of retaliation as his name was so prominently featured in the August 2, 2021 letter. Finally, the Court observes that in determining the "strength" of the inference of causation, it is notable that Fall Line's counterclaim does not rely on "information and belief" regarding the "staged" safety incident, but rather, relies on an affidavit from a Strata employee that corroborates both that Strata "manufactured" facts relevant to the safety incident and that Mr. Harris's actions were falsely reported as part of that same incident. ECF No. 11-2.

The above facts, when considered together, undercut Strata's contention that Fall Line's alternative or overlapping "starve the contractor" theory is fatal to Fall Line's ability to demonstrate that the August 2, 2021 letter was a "but for" cause of Strata terminating the contract when it did. See Houck v. Substitute Tr.

Servs., Inc., 791 F.3d 473, 484 (4th Cir. 2015) ("To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable or that alternative explanations are less likely; rather, she must merely advance her claim 'across the line from conceivable to plausible.'" (quoting Twombly, 550 U.S. at 570)). Therefore, for the above-stated reasons, Strata's rule 12(c) motion is **DENIED** as to Count Five.

### IV. CONCLUSION

As explained in detail herein, Strata's rule 12(c) motion is **GRANTED** with respect to Count Four, and is **DENIED** with respect to Count Five. ECF No. 33. The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

/s/ Mark S. Davis

Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
July 20 , 2023