UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

STRATA SOLAR, LLC,

      Plaintiff and Counterclaim Defendant,

v.                                    Civil Action No.:  4:22-CV-106

FALL LINE CONSTRUCTION, LLC,

      Defendant and Counterclaimant,

  and

ARCH INSURANCE COMPANY,

      Defendant.

**MEMORANDUM IN SUPPORT OF ARCH INSURANCE COMPANY'S
MOTION FOR SUMMARY JUDGMENT**

Defendant Arch Insurance Company ("Arch"), by counsel, in accordance with Local

Civil Rule 7(F)(1) and Rule 56 of the *Federal Rules of Civil Procedure,* respectfully submits the

following memorandum in support of its contemporaneously filed Motion for Summary

Judgment.

## I.    INTRODUCTION

This case arises from a construction project to build the Rochambeau Solar Project in

Williamsburg, Virginia (the "Project").[1]  Strata Solar, LLC ("Strata") was the general contractor

selected by Dominion Virginia Power ("Dominion"), the Project owner.  In conjunction with the

performance of its contractual obligations to Dominion, Strata awarded its November 4, 2020

Engineering, Procurement and Construction Subcontract Agreement (the "Subcontract") to Fall

---

[1] Another project in Gretna, Virginia, referred to as "Sycamore" in the pleadings, is at issue
between Strata Solar, LLC and Fall Line Construction, LLC, but Arch is not implicated in that
dispute.

Line Construction, LLC ("Fall Line"), which agreed to furnish labor and materials relating to the civil work to be performed on the Project. As required by its subcontract, Fall Line provided a Subcontract Performance Bond (the "Bond") to Strata to secure its performance of the subcontract. The Bond was issued by Arch, as surety, naming Fall Line as its principal and Strata as its obligee.

The relationship between Strata and Fall Line soured during the course of the Project amid Strata's allegations of performance issues related to Fall Line. Strata alleges that, at least as early as April 2021, Fall Line committed a number of "Subcontractor Defaults" on its obligations under the Subcontract, but permitted Fall Line to continue its work. On August 5, 2021, Strata suspended Fall Line's work on the Project, purportedly for cause. The following day, August 6, 2021, for the first time, Strata advised Arch that it declared a default and called upon Arch to take action under the Bond. Arch conducted an investigation and explored the efficacy of various options available to it under the Bond, including the option to take over the Subcontract and utilize Fall Line as its completion contractor. Knowing that Arch's investigation was ongoing, Strata undertook to complete Fall Line's scope of work itself, through its own employees as well as at least two completion subcontractors whom Strata unilaterally engaged.

Arch is not required to make any payment to Strata under its Bond because Strata robbed Arch of the opportunity to intelligently select from its options under the Bond. By arranging for the completion of Fall Line's scope of work while giving notice in name only to Arch, Strata failed to satisfy a condition precedent to recovery and forfeited its right to make a claim under the Bond. The loss of the options guaranteed to Arch under the Bond and of other rights inuring to it as Fall Line's surety constitutes actual prejudice sufficient to discharge the Bond as a matter

of law.

## II.   LIST OF UNDISPUTED MATERIAL FACTS

### A.   <u>The Subcontract and Bond</u>

1.     Dominion and Strata entered into a general contract dated December 20, 2019 under the terms of which Strata was to construct the Rochambeau Solar Project in Williamsburg, Virginia.  FIRST AMENDED COMPLAINT, ¶ 7 [DOC 16].

2.     On November 4, 2020, Strata and Fall Line entered into the Subcontract under the terms of which Fall Line was to furnish labor and materials relating to the civil scope of work on the Project.  FIRST AMENDED COMPLAINT, ¶ 8 [DOC 16]. EXHIBIT 1 – THE SUBCONTRACT.

3.     At the request of Fall Line, and as required by the Subcontract, Arch issued its Subcontract Performance Bond (the "Bond") in the amount of $2,000,000, naming Fall Line as its principal and Strata as its obligee. EXHIBIT 2 – SUBCONTRACT PERFORMANCE BOND.

4.     The Bond identifies Fall Line as "Principal," Strata as "Obligee," and Arch as "Surety," and states in relevant part:

> 4.     PRINCIPAL DEFAULT.  Whenever the Principal shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly:
>
>     4.1     COMPLETE SUBCONTRACT.  Complete the Subcontract in accordance with its terms and conditions; or
>
>     4.2     OBTAIN NEW CONTRACTORS.  Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, ***and upon determination by the Surety*** of the lowest responsible bidder, or negotiated proposal, or, if the Obligee elects, ***upon determination by the Obligee and the Surety jointly*** of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and the Obligee.  The Surety will make available as work progresses sufficient funds to pay the cost of completion less the balance of the contract price.  The cost of completion includes responsibilities of the Principal for correction of defective work and

3

completion of the Subcontract; the Obligee's legal and design professional costs resulting directly from the Principal's default, and; liquidated damages or actual damages if no liquidated damages are specified in the Subcontract. The term "balance of the contract price," as used in this paragraph, shall mean the total amount payable by the Obligee to the Principal under the Subcontract and any amendments to it, less the amount properly paid by the Obligee to the principal; or

       4.3    PAY OBLIGEE.  Determine the amount for which it is liable to the Obligee and pay the Obligee that amount as soon as practicable; or

       4.4    DENY LIABILITY.  Deny its liability in whole or in part and notify and explain to the Obligee the reasons why the Surety believes it does not have responsibility for this liability.

EXHIBIT 2 – SUBCONTRACT PERFORMANCE BOND (*emphasis added*).

5.      Nothing in the Bond purports to limit Arch's option to complete the Subcontract under §§ 4.1 or 4.2 of the Bond in any way.

      **B.**      **<u>Performance Issues Arise on the Project</u>**

6.      According to Strata, Fall Line committed numerous "Subcontractor Defaults" as defined by § 17.2.1 of the Subcontract early in its work on the Project. FIRST AMENDED COMPLAINT, ¶¶ 10 and 107 [DOC 16]. Strata maintains that Fall Line (1) failed to follow provisions in the terms of the Subcontract for submitting requests for material approvals which later led to a cascading series of impacts around circular risers;[2] (2) breached requirements to keep the Project site in compliance with environmental codes and standards;[3] (3) released chemicals on the jobsite and failed to timely correct the situation;[4] (4) failed to install a construction entrance according to the plans;[5] and (5) failed to maintain the entrance so as to

---

[2] EXHIBIT 3 - TRANSCRIPT OF DEPOSITION OF SAM SINK, August 18, 2023 ("SINK 8/18/23 TR") at 18-19.
[3] *Id.* at 19.
[4] *Id.*
[5] *Id.* at 41.

prevent sediment runoff and discharges offsite.[6]  These issues allegedly arose in or before April 2021.[7]

7.      In June 2021, Strata began to directly perform work within Fall Line's scope.[8] Arch was neither given notice by Strata of a declaration of default nor asked to perform under the Bond during this period.  EXHIBIT 4 - DECLARATION OF JOEL BEACH ("BEACH DECL."), ¶ 6.

