**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Newport News Division**

| | | |
|---|---|---|
| STRATA SOLAR, LLC | ) | |
| | ) | |
| Plaintiff/Counterclaim Defendant, | ) | |
| | ) | |
| v. | ) | Case No.: 4:22-cv-106 |
| | ) | |
| FALL LINE CONSTRUCTION, LLC, | ) | |
| | ) | |
| Defendant/Counterclaimant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| ARCH INSURANCE COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**STRATA SOLAR, LLC'S MEMORANDUM IN OPPOSITION TO ARCH INSURANCE
COMPANY'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff/Counterclaim Defendant Strata Solar, LLC ("Strata"), states as follows in opposition to Defendant, Arch Insurance Company ("Arch")'s Motion for Summary Judgment (ECF No. 60) (the "Motion"):

**I.      INTRODUCTION**

Arch issued a performance bond (ECF No. 61-2) (the "Bond") binding itself to perform Fall Line Construction, LLC ("Fall Line")'s subcontract with Strata (the "Subcontract") in the event that Fall Line failed to perform. On **August 5, 2021**, Strata declared Fall Line in default and removed Fall Line from the Rochambeau Project (the "Project") at the direction of the owner, Virginia Electric and Power Company, Inc. ("Dominion"). On **August 6, 2021**, Strata gave Arch notice of the same and demanded performance under the Bond. In late August and early September 2021, with Arch having taken no definitive action, Strata (with advance notice to Arch) hired

replacement subcontractors to complete Fall Line's work. Under its contract with Dominion, Strata was required to substantially complete the Project by **November 22, 2021**. On **November 10, 2021**, Arch completed its "investigation." (ECF No. 61-53, at 2). At the conclusion of its investigation, Arch's "decision under the Performance Bond" was to "request[] that the parties participate in a settlement conference or mediation." (ECF No. 61-53, at 7). Arch failed to fulfill its obligations under the Bond.

Arch asks the Court to excuse it from any and all liability under the Bond based on one argument. Arch argues that "Strata robbed Arch of a meaningful choice between the options . . . under the Bond," (ECF No. 61, at 19), because Strata did not "comply with the *spirit* . . . of the bond form," (ECF No. 61, at 20) (emphasis added), by only giving Arch several weeks to "conduct a proper investigation." (ECF No. 61, at 19).

Arch's argument fails for three reasons. First, Arch relies on a non-existent contract term. Although Arch uses words like "unambiguous" and "plain language," it cannot, and does not, identify any provision in the Bond that makes an investigation by Arch a condition precedent to Arch's obligation to perform the Subcontract. The Bond's terms are one-page. The Bond contains the word "notice" once: Arch "hereby waives notice of any alteration or extension of the Subcontract . . . ." (ECF No. 61-2, at 2). The Bond contains no provision regarding an investigation by Arch, much less a condition precedent. "'We construe [a contract] as written, without adding terms that were not included by the parties.'" *RECP IV WG Land Inv'rs LLC v. Capital One Bank USA, N.A.*, 295 Va. 268, 283 (2018) (quoting *City of Chesapeake v. Dominion SecurityPlus Self Storage, L.L.C.*, 291 Va. 327, 335 (2016)). There is no requirement that Arch have a "meaningful" opportunity to decide what it wanted to do under the Bond.

Second, even if the Bond did allow Arch such an opportunity, Arch had more than sufficient and reasonable time to investigate and make a decision on how it would comply with the terms of the Bond. Strata provided Arch repeated written notice of the urgency of the Project and proposed replacement subcontractors. While many sureties act within days, Arch had several weeks until Strata was forced to proceed with replacement subcontractors on a limited, time and materials basis, until Arch made a decision. Strata's time (and notice to Arch) was more than reasonable to satisfy any "implicit" condition precedent Arch attempts to read into the Bond. (ECF No. 61, at 17).

Finally, even if the Bond did require Strata to provide Arch over three months to investigate before it had a duty to make a decision under the Bond, whether the notice and opportunity to make a decision under the Bond given to Arch by Strata was reasonable or sufficient under the circumstances is a disputed issue of material fact for trial. The Court should deny Arch's Motion for Summary Judgment.

## II.     STANDARD OF REVIEW

Under Rule 56 of the Federal Rules of Civil Procedure, the Court shall only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact *and* the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a) (emphasis added). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable jury could return a verdict for the nonmoving party." *CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020) (quoting *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014)).

When reviewing the record as a whole, the Court tilts its review in favor of the nonmovant. "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn

in his favor.'" *McAirlaids, Inc.*, 756 F.3d at 310 (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). The Court must decide whether the evidence presented on the papers "'is so one-sided that one party must prevail as a matter of law,'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)), or rather there are genuine factual disputes to be resolved at trial.

"Where . . . the movant seeks summary judgment on an affirmative defense, it must conclusively establish all essential elements of that defense." *Ray Commc'ns, Inc. v. Clear Channel Commc'ns, Inc.*, 673 F.3d 294, 299 (4th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986)). "[W]here the movant fails to fulfill its initial burden of providing admissible evidence of the material facts entitling it to summary judgment, summary judgment must be denied, even if no opposing evidentiary matter is presented, for the non-movant is not required to rebut an insufficient showing." *Id.* (citation omitted).

## III.   STRATA'S RESPONSES TO ARCH'S LIST OF MATERIAL FACTS NOT IN GENUINE DISPUTE

1.      Strata does not dispute the facts alleged in paragraphs 1 and 2 of Arch's List of Undisputed Facts.

2.      Strata does not dispute that Arch issued the Bond in the amount of $2,000,000, but denies that it was "as required by the Subcontract." Exhibit L to the Subcontract required a performance bond "for the entire amount of the subcontract," which was $2,800,000.