8.      On June 29, 2021, Strata sent an email to Fall Line by which it forwarded a letter dated June 28, 2021 regarding a "Notice of Failure to Achieve Subcontract Requirements," complaining of numerous issues, including (a) ongoing problems regarding the installation of circular risers rather than square risers, (b) failure to provide the proper materials to install basin emergency spillways, (c) failure to adequately staff the Project, (d) failure to provide a detailed Recovery Plan, (e) lack of qualified supervision, and (f) allowing an unapproved subcontractor to work without notice to Strata.[9]

9.      On the following day, June 29, 2021, Fall Line provided a vehement written response to Strata contesting many of the assertions in the "Notice of Failure to Achieve Subcontract Requirements."  EXHIBIT 6 – JUNE 29, 2021 LETTER FROM RYAN POUNDS TO DALE HOHENSTEIN AND OTHERS.  In addition to its disagreement with the various points raised in Strata's June 29, 2021 letter, Fall Line declared Strata in default for failure to make payment under a recent pay application.  *Id.*

10.     The exchange continued, with Strata sending another letter on July 2, 2021 reiterating its accusations that Fall Line had performed untimely and improper work.  Exhibit 7 –

---

[6] *Id.*
[7] *Id.* at 17-19, 23, 41 and 43.
[8] *Id.* at 49.
[9] EXHIBIT 5 - JUNE 28, 2021 LETTER FROM DALE HOHENSTEIN TO RYAN POUNDS, AND EXHIBIT 4 – BEACH DECL, ¶ 6.

JULY 2, 2021 LETTER FROM DALE HOHENSTEIN TO FALL LINE.  Fall Line sent additional letters on July 6 and 12, 2021, addressing the same issues. EXHIBITS 8 and 9 – JULY 6 AND 12, 2021 LETTERS FROM FALL LINE TO STRATA, respectively).

11.     On July 16, 2021, Strata's counsel sent a letter to Fall Line's counsel alleging that all delays in the performance of the Project were caused by Fall Line's failure to comply with the terms of the Subcontract.  EXHIBIT 10 – JULY 16, 2021 LETTER FROM MONICA DOZIER TO ANTONY L. SANACORY.  An additional letter from Strata on July 20, 2021, provided notice to Fall Line that several of its sub-subcontractors had asserted liens, and demanded that the liens be released within five days.  EXHIBIT 11 – JULY 20, 2021 LETTER FROM STRATA TO FALL LINE AND ARCH (giving notice of what it claimed was notice under a payment bond).

12.     On July 28, 2021, Strata again noted that several sub-subcontractors had been unpaid, and requested a conference call with Fall Line and Arch to discuss the steps being taken to cure Fall Line's alleged default.  EXHIBIT 12 – JULY 28, 2021 LETTER FROM STRATA TO FALL LINE AND ARCH, reserving its rights against the latter.

13.     Fall Line continued to assert its innocence.  On August 2, 2021, Fall Line's counsel sent an email to Strata's counsel that the Project was in an "indefinite freeze" that was not related to Fall Line's performance, and that because Fall Line was neither being paid nor permitted to continue its work, there was no reason for it to be at the Project site.  EXHIBIT 13 – AUGUST 2, 2021, EMAIL FROM ANTONY SANACORY TO MONICA DOZIER.  The same day, Fall Line sent its own letter directly to Strata containing allegations of racial discrimination and harassment, as well as summarizing its arguments surrounding Strata's failure to pay amounts partially relating to the Project.  EXHIBIT 14 – AUGUST 2, 2021 LETTER FROM FALL LINE TO STRATA.  Fall Line took the position that because Strata was unable to move the Project forward

or fund it, Fall Line's performance under the Subcontract was excused and Fall Line was prepared to demobilize.  *Id.*

        C.      **Strata Supplements Fall Line's Work and then Seeks and Engages Replacement Subcontractors**

14.      Strata admits that it began supplementing Fall Line's work in June of 2021,[10] which was over a month prior to Strata's declaration of default.

15.      Strata claims that its damages in this matter include payments made to Aerotek, AES Consulting Engineers, P.C., Inc., Ballentine associates, P.A., Environmental Construction Solutions, JRP Energy, Nansemond Pre-Cast Concrete Co., Sunbelt Rentals, and United Rentals. EXHIBIT 15 – STRATA'S LIST OF COMPLETION CONTRACTORS (STRATA-0121136).

16.      Each of the above-listed subcontractors and suppliers incurred expenses prior to August 6, 2021, that Strata now attributes to Fall Line's default. Strata claims it spent $150,192.45 remedying Fall Line's failures *prior* to the August 6, 2021 notice to Arch under the Bond advising that it declared Fall Line in default. EXHIBIT 16 – COLLECTION OF INVOICES.

17.      Meanwhile, in July 2021, Strata invited contractors to visit the Project site to collect pricing information to complete Fall Line's scope of work.[11]

18.      On August 4, 2021, a Strata internal email reveals that a civil contractor named Henderson, Inc. ("Henderson") was being considered as a "replacement" for Fall Line on the Project.  EXHIBIT 17 – AUGUST 4, 2021 INTERNAL STRATA EMAIL (STRATA-0094116).

19.      On August 4, 2021, Strata advised via an internal email with the subject being "Replacement Contractors for Rochambeau" that a potential completion contractor, Toano, was not available for the Project and arranged for another civil contractor, Tindol, to visit the site

---

[10] See EXHIBIT 3 - SINK 8/18/23 TR, at 46.
[11] See EXHIBIT 3 - SINK 8/18/23 TR, at 49.

shortly thereafter.  EXHIBIT 18 – AUGUST 4, 2021 INTERNAL STRATA EMAIL (STRATA-0066738).

20.     On the same day, August 4, 2021, a Strata employee noted that another potential

completion subcontractor, JSG, was scheduled to visit the Project site on August 12, but that JSG

was "looking to see if Monday [August 9, 2021]" would work. In the same email, Strata noted

that "Fall Line is out of the picture" and that it already had a "list" of "potential options" to

replace Fall Line. EXHIBIT 19 – AUGUST 4, 2021 INTERNAL STRATA EMAIL (STRATA-0071335-

0071336).