3.      Paragraph 4 of Arch's List of Undisputed Facts quotes from the Bond.

4.      Paragraph 5 of Arch's List of Undisputed Facts states a legal argument about the construction of the terms of the Bond, which Strata disputes. The word "promptly" in Section 4 of the Bond limits Arch's option.

5.      Strata does not dispute that Fall Line failed to fulfill its work in compliance with the Subcontract in the time period before April of 2021.

6.      Strata does not dispute the facts alleged in paragraph 7 of Arch's List of Undisputed Facts.

7.      Strata does not dispute the facts alleged in paragraph 7 of Arch's List of Undisputed Facts. Arch was copied on the June 29, 2021 letter outlining defaults by Fall Line. *See* (ECF No. 61-4, at 2, ¶ 6).

8.      Strata does not dispute that Fall Line sent a response letter dated June 29, 2021, disagreeing with Strata's letter dated June 29, 2021.

9.      Strata does not dispute the facts alleged in paragraphs 10, 11, and 12 of Arch's List of Undisputed Facts.

10.      Strata does not dispute that Exhibits 13 and 14 to Arch's Memorandum in Support of its Motion for Summary Judgment were exchanged between Strata and Fall Line.

11.      Strata does not dispute the facts alleged in paragraphs 14, 15, and 16 of Arch's List of Undisputed Facts.

12.      Strata disputes the facts alleged in paragraph 17 of Arch's List of Undisputed Facts to the extent it contends that subcontractors intended to *replace* rather than *supplement* Fall Line were invited to the Project site in July of 2021. *See* S. Sink Tr. 49:21-25:

> 21      Q.   When did you ask the potential
> 22   subcontractors to visit the site and provide bids?
> 23      A.   I believe there's a record of
> 24   contractors visiting the site in July with the
> 25   intent to provide pricing for supplementation.

13.      Strata does not dispute the facts alleged in paragraph 18 of Arch's List of Undisputed Facts. *See also* S. Sink Tr. 65:4-21:

```
 4        Q.   "Are they good to be considered as a
 5     replacement in Rochambeau."  That's what the
 6     statement is.  This would suggest, would it not,
 7     that Strata solar had already determined it was
 8     going to place the subcontractor not necessarily
 9     with Henderson but to replace Fall Line Construction
10     with somebody?  Is that a fair assessment?
11        A.   No, sir, I don't believe that it is.
12        Q.   How is it incorrect?
13        A.   I believe that it's an overstatement of
14     the phrase "replacement," and the context behind
15     replacement here would be in reference to the
16     supplementation efforts that we were considering
17     that I mentioned previously that were ongoing
18     through the late June, July time frame, and so
19     replacement of specific scopes of Fall Line in an
20     effort to supplement them would be the full context
21     behind this.
```

14.    Strata does not dispute the facts alleged in paragraphs 19 through 33 of Arch's List of Undisputed Facts.

15.    Strata does not dispute the facts alleged in the first sentence of paragraph 34 of Arch's List of Undisputed Facts. Strata objects to the statement alleged in second sentence of paragraph 34 (and stated in paragraph 7 of Mr. Hillman's Declaration) as inadmissible hearsay. *See* Fed. R. Civ. P. 56(c)(2). The alleged statement of Mr. Pounds of Fall Line does not fit within Rule 801(d)(2) of the Federal Rules of Evidence because it is not being offered against Fall Line, but against Strata. As a result, it is hearsay barred by Rule 802 of the Federal Rules of Evidence. Strata also disputes the underlying allegation that Fall Line was capable of completing its scope of work on the Project. Approximately 40 staff members were needed to timely complete the Work. *See* Letter dated Sept. 15, 2021 from Strata to Arch (attached as **Exhibit 1**). In Fall Line's July 22,

2021 Project Completion Plan, it proposed staffing the Project with 17-19 workers (attached as **Exhibit 2**). In addition, Fall Line was unable to complete the work because the owner of the Project (Dominion) had specifically requested Fall Line's removal and barred Fall Line from the site. *See* Letter dated Aug. 5, 2021 from Dominion to Strata (attached as **Exhibit 3**) ("Owner hereby directs Contractor to remove Fall Line Construction from the Rochambeau site, effective immediately. Fall Line Construction has ignored safety directives from Strata and Owner's staff, and they have not complied with the James City County inspector's instructions related to permit compliance."); *See* Email dated Aug. 6, 2021 (attached as **Exhibit 4**) (Dominion barring Fall Line's Rico Harris and Ben Norton from the site); *See* Email dated Aug. 19, 2021 (attached as **Exhibit 5**) (Dominion noting "Strata's former civil sub, Fall Line Construction, had ignored remediation instructions from the James City County inspector for several weeks who had in turn not allowed Strata/Fall Line to open up more of the site to land clearing. This situation was moving quickly towards an environmental NOV so we advised Strata to remove the contractor (for environmental and safety compliance issues) as a first step to bring the site into compliance.").

16.     Strata does not dispute the facts alleged in the second paragraphs 32, 33, and 34 [sic][1] of Arch's List of Undisputed Facts.

17.     Strata does not dispute the facts alleged in paragraphs 35 through 41 of Arch's List of Undisputed Facts.

18.     Arch's Exhibit 45 speaks for itself.

19.     Strata does not dispute the facts alleged in the first sentence of paragraph 43 of Arch's List of Undisputed Facts. Strata does not dispute that Fall Line sent the letter attached to Arch's Memorandum as Exhibit 46, but denies that any of its contents "refute" the various

---

[1] Arch's Memorandum appears to contain a paragraph numbering error starting on page 11.

allegations made by Strata in its previous correspondence for the reasons stated in Strata's correspondence. *See* Arch Mem. Exs. 42 and 43; Letter dated Aug. 25, 2021 (attached as **Exhibit 6**)

20.     In response to paragraph 44 of Arch's List of Undisputed Facts, Strata does not dispute that Arch "attempted to investigate Strata's claim," but disputes that Arch took any action or efforts to investigate "promptly" as required by the Bond. *See* Arch Mem. Ex. 2. As shown by the two email chains between Strata and Arch (attached as **Exhibit 7** and **Exhibit 8)**, Arch failed to make any progress toward completing its "investigation" for several weeks. Arch repeatedly failed to respond to email requests from Strata, despite Strata providing responsive documentation to Arch on August 27, 2021 and despite Strata's prompt answering of Arch's questions.