21.     Henderson visited the Project site on August 5, 2021, and on the same day Strata

asked Henderson to provide "quotes for an "October 31 finish as well as a more aggressive

October 1 finish."  EXHIBIT 20 – AUGUST 5, 2021 EMAIL FROM DALE HOHENSTEIN TO

HENDERSON, INC. (STRATA-0057083).

22.     On August 6, 2021, Strata proposed to Dominion that Henderson be approved as a

replacement for Fall Line. EXHIBIT 21 – AUGUST 6, 2021 EMAIL FROM STRATA TO DOMINION

(STRATA-0094124).

23.     Dominion rejected Henderson as a substitute for Fall Line on August 9, 2021.

EXHIBIT 22 – AUGUST 9, 2021 EMAIL FROM DOMINION TO STRATA REJECTING HENDERSON

(STRATA-0094123).

24.     Nevertheless an email dated August 9, 2021 from Sam Sink of Strata states "[i]t is

important that we develop a plan to explore Henderson as an option as we continue to vet other

options for replacement of Fall Line."  EXHIBIT 23 – AUGUST 9, 2021 INTERNAL STRATA EMAIL

(STRATA-0094121).  Mr. Sink confirmed during a Rule 30(b)(6) corporate deposition of Strata

that on the same day, Strata was considering Tindol, JSG, and Henderson as replacements for

Fall Line.  EXHIBIT 3 - SINK 8/18/23 TR, AT 57.

25.     Strata's August 10, 2021 Monthly Progress Report states that Strata is "currently in the process of selecting a new civil subcontractor to complete the project."  Exhibit 24 - 8/10/21 MONTHLY REPORT (STRATA-0007292).  Similarly, Strata's August 11, 2021 Weekly Meeting Minutes state that Strata is "Actively looking for new civil contractor."  Exhibit 25 – AUGUST 11, 2021, ROCHAMBEAU WEEKLY MEETING MINUTES (STRATA-0006374).

26.     Strata set up a meeting with yet another civil contractor, Town & Country, which took place on August 16, 2023.  Exhibit 26 – AUGUST 16, 2021 STRATA MEETING INVITATION TO TOWN AND COUNTRY (STRATA-0023711).

27.     In an August 20, 2021 email, Strata advised Tindol that it had a target completion date of October 16, 2021.  EXHIBIT 27 - AUGUST 20, 2021 EMAIL FROM STRATA TO TINDOL CONSTRUCTION (STRATA-0090199).

28.     Strata engaged Town & Country to perform work in Fall Line's scope of work on the Project.  Town & Country's began working on the Project on a time and materials basis starting on August 23, 2021. EXHIBIT 28 – TOWN AND COUNTRY INVOICES.

29.     Strata also engaged Tindol to perform other parts of Fall Line's scope of work on the Project.  On August 24, 2021, Tindol's mobilization was established for September 13, 2021. EXHIBIT 29 – AUGUST 24, 2021 STRATA ROCHAMBEAU EPC MEETING (STRATA-0006040).

30.     On September 9, 2021, Strata issued a Limited Notice to Proceed ("LNTP") to Tindol, which authorized them to invoice costs up to $900,000.00. The LNTP also stated that Strata anticipated a full subcontract agreement with Tindol would be in place by September 30, 2021. EXHIBIT 30 - LETTER FROM STRATA TO TINDOL CONSTRUCTION RE LIMITED NOTICE TO PROCEED (STRATA-0097118).[12]

---

[12] Due to an apparent technical error, the PDF version of this file (originally produced as a TIFF file by Strata), does not contain a date. The plain text version of the file, produced concurrently

31.     On September 8, 2021, a Strata internal email stating "[l]egal has requested we not execute a full contract with Tindol or [Town & Country] until the surety has the opportunity to perform their investigation.  As such, we need to execute an LNTP for work to buy us time until the 24th."  EXHIBIT 31 - SEPTEMBER 8, 2021 INTERNAL STRATA EMAIL (STRATA-0097116). Yet at that time, Town & Country had been working for approximately two weeks on Fall Line's scope of work, and Tindol was having equipment delivered to the site with the intent to mobilize on September 13, 2021.  Exhibit 32 –SEPTEMBER 8, 2021 STRATA ROCHAMBEAU WEEKLY MEETING MINUTES (STRATA-0006319).

32.     On September 8, 2021, counsel for Arch notified counsel for Strata that Arch had retained Michael A. Hillman of Professional Construction Consulting, Inc. ("PC2"), to conduct a site visit as part of Arch's investigation. EXHIBIT 33 - SEPTEMBER 8-9, 2021 EMAIL.

33.     Mr. Hillman conducted his site visit on September 13, 2021, and toured the Project site with Fall Line's Ryan Pounds, as well as Strata employees Sam Sink and Andy Solomon. EXHIBIT 34 – DECLARATION OF MICHAEL A. HILLMAN ("HILLMAN DEC."), ¶¶ 4-5.

34.     During Mr. Hillman's September 13, 2021 site visit, he observed that Strata already had two completion contractors, Tindol Construction and Town & Country Farms, on site and actively completing Fall Line's scope of work. HILLMAN DEC., ¶ 6. During that visit, Mr. Hillman spoke with Ryan Pounds of Fall Line who confirmed he was capable of completing the scope of work under its subcontract, but could not do so because Strata prevented it from returning to the Project. HILLMAN DEC., ¶ 7.

32.     Strata's September 9, 2021 Monthly Progress Report lists both Town & Country and Tindol as the "Primary Subcontractor" for the civil scope of work.  EXHIBIT 35 -  SEPTEMBER

---

by Strata, indicates that the document is dated September 9, 2021. A screenshot of the original plain text file is included with the Exhibit for the sole purpose of showing the document's date.

9, 2021 STRATA ROCHAMBEAU SOLAR MONTHLY REPORT (STRATA-0015401).

33.     Strata's September 7-12, 2021 Weekly Report shows that Tindol's first day on the Project site was September 10, 2021.  Exhibit 36 - SEPTEMBER 7-12, 2021 WEEKLY REPORT (STRATA-0008343).