21.     Strata disputes the facts alleged in the first sentence of paragraph 45 of Arch's List of Undisputed Facts. In accompanying email correspondence, Strata stated that it provided the documents on August 27, 2021 via Sharefile link. *See* Ex. 7:

---

**From:** Ross Cook
**Sent:** Friday, August 27, 2021 6:15 PM
**To:** 'Richard T. Pledger' <rpledger@wcslaw.com>
**Cc:** 'Dozier, Monica Wilson' <mdozier@bradley.com>
**Subject:** RE: Rochambeau Solar Project - Strata Solar, LLC and Fall Line Construction, LLC

Rich,

In follow up to my email below, here is a Sharefile link to the documents/information requested: https://stratasolar.sharefile.com/d-s8eca20a9bef04e73b729fd4e700a2457

You will need to provide your name and email address to access the documents. Please let me know if you have any issues accessing the documents.

Thanks,

Ross Cook
Senior Associate Counsel
<image001.png>
800 Taylor Street, Suite 200                                                    ARCH 00666
Durham, NC 27701

---

Strata's August 27, 2021 letter otherwise speaks for itself.

22.     In response to paragraph 46 of Arch's List of Undisputed Facts, Strata does not

dispute that Arch was apparently just "beginning its investigation" on September 2, 2021, after

Arch received Strata's claim on August 6, 2021 or that Strata gave Arch multiple notices and

opportunities to engage with Strata to pursue replacement subcontractors. *See* Arch Ex. 49:

Rich,

As you are aware, Strata has worked diligently to develop a plan for completion of Fall Line's subcontract work at the Rochambeau site following the default by Fall Line. Strata has seen no substantive response/plan from Arch Insurance since Strata's August 6 claim on the subcontract performance bond, and the civil work at Rochambeau has been effectively suspended on site since Fall Line's August 3 abandonment. Strata has requested Arch Insurance to engage since August 6 and we welcome and have invited Arch Insurance to be a part of this process, visit the Rochambeau site, and speak with our project team. This has not happened and there seems to be no definitive timeframe within which Arch Insurance will be able to provide a "prompt" response under the performance bond much less ensure completion of Fall Line's performance. We understand that you were not retained by Arch Insurance until August 17 which is why we're trying to provide you with all information up front as this is happening – we want Arch Insurance's input. Strata's invitation to Arch Insurance to be a part of this process and coordinate with our team remains open. We don't want to be in this position. But as we have said many times, Strata has an obligation to mitigate damages and we believe we are acting in every reasonable way possible to do that. We do not believe it is reasonable (or even feasible at this point given the critical schedule constraints of this project) to continue to await response at this point and not act.

As I indicated in my August 11 letter to Arch Insurance and stated in my August 27 letter to you and Arch Insurance, Strata completed an RFP the week of August 20 and received pricing from 3 bidders, 2 of whom we shortlisted for further review. We have considered all available options for completion of Fall Line's scope. Because no bidder alone will be able to support the project completion dates, the most viable option to minimize damages of Fall Line's default is to retain the 2 shortlisted subcontractors (Tindol Construction and Town and Country) for performance of work in parallel. We are working on planning and pricing negotiations as well as scope breakdowns between these 2 subcontractors. Today we have a meeting with James City County (JCC) and the project owner to review proposed plans moving forward. Strata has also retained a local civil firm, JSG, who is providing consulting services to interface with JCC. All documents from the RFP and the responsive bids were of course included in our sharefile to you.

Following today's meeting with JCC, Strata intends to move forward in negotiation of subcontracts with Tindol Construction to perform a portion of the basin work, and Town and Country for other basin work, grading, and road scopes. We expect we will need additional support for clearing and grubbing from K&B Clearing and stabilization with Ace Hydro Seeding.

Finally, in a further effort to minimize costs, Strata intends to provide all procurement of materials to support the basin installation, road installation, and erosion control.

23.     In response to paragraph 47 of Arch's List of Undisputed Facts, Strata does not

dispute that that it sent its September 15, 2021 letter, which speaks for itself:

While we fully understand the Surety continues to review and investigate Strata's claim on the bond, we strongly believe that there is no other practical, reasonable option at this point but to move forward with completion of Fall Line's scope with replacement subcontractors. We have previously provided the Surety with pricing and information received from potential replacement subcontractors. As you know, our competitive bids to potential replacement contractors have led Strata to shortlist Tindol and Town and Country for the majority of Fall Line's remaining scope of work. In order to complete the scope to allow subsequent subcontractors' performance and place the plant in service by year end, both replacement subcontractors will need to perform work in parallel on the site. Their scopes will likely exclude long-term maintenance, clearing and grubbing of treed acreage, temporary and permanent seeding, and storm water pollution prevention work, because we believe this work can be either self-performed by Strata or subcontracted to another party at a lower cost. We have requested pricing from ACE Seeding for temporary and permanent seeding scope. We have requested pricing from K&B Land Clearing to clear and mulch all mature growth vegetation prior to civil construction (as required by the Subcontract).

Strata is proposing moving forward with Tindol for all basin work, including diversion ditches and BMPs relating to directing flow to each basin (#s 1, 2, 3, 4, 18, 19, 20 and 21). We are proposing Town and Country perform all remaining basin rework in Zone 5 which captures basins #s 9, 10, 11, 12, 16 and 17, and also to perform basin construction work for basins #s 7 and 8. Finally, we propose that Town and Country perform all upland grading for all Zones. We have requested additional pricing from both subcontractors for basin construction work for basins #s 5 and 6 and propose awarding that work to the subcontractor with the most reasonable price and available crews.