34.     On September 14, 2021, Strata provided a Limited Notice to Proceed to Town & Country for certain basin and grading work, and authorized it to invoice for costs up to $200,000. EXHIBIT 37 – SEPTEMBER 14, 2021 LETTER FROM STRATA TO TOWN & COUNTRY FARMS LIMITED NOTICE TO PROCEED (STRATA-0070716).  Strata was working to send Town & Country a full contract by September 24, 2021.  EXHIBIT 38 – SEPTEMBER 14, 2021 EMAIL FROM STRATA TO TOWN AND COUNTRY (STRATA-0071096).

35.     Fall Line was never formally terminated by Strata.  *See* EXHIBIT 3 - Sink 8/18/23 TR, at 37.

36.     Sam Sink of Strata testified that the replacement contractors for Fall Line were Town & Country and Tindol.[13] Strata takes the position that the work performed by Town & Country and Tindol for which it seeks damages against Arch is the exact work that was in-scope for Fall Line when it contracted the Project, with one small exception.[14]

**D.     Strata Suspends Fall Line and Submits a Bond Claim to Arch**

37.     On August 3, 2021, a safety incident occurred on the Project involving Fall Line employees, and Fall Line left the Project site at 4:30 p.m. the same day.[15]

38.     On the following day, August 4, 2021, Ryan Pounds of Fall Line protested in an email that Fall Line's crew was engaging in the same installation procedures that had been

---

[13] EXHIBIT 39 - TRANSCRIPT OF DEPOSITION OF SAM SINK, AUGUST 17, 2023 ("SINK 8/17/23 TR") at 68.
[14] *Id.* at 225.
[15] EXHIBIT 40 - AUGUST 3, 2021 EMAIL FROM DALE HOHENSTEIN.

utilized previously without objections, and stated that Fall Line's means and methods were "industry standard."[16]

39.     Fall Line did not show up to the Project site on August 4, 2021, prompting a letter from Sam Sink of Strata to Ryan Pounds of Fall Line, complaining of this and other perceived deficiencies.[17]

40.     In a letter dated August 5, 2021, Sam Sink of Strata formally suspended Fall Line's performance of the Subcontract for cause.[18]  Many of the reasons given by Mr. Sink for the suspension were the same performance issues that arose in the April to June 2021 time frame as recounted above.

41.     On August 6, 2021, after Strata had already invited prospective replacement subcontractors to view the site, and the *same day* it proposed Henderson as a completion subcontractor to Dominion, Strata submitted a claim to Arch under the Bond, requesting that Arch "promptly remedy the Subcontractor Default or promptly take other action as specified in Paragraph 4 of the Subcontract Performance Bond."[19]  This was the first claim Strata made against the Bond.[20]

42.     In an August 11, 2021 letter, Strata's general counsel acknowledged in a letter that a conference had been held with Arch the same morning, and represented that Strata was required to obtain bids from potential completion subcontractors no later than August 18, 2021, and that a bid would be selected by August 20, 2021, a date only 14 days after the bond claim was asserted.[21]

---

[16] EXHIBIT 41 - AUGUST 4, 2021 EMAIL FROM RYAN POUNDS.
[17] EXHIBIT 42 - AUGUST 4, 2021 LETTER FROM SAM SINK.
[18] EXHIBIT 43 - AUGUST 5, 2021 LETTER FROM SAM SINK.
[19] EXHIBIT 44 - AUGUST 6, 2021 LETTER FROM ROSS COOK.
[20] See EXHIBIT 3 - SINK 8/18/23 TR, 74.
[21] EXHIBIT 45 - .AUGUST 11, 2021 LETTER FROM ROSS COOK

43.     Notwithstanding its suspension, Fall Line repeatedly announced its willingness and ability to complete the Project.[22]  For example, on August 16, 2021, Ryan Pounds of Fall Line sent a letter to Strata refuting various allegations made by Strata in its previous correspondence, contending that: (1) the "safety incident" reported by Strata was improper retaliation for reporting racial discrimination; (2) Strata failed to make timely payment of Fall Line's May 27, 2021 invoice; (3) Strata failed to provide a plan for Fall Line to resume work; (4) the necessary safety documents were in place; and (5) neither Fall Line nor the surety had any continuing obligation as a result of Strata's defaults.[23]

44.     Against this backdrop of vehement contention between Strata and Fall Line, Arch attempted to investigate Strata's claim.  In an August 20, 2021 letter, Arch's counsel noted the unreasonably short time constraints Strata had placed on it, and requested an extensive list of documents.[24]

45.     On August 27, 2021, Strata replied to Mr. Pledger's letter, stating that it was collecting the documents requested by Arch.[25]  Continuing, Strata stated, "the Project simply cannot afford to wait for the results of an extensive Surety investigation."[26]  Even though it was still responding to Arch's reasonable request for documents to support the claim, Strata threatened that unless Arch made "immediate arrangements to perform and complete the Subcontract," Strata would engage a replacement subcontractor.[27]  While Strata provided some information on the bids submitted by the civil contractors, it failed to mention that it had already directed Town & Country to commence work, and had already lined up Tindol to start work on

---

[22] See Exhibit 3 - Sink 8/18/23 TR, 96.
[23] Exhibit 46 - August 16, 2021 Letter from Ryan Pounds.
[24] Exhibit 47 - .August 20, 2021 letter from Richard T. Pledger
[25] Exhibit 48 - August 27, 2021 letter from Ross Cook, 1.
[26] Id. at 4.
[27] Id.

September 10.

46.     On September 2, 2021, Strata sent an additional letter to Arch's counsel, acknowledging that Arch was reviewing documents and beginning its investigation, but nevertheless pushing Arch to support Strata's unilateral decision to negotiate subcontracts with Tindol and Town & Country.[28]

47.     Strata sent another letter on September 15, 2021, acknowledging that Arch recently conducted a site visit and that Arch "continues to review and investigate Strata's claim on the bond," but indicating that Strata will move forward with engaging subcontractors to complete Fall Line's scope of work.[29]  The letter neglects to mention that Strata had already authorized Tindol and Town & Country to invoice a combined $1,100,000 relating to Fall Line's scope of work, over half the Bond amount.