24.    In response to paragraph 48 of Arch's List of Undisputed Facts, Strata does not dispute that Dominion precluded Fall Line from returning to the site.

25.    In response to paragraph 49 of Arch's List of Undisputed Facts, Strata does not dispute that Arch's counsel sent the letter dated November 10, 2021. Strata disputes that the actions taken by Arch were prompt, reasonable, or sufficient under the terms of the Bond. Instead, Arch continually delayed and refused to act, without ever identifying specific issues or concerns that precluded it from making its required decision under the Bond and without ever specifically objecting to Strata's use of replacement subcontractors, Tindol and Town & Country. Instead, Arch immediately took the position that it could not adequately investigate and continually (including through this litigation) stuck with that position, blaming Strata, asking the same rhetorical and argumentative questions again and again. *See, e.g.*:

> a.  Mr. Pledger's August 20, 2021 Letter: "It is not clear to me how Strata Clean
>     Energy can expect Arch, which received a notice of default short of two weeks ago,

to conduct a complete investigation and determine precisely how its wishes to proceed . . . ." (ECF No. 61-47, at 2).

b.  Mr. Pledger's November 10, 2021 Letter: "It was not clear to me then and it is not clear to me now how Strata Solar could reasonably expect Arch, which received a notice of default just short of two weeks before my letter of August 20, 2021, to immediately absorb all of the history of delays and claims on this Project . . . ." (ECF No. 61-53 at 3).

c.  Sam Sink Tr. 72:24-73:6:

| | |
|---|---|
| 24 | How is it that Strata can expect Arch to |
| 25 | receive notice on August 6, to conduct a complete |

Page 73

1   investigation and determine precisely how it wishes
2   to proceed, especially in light of the fact that the
3   issues between Strata and Fall Line were disputed
4   and contentious?  Why did Strata expect Arch just to
5   jump in and do something right way when it just got
6   notice?
7       A.   Strata expected that Arch had been
8   participating in trying to understand Fall Line's
9   defaults prior to the August 6 notice based on
10  other notices that Strata provided to Fall Line and
11  copied Arch on and Strata was making every effort
12  to make Arch aware of all the facts and
13  circumstances as well as any information that may
14  be further to make a decision including access to
15  the site to do an evaluation which we felt would
16  support your belief to do so and we felt that you
17  had an obligation to respond in a timely fashion.

d.  Sam Sink Tr. 77:12-22:

```
12      Q.   Understand the circumstances, since they
13   only gave Arch notice on August 6 of default and
14   called upon to proceed under the bond, why wouldn't
15   Strata allow the surety to investigate?
16      A.   Strata had engaged with the surety to
17   support an investigation.  We had asked what
18   information was needed, we had provided information
19   that we thought you may need in response to your
20   request and also made the site available for
21   inspection in an effort to support your
22   investigation.
```

e.  Sam Sink Tr. 79:5-23:

```
5       Q.   Isn't it fair to state that Strata
6    simply wanted Arch to rubber stamp its decisions
7    about who it was going to hire and stroke a check
8    and that's it?
9       A.   No, sir, I do not think that's an
10   accurate summation of Strata's expectations.
11      Q.   On a project this complex, how can you
12   expect the surety to complete the investigation and
13   determine what is necessary to complete the
14   performance?
15          MS. BROWN:  Objection to the form.
16      A.   Strata believes that the record of
17   noticing Fall Line with Arch in copy gave Arch the
18   opportunity to begin investigating and supporting
19   means to cure defaults of Fall Line prior to
20   calling the bond, and at the time we did call the
21   bond and all subsequent conversations thereafter,
22   Strata made every opportunity to collaborate and
23   support the surety's ability to make a decision.
```

f.  Sam Sink Tr. 100:14-23:

> 14   Q.   Would you agree that Strata had already
> 15   decided what source of action that the surety needed
> 16   to take by selecting completion contractors and
> 17   wanting it to rubber stamp those decisions?
> 18   A.   No, sir, I do not believe that's an
> 19   accurate summation.  In fact, Strata had already
> 20   been working to develop supplementation options due
> 21   to the numerous defaults of Fall Line.  We made
> 22   that information available to the surety so you
> 23   could execute one of your available remedies.

## IV.    ARGUMENT

The Court should deny Arch's Motion for Summary Judgment.

### A.    The Bond Does Not Contain Any Express Condition Precedent (or Subsequent) Relating to Arch's Investigation or "Meaningful Opportunity to Choose from Its Options" Under the Bond.

"A performance bond is simply a contract." *Siegfried Constr., Inc. v. Gulf Ins. Co.*, No. 98-2808, 2000 U.S. App. LEXIS 1304, at *8 (4th Cir. Feb. 2, 2000) (unpublished) (applying Virginia law). "Virginia law dictates that surety bonds posted by professional sureties are contractual obligations, subject to the general rules of contract law." *Centex Constr. v. ACSTAR Ins. Co.*, 448 F. Supp. 2d 697, 708 (E.D. Va. 2006) (citations omitted).

"The court's task is to enforce contracts as written, not to unilaterally alter the parties' obligations." *Siegfried Constr., Inc.*, 2000 U.S. App. LEXIS 1304, at *9 (citing *D.C. McClain, Inc. v. Arlington County*, 452 S.E.2d 659, 662 (Va. 1995)). "In Virginia, surety bonds are liberally construed, *see Fidelity & Deposit Co. v. A.J. Bailey*, 133 S.E. 797, 797 (Va. 1926), and 'sureties for hire' are required to 'abide by their contracts and pay everything which by fair intendment can be charged against them.'" *Id.* (quoting C.*S. Luck & Sons, Inc. v. Boatwright*,  162 S.E. 53, 54 (Va. 1932)).