48.     Arch attempted to explore the possibility of Fall Line returning to the Project and completing its scope under Arch's direction as its completion contractor.[30] On September 7, 2021, Sam Sink of Strata contacted Dominion, ostensibly to facilitate Arch's ability to explore this option.[31]  However, on September 22, 2021, a full month after Town & Country had been on the Project completing Fall Line's scope, and over a week after Tindol had commenced work, Strata rejected the notion of Fall Line returning to the Project, blaming the decision on Dominion.[32]

49.     On November 10, 2021, Arch's counsel sent a letter to Strata declining to serve as fact-finder as to the myriad factual disputes between Strata and Fall Line, noting that Strata

---

[28] EXHIBIT 49 - SEPTEMBER 2, 2021 EMAIL FROM ROSS COOK.
[29] EXHIBIT 50 - SEPTEMBER 15, 2021 LETTER FROM ROSS COOK.
[30] See EXHIBIT 4 - BEACH DECL., ¶ 15.
[31] EXHIBIT 51 - SEPTEMBER 7, 2021 EMAIL FROM SAM SINK.
[32] EXHIBIT 52 - SEPTEMBER 22, 2021 EMAIL FROM ROSS COOK.

improperly refused to permit Fall Line to return to the Project, alleging that Strata precluded Arch from completing the Subcontract under ¶ 4.1 and 4.2 of the Bond, and requesting mediation under the terms of the Subcontract.[33]

## III.   LEGAL ANALYSIS

### A.   Standard of Review.

The Court is empowered to enter summary judgment under Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Fed. R. Civ. P.* 56(c).  A fact is "material" if it might affect the outcome of the action under governing law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

As the party seeking summary judgment, Arch bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Once that burden is met, Strata, as the nonmoving party, must "go beyond the pleadings and by [its] own affidavits, or by depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotations omitted).  The Court "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).  The Court must ultimately decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477

---

[33] EXHIBIT 53 - NOVEMBER 10, 2021 LETTER FROM RICHARD T. PLEDGER.

U.S. at 251-52.

### B.     The Claims at Issue.

Only Count II of the First Amended Complaint is at issue in this Motion.  Counts I and III request relief only as against Fall Line.  In this Motion, Arch requests summary disposition of Count II, for breach of the Bond.  Strata's claim against Arch is premised on Strata's putative right to make a claim under the Bond.  Therefore, should the Court grant summary judgment in Arch's favor on Count II, no relief would be available to Strata under the Bond, Count II should be dismissed, and Arch should be dismissed as a party defendant.

### C.     Virginia Contract Law Applies to this Dispute.

Because this case was brought pursuant to the diversity jurisdiction granted by 28 U.S.C. § 1332, the Court must apply Virginia's choice-of-law rules.  *See Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).  Virginia generally enforces choice of law provisions in contracts between private parties.  *See Settlement Funding, LLC v. Von Neumann-Lillie*, 645 S.E.2d 436, 438 (Va. 2007) ("If a contract specifies that the substantive law of another jurisdiction governs its interpretation or application, the parties' choice of substantive law should be applied").

The Bond binds Arch and Fall Line to Strata for the performance of the Subcontract and incorporates the Subcontract by reference.  EXHIBIT 2 – SUBCONTRACT PERFORMANCE BOND, p. 2. Paragraph 21 of the Subcontract states, in relevant part, "[t]his Agreement shall be governed by and construed in accordance with the laws of the Commonwealth of Virginia, without reference to its principles of conflicts of laws."  EXHIBIT 1 - SUBCONTRACT, p. 21.  Because the parties unambiguously elected to have any dispute decided under Virginia law, Virginia law applies to this dispute.

**D.      The Relevant Bond Language Unambiguously Creates Conditions Precedent to Recovery.**

Under Virginia law, where the relevant contract provisions have a meaning discernible from the words alone, interpretation of the contract is a question for the Court, not the fact-finder.  *See Babcock & Wilcox Co. v. Areva NP, Inc.*, 788 S.E.2d 237, 243 (Va. 2016).  "A contract is not ambiguous simply because the parties to the contract disagree about the meaning of its language."  *Pocahontas Mining L.L.C. v. Jewell Ridge Coal Corp.*, 556 S.E.2d 769, 771 (Va. 2002).  The contract must be construed as a whole, with the words therein given their "usual, ordinary, and popular meaning."  *Babcock & Wilcox*, 788 S.E.2d at 244.  Virginia law does not permit a bond claimant to recover where it has failed to comply with a condition precedent clearly established in the bond language.  *See, e.g.*, *New Viasys Holdings, LLC v. Hanover Ins. Co.*, No. 2:06cv488, 2007 WL 783179, at *3-4 (E.D. Va. Mar. 12, 2007) (citing *New Amsterdam Cas. Co. v. U.S. Shipping Bd. Emergency Fleet Corp.*, 16 F.2d 847, 851 (4th Cir. 1927) ("failure to give notice of default in accordance with the terms of a condition contained in a fidelity or indemnity bond releases the surety from further liability thereunder")).

The plain language used in the Bond creates a condition precedent that must be satisfied in order to trigger Arch's liability.  Section 4 provides that whenever Fall Line "shall be, and is declared by the Obligee to be in default under the Subcontract, with the Obligee having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly," choose from its options for performance in §§ 4.1, 4.2, 4.3, and 4.4.  Implicit in such notice provisions is a requirement that the notice to the surety be *timely*, such that the surety is given a meaningful opportunity to choose from its options before the obligee elects to remedy the default on its own terms.  *See W. Sur. Co. v. U.S. Eng'g Constr., LLC*, 955 F.3d 100, 104-05 (D.C. Cir. 2020) (citing *Hunt Constr. Group v. Nat'l Wrecking Corp.*, 587 F.3d 1119, 1121 (D.C. Cir. 2009)).

17

Otherwise, the presence of the performance options in the bond language would be "nearly meaningless." *Id.*

The notice provisions in a performance bond are not mere procedural hurdles. They ensure that a surety whose principal has defaulted in its obligations can act swiftly to mitigate its potential losses arising from the default. *See, e.g.*, *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 220 (1st Cir. 2004) ("notice requirements exist precisely to provide the surety an opportunity to protect itself against loss by participating in the selection of the successor contractor to ensure that the lowest bidder is hired and damages mitigated"). Section 4 of the Bond gives Arch a number of options to choose from once Fall Line is declared in default and it is instructed to take action. But these options are meaningless without a fair opportunity to investigate the reasons for the termination and project status in such a way that it can make an informed choice of remedy. Indeed, for an obligee to rob the surety of its contractually agreed-upon opportunity to participate in the mitigation process would be "inherently prejudicial." *W. Sur. Co.*, 955 F.3d at 106. Accordingly, even assuming that Fall Line was in default and Strata otherwise complied with its obligations to Fall Line under the Subcontract,[34] Strata may only recover under the Bond if it provided timely notice to Arch and Arch had a meaningful opportunity to select its performance option before Strata proceeded to correct the alleged default on its own terms.