Arch argues that "the relevant bond language unambiguously creates conditions precedent to recovery." (ECF No. 61, at 17). However, Arch never identifies the "relevant bond language."

There is none. Instead, Arch has to argue that a contractual condition precedent is "implicit" in Section 4 of the Bond. (ECF No. 61, at 17).[2]

Section 4 of the Bond provides that "[w]henever [Fall Line] shall be, and is declared by [Strata] to be in default under the Subcontract, with [Strata] having performed its obligations in the Subcontract, the Surety may promptly remedy the default, or shall promptly" exercise one of four options:

4.1 – "Complete the Subcontract in accordance with its terms and conditions;[3]"

4.2 – "Obtain a bid or bids formally, informally or negotiated for completing the Subcontract in accordance with its terms and conditions, and . . . if [Strata] elects, upon determination by [Strata] and the Surety jointly of the lowest responsible bidder, or negotiated proposal, arrange for a contract between such party and [Strata]."

4.3 – "Determine the amount for which [Arch] is liable to [Strata] and pay [Strata] that amount as soon as practicable;" or

4.4 – "Deny its liability in whole or in part and notify and explain to [Strata] why the Surety believes it does not have responsibility for this liability."

(ECF No. 61-2, at 2).[4]

No provision of Section 4 of the Bond (nor any other Section of the Bond) creates a condition precedent to Arch's obligations. Arch's argument fails for this reason alone. Attempting to overcome this fatal defect, Arch cites to cases that address bonds that actually have an express condition precedent, such as the American Institute of Architects ("AIA") Form A312 bond.

---

[2] For this proposition, Arch cites to W. *Sur. Co. v. United States Eng'g Constr., LLC*, 446 U.S. App. D.C. 125, 128, 955 F.3d 100, 103 (2020) where the obligee did not make a claim on the AIA Document A312 performance bond until "nearly nine months after" it terminated the subcontractor. Here, Strata never terminated Fall Line. Strata gave Arch repeated notices *before* it engaged replacement subcontractors on a permanent basis. And, Strata gave Arch notice of its claim within one day of Fall Line's declaration of default and suspension from the Project.

[3] Section 1 of the Bond incorporated the Subcontract into the Bond by reference.

[4] Arch acknowledges it did none of those things. Instead, it argues that Strata "robbed Arch of a meaningful choice between the options guaranteed to it under the Bond." (ECF No. 61, at 19).

For example, Arch cites to *New Viasys Holdings, LLC v. Hanover Ins. Co.*, Civil Action No. 2:06cv488, 2007 U.S. Dist. LEXIS 17924, at *3 (E.D. Va. Mar. 12, 2007). (ECF No. 61, at 17). There, the bond stated: "[I]t shall be a condition precedent to any right of recovery hereunder, that in the event of any default on the part of the Principal, a written statement of the particular facts showing the date and nature of such default shall be immediately delivered to the Surety by registered mail at its principal office in Worcester, Massachusetts." 2007 U.S. Dist. LEXIS 17924, at *3. There is no such express language in the Bond here.

Arch cites to a number of AIA A312 bond form cases. A sample AIA A312 bond form (1984 version)[5] is attached as **Exhibit 9**. The A312 bond is a general contractor performance bond, not a subcontractor performance bond. Most critically though, it has language creating an express condition precedent. Its Section 4 provides that "*When* the Owner has satisfied the *conditions*[6] of Paragraph 3, the Surety shall promptly and at the Surety's expense take one of the following actions . . . ." (emphasis added). Arch argues that the A312 bond form "resembles the Bond at issue here in structure and effect." (ECF No. 61, at 20). They are both performance bonds, but performance bonds are merely contracts, and Courts "'consider the words of [a] contract within the four corners of the instrument itself.'" *Mathews v. PHH Mortg. Corp.*, 724 S.E.2d 196, 201 (Va. 2012) (quoting *Uniwest Constr., Inc. v. Amtech Elevator Servs.*, 699 S.E.2d 223, 229 (Va. 2010)). A contract "'is construed as written, without adding terms that were not included by the parties.'" *Id.* (quoting *Uniwest Constr., Inc.*, 699 S.E.2d at 229). "Structure and effect" are meaningless in the abstract. Contrary to Arch's argument, the "slight differences between the bond forms at issue in the cited cases and the Bond at issue here" are critical and dispositive.

---

[5] The AIA issued a new sample performance bond form in 2010, which changed some conditions. All the cases cited by Arch in footnote 36 of its brief were decided before 2010.
[6] Paragraph 3 of the A312 bond form imposes several obligations on the owner to satisfy and expressly provides that the "Surety's obligation under this Bond shall arise after" those owner obligations are satisfied. Ex. 9 at 2.

Because there is no condition precedent in the Bond, Arch's argument fails. The Court should deny Arch's motion.

**B.**   **Even if There Was a Condition Precedent, Strata Provided Arch with Ample Notice and Opportunity to Make a Decision and Ample Notice of Default.**

**1.**   **Strata Provided Arch Reasonable Time to Investigate.**

There is no provision in the Bond requiring Arch have a "meaningful choice" or reasonable time to investigate. But, to the extent Arch was so entitled, Strata gave notice to allow Arch reasonable time to make a decision.

"[R]easonable notice is generally described as notice conveying the requisite information and permitting time for response." *United States ex rel. McKenney's, Inc. v. Leebcor Servs., LLC*, 622 F. Supp. 3d 165, 221 (E.D. Va. 2022) (citing *Siegfried Constr., Inc. v. Gulf Ins. Co.*, 203 F.3d 822, 2000 WL 123944, at *5 (4th Cir. 2000) (unpublished)). "Notice to a performance bond surety is reasonable when it provides the insurer 'time to respond and exercise its options under the bond.'" *Id.* (citing *Siegfried*, 2000 WL 123944, at *6). "When one such option is for the surety or benefitted party to arrange for alternate performance, with the surety paying for the increased cost, this requires notice that would permit the performance bond surety to do something to remedy the deficiency *while the job is ongoing*." *Id.* (citing *Hunt Constr. Grp., Inc. v. Nat'l Wrecking Corp.*, 542 F. Supp. 2d 87, 96 (D.D.C. 2008)) (emphasis added). That is, in cases like *Hunt Constr. Grp.* (on which Arch relies, *see* (ECF No. 61, at 17 and 19)), the surety was not liable because it received notice of default *after the replacement work was completed*. 542 F. Supp. 2d at 89.