E.    **The Bond is Discharged Because Strata Failed to Provide Timely Notice Under § 4 and Unilaterally Undertook to Complete Fall Line's Scope of Work.**

The undisputed facts show that while Strata was aware of numerous alleged defaults as early as April 2021 which it considered to be "Subcontractor Defaults" under § 17.2.1 of the Subcontract early in its work on the Project,[35] it did not request Arch to take action until August

---

[34] These issues are highly contested in this litigation, but Arch acknowledges that the facts for the purposes of this Motion must be construed in Strata's favor.
[35] See FIRST AMENDED COMPLAINT, ¶¶ 10 and 107 [DOC 16].

6, 2021.  By then, Strata had already kicked Fall Line off the job site, decided that Fall Line would no longer be permitted to work, begun self-performance of Fall Line's scope of work, and begun lining up replacement contractors.  Strata neglected to advise Arch of the various Subcontract Defaults going back months and did not declare a default under the Bond until August 6, 2021, well after the alleged defaults occurred depriving Arch of the opportunity to investigate and determine what actions it should take.  Yet, Strata expects Arch to rubberstamp its decision to hire replacement contractors and pay under the Bond.  In late August and early September 2021, when Strata was in the process of providing documents and site access to Arch, Strata permitted its hand-selected replacement subcontractors, Town & Country and Tindol, to perform Fall Line's scope of work.  Strata did so over the vehement objections of Fall Line, which repeatedly voiced its willingness to return to the Project.  By the time Strata unambiguously refused to allow Fall Line to return to the Project on September 22, Town & Country had been on the Project completing Fall Line's scope for a month, and Tindol had already been on the Project doing the same for over a week.  By refusing to allow Arch time to conduct a proper investigation or cooperate in allowing Fall Line to return to the Project, Strata robbed Arch of a meaningful choice between the options guaranteed to it under the Bond. Accordingly, the Bond is deemed discharged and Arch has no liability to Strata.

The *Western Surety* and *Hunt Construction* cases cited above are just two in a long line of cases finding that an obligee forfeits its rights under a performance bond when it fails to provide timely notice to the surety.  "Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void."  *Sch. Bd. of Escambia County, Fla. v. TIG Premier Ins. Co.*, 110 F. Supp. 2d 1351, 1354 (N.D. Fla. 2000); *St. Paul Fire &*

*Marine Ins. Co. v. City of Green River, Wyoming*, 93 F. Supp. 2d 1170, 1178 (D. Wy. 2000); *see also Ins. Co. of N. Am. v. Metro. Dade County*, 705 So. 2d 33, 35 (Fla. 3d D.C.A. 1997); *Balfour Beatty Constr. Inc. v. Colonial Ornamental Iron Works, Inc.*, 986 F. Supp. 82, 86 (D. Conn. 1997); *L&A Contracting Co. v. S. Concrete Serv., Inc.*, 17 F.3d 106, 111 (5ᵗʰ Cir. 1994). This rule has been applied to discharge the surety's obligations in numerous cases involving the AIA A312 bond form, which resembles the Bond at issue here in structure and effect.[36] The slight differences between the bond forms at issue in the cited cases and the Bond at issue here do not justify a departure from the established case law.

Two recent cases illustrate the principle that an obligee must comply with the spirit and not merely the letter of the bond form in order to provide the surety a meaningful opportunity to correct the default. In *United States ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 2:13-CV-01907-APG-NJK, 2016 WL 8732302 (D. Nev. June 17, 2016), the project at issue was the construction of a crash rescue station at Creech Air Force Base in Indian Springs, Nevada. The general contractor, Jaynes Corporation, subcontracted with American Steel Corporation for steel fabrication and erection. *Id.* at *1. Pursuant to its subcontract, American Steel provided payment and performance bonds issued by Ohio Casualty Insurance Company. *Id.* The operative performance bond language required the obligee to declare a contractor default, and provided the

---

[36] *See, e.g., Developers Sur. & Indem. Co. v. Dismal River Club, LLC*, No. 4:07CV3148, 2008 U.S. Dist. LEXIS 122962, *34-35 (D. Neb. May 22, 2008) (summary judgment in favor of surety because it could not pursue its option to arrange for defaulting contractor to complete the project when obligee completed the work on its own without notice); *United States ex rel. Platinum Mech., LLC v. United States Sur. Co.*, No. 07 Cv. 3318, 2007 U.S. Dist. LEXIS 94026, *3 (S.D.N.Y. Dec. 21, 2007) (summary judgment granted to surety where owner failed to properly provide notice to surety that it was considering declaring the contractor in default); *120 Greenwich Dev. Assocs. v. Reliance Ins. Co.*, No. 01 Civ. 8219 (PKL), 2004 U.S. Dist. LEXIS 10514, *37 (S.D.N.Y. June 8, 2004) (summary judgment granted to surety where obligee admitted that it did not comply with notice provisions in bond); *Bank of Brewton v. Int'l Fid. Ins. Co.*, 827 So. 2d 747, 754 (Ala. 2002) (upholding discharge of performance bond on summary judgment where obligee never terminated principal's right to finish the project).

surety various options to remedy the default.  *See id.* at *4-5.

The relationship between Jaynes and American Steel broke down, with each party blaming the other for delays and problems on the project.  *Id.* at *2.  Jaynes sent several letters to American Steel noting delays and/or threatening to hire a replacement subcontractor at American Steel's cost.  *Id.* at *5.  American Steel advised Jaynes that it would not continue its work on the project until Jaynes approved various change orders and paid for work performed.  *Id.* at *2.  In response, Jaynes sent a letter dated June 26, 2013, to American Steel advising that it was contracting with a replacement subcontractor to complete American Steel's scope of work.  *Id.* at *5.  The replacement subcontractor began its work the following day, and completed its work nearly a month later.  *Id.* at *6.  Ohio Casualty received its first verbal and written notice of a claim against its performance bond on August 28 and 29, 2013, respectively.  *Id.*  Jaynes sought payment for the cost of completing the work through the replacement subcontractor.  *Id.*  In the ensuing lawsuit, Ohio Casualty moved for summary judgment and argued that its performance bond had been discharged.

Evaluating Jaynes's actions in light of the A312-2010 performance bond language, the Court held:

> There is no evidence that Jaynes ever issued a seven-day notice of termination or that it provided that notice to Ohio Casualty.  Nor did Jaynes provide Ohio Casualty with any other letter that stated it was terminating the contract with American Steel such that Ohio Casualty would be on notice that it was expected to commence performing under the bond. Because Jaynes did not do so, and instead decided to immediately employ a different contractor, Ohio Casualty's performance bond obligations are excused.