Here, Strata provided more than a reasonable opportunity to Arch to make a decision before Strata permanently engaged replacement subcontractors to complete the scope of work of Fall Line. Arch was on notice of Fall Line's defaults as early as June 29, 2021, when Strata copied Arch on a letter outlining defaults by Fall Line. *See* (ECF No. 61-4, at 2, ¶ 6). On August 5, 2021,

Dominion, exercising its contractual rights incorporated into the Subcontract, *directed* Strata "to remove Fall Line Construction from the Rochambeau site, effective immediately." Ex. 3. On August 6, 2021, Strata gave Arch written notice of its claim on the Bond. *See* (ECF No. 61-4, at 13). In the August 6, 2021 letter, Strata specifically requested that Arch "promptly remedy the Subcontractor Default or promptly take other action as specified in Paragraph 4 of the Subcontractor Performance Bond." (*Id.*) Strata also specifically put Arch on notice that "[i]n the event Arch Insurance fails to take appropriate action or denies liability in whole or in part, Strata will be forced to exercise its remedies specified in Section 17.2.2 of the [Subcontract]." (*Id.*)

The Subcontract was expressly incorporated into the Bond by reference in Section 1 of the Bond. *See* (ECF No. 61-4, at 16). Section 17.2.2 of the Subcontract granted Strata the right to, among other things, "[u]pon the occurrence of a Subcontractor Default, . . . supplement Subcontractor's workforce or hire a separate subcontractor to take over and perform any portion or all of the Work as Contractor deems necessary to cure the Subcontractor Default." (ECF No. 61-1, at 24). Where a contract is incorporated into the bond, and the contracts allows such supplementation or replacement, the surety cannot escape liability based on the contractor's exercise of its rights. *See Kilpatrick Bros. Painting v. Chippewa Hills Sch. Dist.*, No. 262396, 2006 Mich. App. LEXIS 736, at *6 (Ct. App. Mar. 16, 2006) (holding that surety failed to act with reasonable promptness by doing nothing but "investigate" in response to repeated invitations to collaborate with contractor on replacement subcontractors). "The goal is to ensure that the *resumption* of construction will not be unduly delayed." *Int'l Fid. Ins. Co. v. Cty. of Rockland*, 98 F. Supp. 2d 400, 421 (S.D.N.Y. 2000) (emphasis in original).

Throughout the letter and email exchange between Mr. Sink (Strata), Mr. Cook (Strata) and Mr. Pledger (Arch), Strata repeatedly gave Arch: notice of the urgency of the need to timely

complete the Project; notice of Strata's proposed subcontractors; notice of Strata's proposed plan of action should Arch fail to promptly act; and information requested by Arch. *See, e.g.*, Strata Letter to Arch dated August 6, 2021 (ECF No. 61-4, at 13-19); Strata Letter to Arch dated August 11, 2021 (ECF No. 61-4, at 20); Strata Email to Arch dated September 2, 2021 (ECF No. 61-49); Strata Letter to Arch dated August 27, 2021 (ECF No. 61-4, at 28-32); Strata Letter to Arch dated September 15, 2021 (ECF No. 61-4, at 33-35); Strata Email to Arch dated September 22, 2021 (ECF No. 61-52). Throughout this time, Arch never specifically objected to Strata's retention of replacement subcontractors.[7]

The AIA A312 bond form and *Siegfried Construction* illustrate that Arch's view of "promptly" as used in Section 4 of the Bond is out of touch, and as a result, Strata's notice and opportunity to Arch was reasonable (and that Arch's argument fails). The 1984 AIA A312 bond effectively calls for the surety to make a decision within fifteen (15) days. Section 5 of the 1984 form provides that "[i]f the Surety does not proceed as provided in Paragraph 4 [its options] with reasonable promptness, the Surety shall be deemed to be in default on this Bond ***fifteen days*** after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond . . . ." Ex. 9 (emphasis added). The 2010 AIA A312 bond form (attached as **Exhibit 10**) requires even prompter action from the Surety. Its Section 6 requires the Surety to act with seven days: "If the Surety does not proceed as provided in Section 5 [its options] with reasonable promptness, the Surety shall be deemed to be in default on this Bond ***seven days*** after receipt of an additional written notice from the Owner to the Surety demanding that the Surety perform its obligations under this Bond . . . ." Ex. 10 (emphasis added). The AIA

---

[7] Arch also argues that Strata failed to "cooperate in allowing Fall Line to return to the Project," (ECF No. 61, at 19), but Arch ignores the reality that Dominion had foreclosed that possibility which Strata pursued at Arch's request. *See* Strata Email to Arch dated September 22, 2021 (ECF No. 61-52) ("Dominion has made clear that is not a viable option.").

form requires a decision from the Surety within 7 to 15 days. Here, Arch has never elected an option under Section 4 of the Bond. At best, Arch made a decision after 96 days (from August 6, 2021 to November 10, 2021). That is not prompt.[8] The A312 form shows Arch did not act promptly despite Strata's reasonable notice.