*Agate Steel*, 2016 WL 8732302, at *6.  Jaynes argued that Ohio Casualty was eventually put on notice of the default in August 2013 and that Ohio Casualty was not prejudiced by the failure to follow the precise notification procedure in the bond.  *Id.* at *7.  The Court rejected this

21

argument and noted that Section 3 of the bond states that the surety's obligations under the bond "shall arise after" the obligee complies with sections 3.1, 3.2 and 3.3. *Id.* at *7. By failing to provide timely notice to the surety, Jaynes committed a material breach that deprived Ohio Casualty of the ability to exercise its options under section 5 of the bond, and Ohio Casualty was excused from performance. *Id.* Ohio Casualty's Motion for Summary Judgment was granted. *Id.* at *8.

The actions of the obligee in *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 192 F. Supp. 3d 1326 (S.D. Fla. 2016), *aff'd*, 681 Fed. Appx. 771 (11th Cir. 2017), are strikingly similar to those by Strata here. The obligee, Americaribe-Moriarty JV ("AMJV"), notified the principal that it was in default via letter dated July 15, 2015. *Americaribe*, 192 F. Supp. 3d at 1333. About two months later, on September 21, 2015, AMJV declared the principal in default, terminated the subcontract, and made a demand on the subcontract performance bond. *Id.* On the following day, September 22, 2015, AMJV sent the surety, International Fidelity Insurance Company ("IFIC"), a letter stating that it intended to award the remaining scope of work under the subcontractor to another entity called Dillon Pools. *Americaribe*, 192 F. Supp. 3d at 1333. The day after that, on September 23, 2015, Dillon Pools began its work on the job site. *Id.* On October 1, a formal replacement subcontract was executed between AMJV and Dillon Pools. *Id.*

The district court found that while AMJV may have technically provided notice to IFIC, it was really "notice in name only." *Id.* Crucial to this determination was the fact that AMJV did not afford IFIC "actual notice and an opportunity to act before taking matters into its own hands and arranging for completion of the subcontract by Dillon Pools." *Id.* In fact, continued the court, "AMJV anticipated employing Dillon Pools to complete the subcontract as early as September 16, 2015, when it obtained a bid from Dillon Pools." *Id.* "Almost coextensive with

its declaration of default, which triggered IFIC's options under…the performance bond, AMJV engaged Dillon Pools and allowed Dillon Pools to begin work at the site." *Id.* This rendered any opportunity AMJV claimed to have provided to IFIC to act under the performance bond "fictional," and IFIC's "right to reasonable notice before AMJV undertook to arrange for performance of the pool and spa work to cure [the] default" was prejudiced. *Id.*

Further, the court found that even if AMJV had provided IFIC with the appropriate notice required by the bond, AMJV's decision to unilaterally hire Dillon Pools to complete the scope of the subcontract was an independent breach of the bond. *Id.* at 1334. Just as the Bond in this case does, the bond in *Americaribe* outlined four ways to proceed once AMJV notified IFIC of the default and made a claim under the performance bond. *Id.* IFIC "was actively considering its options under the terms of the performance bonds and communicating with AMJV about its concerns when AMJV decided to unilaterally retain Dillon Pools to complete [the principal's] work." *Id.* While AMJV may have had the right under the subcontract to hire a replacement subcontractor, it did not have a right do to so without first allowing IFIC an opportunity to exercise its rights under the performance bond. *Americaribe*, 192 F. Supp. 3d at 1334. AMJV's improper notice to IFIC *and* its unilateral decision to allow Dillon Pools to commence work while IFIC was actively engaged and considering its options were independent breaches of the bond sufficient to discharge IFIC's obligations. *Id.*

Turning back to the facts of the instant case, Strata was aware of what it considered to be "Subcontractor Defaults" under the Subcontract several months before it asserted a claim against the Bond. Under the clear terms of the Bond, Arch had no duty to act until Strata made its claim on August 6, 2021. When it did so, Strata had already obtained quotes from potential replacement subcontractors and allowed them to visit the job site. On the *very day* it alleges to

have provided adequate notice to Arch, Strata proposed to Dominion that Henderson be accepted as a replacement subcontractor for Fall Line.  When Henderson was rejected, Strata immediately, and without regard to Arch's rights as surety, arranged for Town & Country to begin work on August 23, 2021, and established a start date for Tindol on August 24.[37]

As all of this was occurring, and over the course of just a few days, Arch was in receipt not only of repeated entreaties for immediate action from Strata, but of regular communications from Fall Line vociferously contesting the alleged bases for default and declaring its interest in completing the Project.  Arch was also in the process of collecting and reviewing documents from both Strata and Fall Line, and arranging a site visit to inspect Fall Line's work itself.  These fact-finding steps were crucial because Arch, as surety, owed a duty of good faith to Fall Line to consider its arguments and versions of the fact to make a determination whether Fall Line (1) was really in default, (2) could reasonably be brought back to complete its work under the Subcontract with Arch's supervision, and (3) was entitled to assert any valid defenses to which Arch could succeed as surety.  *See RLI Ins. Co. v. Nexus Servs. Inc.*, 470 F. Supp. 3d 564, 590 (W.D. Va. 2020) (surety must act in good faith in determining whether principal has defaulted, and must in all respects deal fairly with the principal); *Fid. & Dep. Co. of Maryland v. Bristol Steel & Iron Works, Inc.*, 722 F.2d 1160, 1163 (4th Cir. 1983) (surety forfeits right of indemnity against principal when it makes payments with lack of good faith); *Bd. of Sup'rs of Stafford County v. Safeco Ins. Co. of Am.*, 310 S.E.2d 445, 450 (Va. 1983) (surety may raise defenses available to its principal).

Over the same course of time, Strata paid occasional lip service to Arch's right to select its performance option under § 4 of the Bond, but even while it acknowledged that Arch was

---

[37] Tindol's start date on the Project was September 10, 2021, as stated above.

performing its investigation, Strata flatly refused to allow Arch to do so before instructing its hand-selected completion subcontractors to proceed. Indeed, when Strata wrote its September 15, 2021 letter[38] to Arch acknowledging Arch's ongoing investigation and recent site visit, it had already issued Limited Notices to Proceed to both primary completion subcontracts, Town & Country and Tindol, and had promised each of them full subcontracts would follow shortly.[39] Just as in *Americaribe*, Strata gave notice in name only to Arch when it made a claim against the Bond without affording sufficient time to Arch for it to make an intelligent and informed choice among its options under the Bond. The impact of this insufficient notice was compounded by Strata's choice to unilaterally complete Fall Line's scope of work using its own employees as well as Town & Country and Tindol, among others, despite its concurrent acknowledgement that Arch was still investigating the claim and actively considering its options under the Bond. The same result should obtain here as in *Americaribe* and Arch's obligations under the Bond should be deemed discharged.