In *Siegfried*, a general contractor building a Sleep Inn hired a drywall subcontractor, which subcontractor obtained a performance bond. 2000 U.S. App. LEXIS 1304, *2. Following various defaults with the subcontractor's performance, on July 14, 1997, the general contractor sent a "Formal Notice of Termination for Failure to Perform" to the subcontractor. *Id.* Fourteen days later, it put the surety on notice. On July 28, 1997, the general contractor sent a "Notice of Claim" to the performance bond surety, in which it informed the surety of the *ongoing* supplementation of the subcontractor's workforce by the general contractor in accordance with the subcontract. *Id.* at *5. On August 5, 1997, the surety's agent informed the general contractor that it had been retained "to investigate claims against [the subcontractor's] bond." *Id.* at *6. "[The general contractor] did not hear from [the surety or its investigator] while construction proceeded, and there [wa]s some dispute concerning [the subcontractor]'s abandonment of the job. However, all parties agree that [the general contractor] never terminated [the subcontractor]." *Id.* In January of 1998, the general contractor submitted a claim on the bond, which the surety denied. During trial, the district court granted Rule 52(c) judgment as a matter of law to the surety on, among other bases, that the surety "was denied its options under the bond because [the general contractor] neglected to provide reasonable notice that it was arranging for the correction and completion of [the subcontractor's] work." *Id.* at *7, *16-17.

---

[8] Moreover, here, the Bond does not contain any express reasonableness requirement like the the "*reasonable* promptness" in the A312 form. Arch's Bond requires Arch to act "promptly." (ECF No. 61-4, at 7).

The Fourth Circuit reversed. Citing the simple letter attaching the contractor's notice of default, notifying the surety that it planned to augment the subcontractor's workforce, and the fact that the work was not yet complete at the time of notice to the surety, the court held that the surety "had time to respond and exercise its options under the bond." *Id.* at \*19; *see id.* \*18 ("Virginia courts have not been overly strict in interpreting the notice requirements of construction bonds.") (citing *Southwood Builders, Inc. v. Peerless Ins. Co.*, 366 S.E.2d 104, 106-07 (Va. 1988); *American Surety Co. of New York v. Zoby*, 130 S.E.2d 587 (Va. 1963))).  The court also rejected the surety's argument that it was prejudiced because the contractor "had been supplementing [the subcontractor's] workforce long before the July 28 letter" as  having "no bearing on whether notice was given" and rejected the surety's argument that it was at risk of tortiously interfering with the subcontractor's subcontract. *Id.* at \*19.

Here, as Exhibits 4, 49, and 52 to Arch's Memorandum demonstrate, Strata provided repeated notice to Arch that it would have to (and later did) proceed with hiring of replacement subcontractors in order to progress the work and avoid further defaults on the prime contract with Dominion. Strata's detailed letters, emails, and documentation far exceed (in detail, volume, and frequency) the minimal correspondence in *Siegfried*. Also, like the surety in *Siegfried*, Arch never specifically objected to Strata's retention of Town & Country and Tindol.[9] Arch just continually stated that it "cannot provide a substantive response to the issues raised in [Strata's] letters until Arch and [its counsel] have concluded this investigation." Ex. 7, at 12 (stating that the "surety has the right – *nigh* – the obligation to conduct its investigation prior to making a claims decision"). Arch had an obligation to act *promptly* under Section 4 of the Bond. It did not.

---

[9] Arch merely included boilerplate language in its counsel's letters that each letter was "sent to you for investigatory purposes only, and should not be construed . . . as an admission of liability of a promise to perform or pay the claim. In addition, please be advised th[at] Arch reserves any and all rights and defenses it may possess under the Contract Documents, the bond and the law . . . ." (ECF No. 61-47, at 2).

In addition, the cases cited by Arch are distinguishable. In *United States ex rel. Agate Steel, Inc. v. Jaynes Corp.*, No. 2:13-CV-01907-APG-NJK, 2016 U.S. Dist. LEXIS 79888, at *18 (D. Nev. June 17, 2016), the performance bond (unlike here) expressly required the contractor to *terminate* the subcontractor before the surety's obligations on the bond arose. And, (unlike here) by the time the contractor provided notice of its claim, the replacement subcontractor work had been *completed. Id.* at *24. Here, Strata provided immediate notice to Arch once Fall Line was removed from the Project and did not have replacement subcontractors start substantial work until weeks later (with contemporaneous notice to Arch). *See* Undisputed Facts ¶¶ 28, 33.

In *Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV*, 192 F. Supp. 3d 1326, 1333 (S.D. Fla. 2016), the contractor declared the subcontractors in default, terminated the subcontract, and made a demand upon the surety to perform under the performance bond on September 21, 2015. The next day (September 22), it sent the surety a letter stating that it intended to award the subcontract to complete the remaining work to a subcontractor. The very next day after that (September 23), the replacement subcontractor began work on the site. There was literally one single day between the performance bond claim and commencement of work. Here, Strata made demand on the Bond on August 6, 2021, but did not have Town & Country working on site until August 23, 2021. Undisputed Facts ¶ 28. Tindol was not working on site until at least September 10, 2021. Undisputed Facts ¶ 33. Neither Town & Country nor Tindol were permanently engaged until October 13, 2021 and November 2, 2021, respectively. *See* Town & Country and Tindol Subcontracts without exhibits (attached as **Exhibits 11** and **12**, respectively). Under the A312 bond form discussed above, seven to fifteen days is a reasonable time in which the surety can act "promptly." Arch's 17 days is far different from the one day in *Americaribe-Moriarty*.

Strata provided Arch reasonable notice and opportunity to investigate.

**2.      Earlier *Events* of Default Are Irrelevant Under the Terms of the Bond.**

Arch also argues that "Strata neglected to advise Arch of the various Subcontract Defaults going back months and did not declare a default under the Bond until August 6, 2021, well after the alleged defaults occurred depriving Arch of the opportunity to investigate and determine what actions it should take." (ECF No. 61, at 19). However, the timing of the *existence* of prior defaults does not matter. All that matters under the Bond is when Strata *declared* a default. Arch concedes as much. *See* (ECF No. 61, at 23) ("Under the clear terms of the Bond, Arch has no duty to act until Strata made its claim on August 6, 2021.").