Strata will complain that it faced a Hobson's choice of allowing Arch to conduct a full investigation, or timely completing the Project for Dominion. This dilemma was entirely of Strata's own making. Strata allowed Fall Line to continue its work from April 2021, when it contends it first became aware of alleged defaults committed by Fall Line, until August 5 when Fall Line was suspended. Strata was certainly within its rights to allow Fall Line to attempt to placate Strata, Dominion and James City County without asking Arch to take action. But having made the decision to wait until the eleventh hour to ask Arch to become involved, Strata could not arbitrarily compress Arch's investigation and response time to comply with performance benchmarks that Strata was fully aware of long before Fall Line even set foot on the Project.

---

[38] Ex. 50.
[39] Exs. 30 & 37.

Arch's right to investigate the claim and select among its options under the Bond is a contractual, bargained-for right that could not be massaged out of existence by Strata's sharp dealing.

### F.     A Showing of Actual Prejudice is Not Necessary, but Arch Has Been Prejudiced Nonetheless.

As set forth above, Arch need not show that it has suffered actual prejudice because Strata's failure to provide reasonable notice of what it considered to be Fall Line's "Subcontractor Defaults" and its intent to assert a bond claim, in and of themselves, constitute a material breach of § 4 of the Bond and discharges Arch's obligations.  Nevertheless, should it be determined that actual prejudice must be shown in order to dismiss Count II of the First Amended Complaint, there are ample grounds for a finding of prejudice as a matter of law.

Arch suffered prejudice because Fall Line's scope of work was in the process of being completed by the time Arch was asked to take action to correct Fall Line's performance.  By effectively losing its options to mitigate its damages under the Bond, Arch could not investigate or choose the course of action that would have minimized its losses.  When Strata provided for completion of its scope of work without giving meaningful notice to Arch, it sought to force Arch to accept the course of action Strata found to be most expedient at the time, rubberstamp its decisions and foot the bill when all was said and done.  Arch's right to have input as to the completion of Fall Line's scope of work was eviscerated.  Strata's failure to comply with the notice requirement was thus more than a mere technical breach, it was a material breach that deprived Arch of its rights under the Bond to its irreversible prejudice.  *See Agate Steel*, 2016 U.S. Dist. LEXIS 79888 at *23-24 (citing *Seaboard Sur. Co.*, 370 F.3d at 220 (rejecting the argument that failure to give notice of termination was a technical breach because "the notice provision…provides an opportunity for the surety to cure the breach and thus mitigate damages," and "even if [the surety] must show injury, loss, or prejudice, it meets this hurdle, given its

26

deprivation of mitigation opportunities").

## IV.  CONCLUSION

For the reasons stated above, Strata has forfeited any right it may have had to assert a claim under the bond by failing to give adequate notice, and unilaterally choosing to complete Fall Line's scope of work without providing Arch an opportunity to intelligently select among the options guaranteed to it by the Bond.  In such circumstances, the well-established law governing sureties and obligees, as well as the plan language of the Bond, support the dismissal of Count II and discharge of Arch's liability under the Bond.

Respectfully submitted,

ARCH INSURANCE COMPANY

By Counsel

/s/ Richard T. Pledger
Richard T. Pledger (VSB No. 28192)
Thomas J. Moran (VSB No. 71296)
WRIGHT, CONSTABLE & SKEEN, LLP
301 Concourse Boulevard
Suite 120, West Shore III
Glen Allen, VA  23059
Telephone:      (804) 362-8293
Facsimile:      (804) 441-9250
email:         rpledger@wcslaw.com
               tmoran@wcslaw.com
Counsel for Arch Insurance Company

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 8th day of September 2023, I filed the foregoing using the

Court's CM/ECF system, which will send an electronic notice of filing to:

Clark James Belote, Esquire
KAUFMAN & CANOLES PC
150 W. Main St.
Suite 2100
PO Box 3037
Norfolk, VA 23510
Email: cjbelote@kaufcan.com
*Virginia Counsel for Strata Solar, LLC*

Lee-Ann Christine Brown, Esquire
BRADLEY ARANT BOULT CUMMINGS, LLP
1615 L Street, NW
Suite 1350
Washington, DC  20036
Email: labrown@bradley.com
*Virginia Counsel for Strata Solar, LLC*

Kristan Boyd Burch, Esquire
KAUFMAN & CANOLES PC
150 W. Main St.
PO Box 3037
Norfolk, VA 23510
Email: kbburch@kaufcan.com
*Virginia Counsel for Strata Solar, LLC*

Monica Wilson Dozier, Esquire
BRADLEY ARANT BOULT CUMMINGS, LLP
214 N. Tryon Street
Suite 3700
Charlotte, NC 28202
Email: mdozier@bradley.com
*North Carolina Counsel for Strata Solar, LLC*

Dorothea Ille, Esquire
HUDSON LAMBERT PARROTT WALKER, LLC
3575 Piedmont Rd
Suite 200
Atlanta, GA 30305
Email:  dille@hlpwlaw.com
*Georgia Counsel for Fall Line Construction, LLC*

28

Carlton Daniel Miller, Esquire
HUDSON LAMBERT PARROTT WALKER, LLC
2450 Maitland Center Pkwy
Suite 206
Maitland, FL 32751
Email:  cmiller@hlpwlaw.com
*Florida Counsel for Fall Line Construction, LLC*

Antony L. Sanacory, Esquire
HUDSON LAMBERT PARROTT WALKER, LLC
3575 Piedmont Road
Suite 200
Atlanta, GA  30305
Email:  asanacory@hlpwlaw.com
*Georgia Counsel for Fall Line Construction, LLC*

Emily Munro Scott, Esquire
HIRSCHLER FLEISCHER PC
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, VA  23223
Email:  escott@hirschlerlaw.com
*Virginia Counsel for Fall Line Construction, LLC*

        and

Jaime Brett Wisegarver, Esquire
HIRSCHLER FLEISCHER PC
The Edgeworth Building
2100 East Cary Street
Post Office Box 500
Richmond, VA  23223
Email: jwisegarver@hf-law.com
*Virginia Counsel for Fall Line Construction, LLC*


                    */s/ Richard T. Pledger*