Under Section 4 of the Bond, Arch's obligations arise when "the Principal shall be, and is declared by the Obligee to be in default under the Subcontract." (ECF No. 61-4, at 7). As in *Siegfried*, "[u]nder the performance bond, [the surety] is liable for [the subcontractor]'s breach of contract if two conditions occur: (1) [the subcontractor] is in default, and (2) [contractor] declares [the subcontractor] to be in default." 2000 U.S. App. LEXIS 1304, at *9. That is all. Fall Line defaulted, and Strata declared Fall Line in default on August 5, 2021. *See* Aug. 5, 2021 Letter (attached as **Exhibit 13**).

Notably, other than repeating its same arguments that it was "robbed" of its choice and its input was "eviscerated," Arch offers no concrete reasons why it was prejudiced by the alleged lack of earlier defaults by Fall Line. *See* (ECF No. 61, at 26). Indeed, Strata did provide notice of default as early as June. *See* Undisputed Facts ¶ 7.

Arch also argues that it "suffered prejudiced because Fall Line's scope of work was in the process of being completed by the time Arch was asked to take action to correct Fall Line's performance." (ECF No. 61, at 26). That is not accurate. Arch was asked to take action on August 6, 2021. (ECF No. 61-4, at 13) (Strata's August 6, 2021 letter asking that Arch "promptly remedy the Subcontractor Default or promptly take other action as specified in Paragraph 4 of the

Subcontractor Performance Bond."). Arch concedes that no other contractor was on site to perform Fall Line's scope of work until August 23, 2021. *See* Arch's Undisputed Facts ¶ 28. Moreover, the replacement subcontractors on site (after notice to Arch) were working on a *limited* and time and materials basis. *See* Undisputed Facts ¶¶ 30, 31. Strata actively sought to allow Arch time, including not executing a full contract with replacement subcontractors until Arch "has the opportunity to perform their [sic] investigation." *Id.* ¶ 31. Strata could have dispensed with Town & County and Tindol in the event that Arch actually hired a different replacement subcontractor promptly. But, that never occurred because Arch failed to make a prompt decision.

Arch was not prejudiced by its alleged lack of notice of prior Fall Line defaults. Certainly, Arch is not entitled to escape all liability on its Bond based on the alleged lack of notice of prior Fall Line defaults when no such notice was required under the Bond.

### C.     At Worst, Whether Strata Provided Arch Reasonable Notice and Opportunity to Make a Decision Is a Disputed Factual Issue for Trial, not Summary Judgment.

Arch is not entitled to summary judgment for all of the reasons above. At bottom, whether Arch acted "promptly" and whether Strata provided arch "reasonable" notice and opportunity to investigate are genuinely disputed issues for the fact finder. *See, e.g.*, *Metro Wastewater Reclamation Dist. v. Alfa Laval, Inc.*, Civil Action No. 05-cv-02171-WDM-MJW, 2007 U.S. Dist. LEXIS 8865, at *6 (D. Colo. Feb. 7, 2007) ("whether National Union failed to act with 'reasonable promptness' after being notified of the declaration that Alfa Laval was in default . . . is an issue of fact") (denying motion to dismiss); *Cty. of Brunswick v. Lexon Ins. Co.*, 710 F. Supp. 2d 520, 525 (E.D.N.C. 2010) (denying summary judgment to surety arguing that it was deprived of options because the obligee waited too late in the project to declare a default); *Chavis v. United States*, No. 91-7509, 1991 U.S. App. LEXIS 11043, at *5 (4th Cir. May 31, 1991) (unpublished) (vacating "summary judgment because there exists a genuine issue of material fact regarding the

reasonableness" of a party's notice efforts); *Pa. Threshermen & Farmers' Mut. Cas. Ins. Co. v. Thornton*, 244 F.2d 823, 825 (4th Cir. 1957) ("What is reasonable is, of course, a fact question, to be determined in each case according to the surrounding circumstances.") (citations omitted); *Thomason v. Keeney*, 62 S.E. 470 (Ga. 1908) ("what is reasonable notice is in each case a question of fact for the jury").

To obtain summary judgment, Arch must show that no "reasonable jury could return a verdict for" Strata. *Vannoy v. FRB of Richmond*, 827 F.3d 296, 300 (4th Cir. 2016) (citation omitted). Based on the record evidence, a reasonable jury not only could, but should, find for Strata. At worst, there is a disputed issue of fact as to whether the notice and opportunity to investigate provided to Arch was reasonable under the circumstances. *See supra* Section III, ¶¶ 12, 15, 19, 20, 21, 22, 25.  As a result, the Court should deny Arch's Motion.

## V.     CONCLUSION

Based on the foregoing, the Court should deny Arch's Motion for Summary Judgment.

Respectfully submitted,

/s/ *Clark J. Belote*
Kristan B. Burch (VSB No. 42640)
Clark J. Belote (VSB No. 87310)
KAUFMAN & CANOLES, P.C.
150 West Main Street, Suite 1900
Norfolk, VA 23510
Phone: (757) 624-3000
Fax: (888) 360-9092
Email: kbburch@kaufcan.com
Email: cjbelote@kaufcan.com

Lee-Ann Brown (VSB No. 90019)
Bradley Arant Boult Cummings LLP
1615 L Street, NW Suite 1350
Washington, DC 20036
Tel: (202) 719-8237
Fax: (202) 719-8337
Email: labrown@bradley.com

Monica Wilson Dozier (Admitted Pro Hac
Vice)
Bradley Arant Boult Cummings LLP
214 N. Tryon St
Suite 3700
Charlotte, NC 28202
(704) 338-6000
Fax: (704) 332-8858
Email: mdozier@bradley.com

*Counsel for Plaintiff/Counterclaim
Defendant Strata Solar, LLC*