UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

STRATA SOLAR, LLC,

       Plaintiff/Counterclaim
       Defendant,

v.                              Civil No. 4:22cv106

FALL LINE CONSTRUCTION, LLC,

       Defendant/Counterclaim
       Plaintiff,

and

ARCH INSURANCE COMPANY,

       Defendant.

## OPINION AND ORDER

This matter is before the Court on multiple cross-motions for summary judgment filed by Fall Line Construction, LLC, ("Fall Line"), Strata Solar, LLC, ("Strata") and Arch Insurance Company ("Arch"). For the reasons set forth below, Fall Line's and Arch's summary judgment motions are **DENIED**, and Strata's motion for partial summary judgment is **GRANTED**.

### I. FACTUAL BACKGROUND[1]

#### A. Parties and Rochambeau Project Background

Fall Line is a site work contractor specializing in land clearing, excavation, erosion control, and underground utility

---

[1] The facts are drawn from across the various summary judgment filings and are presented as context for the analysis that follows. The Court's recitation of the facts includes a discussion of certain factual disputes, and the Court does not resolve such disputes at the summary judgment stage.

construction.  ECF No. 44, at 8.   Its sole member and CEO is Ryan Pounds.  Id.

Strata is a general contractor performing utility solar projects.  Id.  Strata employs Dale Hohenstein as "Assistant Project Manager."  ECF No. 44-7.  Strata also employs Sam Sink, who is Strata's Vice President of Commercial Operations and acted as a Rule 30(b)(6) representative in this case.  ECF Nos. 48-2 ¶ 2.

Arch is an insurance company that issued a payment bond and a subcontract performance bond (the "Performance Bond," or the "Bond") for one of the two solar construction projects at issue in this case.  ECF No. 61, at 3.   The Bond, in the amount of $2,000,000, was issued by Arch, as surety, and names Fall Line as its principal and Strata as its obligee.  Id.

The instant litigation involves both the Sycamore Creek Solar Project and the Rochambeau Solar Project, but the Rochambeau Project (the "Project"), a 193-acre solar power plant in James City County, Virginia, is primarily at issue.  ECF No. 44, at 8. Virginia Electric and Power Company ("Dominion") is the owner of the Project, and pursuant to the  Rochambeau Prime Contract (the "Prime Contract") Dominion engaged Strata as the Project's Engineering, Procurement, and Construction contractor.  Id. at 2, 9.  The Prime Contract provides Dominion with numerous rights,

2

including the right to direct Strata to remove a subcontractor from the Project. Id. at 9.

To facilitate Strata's work under the Prime Contract Strata entered into a written subcontract (the "Subcontract") with Fall Line in late 2020 whereby Fall Line agreed to perform site work services on the Project. Id. The Subcontract, following agreed Change Order No. 1, provides that Fall Line will be compensated $2,915,917.33 for its site work on the Project. Id. Based on the nature of Fall Line's site work, it appears that the Subcontract needed to be performed before other stages of the Prime Contract could be completed.

### B. Contract and Performance Disputes - Rochambeau

Strata contends that Fall Line failed to perform in accordance with the contract specifications by, for example, installing "circular risers" instead of "square risers" during its construction of certain retention ponds. Fall Line disputes such allegation, contending that it installed the more readily available circular risers to compensate for Project delays attributable to Strata and that Fall Line did so only after Strata approved Fall Line's request to switch to circular risers. Because the installation of the circular risers was a deviation from the approved Project plans, it resulted in a work stoppage initiated by James City County.

3

On June 29, 2021, Strata notified Fall Line's CEO Ryan Pounds, in writing, that Fall Line failed to construct the risers in accordance with contract requirements. ECF No. 61-4, at 2, 8-12. The letter was directed only to Fall Line, but Arch was copied on the email transmitting the letter. Id. at 2. The subject of Strata's letter was: "Notice of Failure to Achieve Subcontract Requirements (Material Procurement and Submittal & Requested Recovery Plan)," and it included various complaints regarding Fall Line's progress and performance, including the riser issue. Id. at 10-12.

Later that same day, Fall Line responded in writing disputing Strata's allegations. ECF No. 61-6. Fall Line attributed project delays to Strata and provided Strata with "notice of default" based on Strata's nonpayment of a recent Fall Line pay application.[2] Id. Throughout July and into August, Strata and Fall Line continued to correspond regarding procurement issues, project delays, alleged improper invoices, Strata's alleged failure to pay Fall Line on time, and Fall Line's alleged failure to pay its sub-subcontractors and vendors. In a letter dated July 12, 2021, Fall Line noted that, as it had stated in prior communications, Strata "is in

---

[2] Based on the evidentiary materials before the Court, this appears to be the first time that either party notified the other in writing that they were in "default." Strata sent a detailed follow-up letter to Fall Line on July 2, 2021, denying default and clarifying Strata's position on Fall Line's alleged performance deficiencies. ECF No. 48-2 ¶ 20 & Ex. C. Strata may have provided a copy of this letter to Arch, id., but even if it did not, the Court's ruling on Arch's summary judgment motion would be the same.

4

default under the Subcontract for nonpayment," "refuses to remedy the default," and has failed to provide assurances "that Strata is able to perform."   ECF No. 61-9.   On July 16, 2021, Strata's outside counsel responded to the allegations in a letter sent to Fall Line's outside counsel.   ECF No. 61-10.   Thereafter, on July 28, 2021, Strata sent a letter to Fall Line's CEO, copying Arch, identifying Fall Line's failure to pay its vendors as a "Subcontractor Default."   ECF No. 61-12.

On August 2, 2021, a date subsequent to the involvement of outside counsel and the parties each blaming project delays on the other and declaring the other to be in "default," Fall Line's CEO sent a letter to Assistant Project Manager Hohenstein as well as Strata's General Counsel and Senior Vice President of Field Operations.   ECF No. 61-14.   The subject of the letter is "Follow-up on Prior Defaults," and the letter opens by noting that it is addressing Strata and Fall Line's "continuing discussions" and identifies "two key, related issues."   Id. at 1.   The first issue is "continuing and inexcusable harassment of Fall Line employees," and the second is Strata's actions delaying and preventing Fall Line from performing its work under the Subcontract and refusing to pay Fall Line when payment becomes due.   Id. at 2.   The letter concludes by indicating that if payment of nearly $350,000 on the Rochambeau and Sycamore Projects "is not arranged for this week" and if Strata "does not provide commitment on schedule and payment

for th[e] unending purgatory of maintenance work at Rochambeau, Fall Line will demobilize and return upon resolution of the issues set forth in this letter." Id. at 3.

An email discussing and attaching the letter was sent from Fall Line's outside counsel to Strata's outside counsel on August 2, 2021. ECF No. 61-13. The email provides a follow up to prior discussions regarding "responsibility for delays" and states that it is counsel's understanding that the Project "is in some indefinite freeze that has nothing to do with Fall Line" and that because "Fall Line is not being paid and not being permitted to work, there is no reason for Fall Line to stay at the site and they will be demobilizing due to the project suspension by Strata, unless Strata allows work to proceed and begins paying." Id. (emphasis added).

On August 3, 2021, the day after Strata received Fall Line's letter, Dominion's Construction Manager Dennis Bradley stopped Fall Line's work at the Rochambeau Project, citing an alleged unsafe work practice that he personally witnessed. ECF Nos. 44-2 ¶ 4; 11-2 ¶¶ 16-18. According to Dennis Bradley's account of events, a Fall Line employee was working "underneath the boom of a trackhoe" on August 3, 2021, while installing pipe (the "safety incident"). ECF Nos. 11-8, at 1; 44-2 ¶ 4. There are significant and genuine disputes of material fact regarding the entire safety incident, with Fall Line taking the position that the entire

incident was fabricated or exaggerated. There is marked disagreement as to whether Fall Line improperly refused to participate in a safety investigation the day after the incident, but it is undisputed that Fall Line did not participate in such investigation.

On August 5, 2021, Strata sent a letter to Fall Line, with a copy to Arch, indicating that Fall Line must "immediately suspend performance of the Work for cause, pursuant to Article 17" of the Subcontract. ECF No. 61-43, at 1. The letter references Fall Line's alleged past performance issues "including but not limited to disregarding required safety procedures, procuring incorrect materials, performing poor-quality Work resulting in repeated [] compliance issues, and providing inadequate staffing/manpower on Site." Id. The letter further alleges that Fall Line's "refusal to acknowledge the [August 3, 2021] safety issue and refusal to cooperate with the necessary investigation and report presents an ongoing and unacceptable safety risk," and that "Fall Line crews have not shown up to Site" the past two days. Id. at 3. The letter's final page indicates as follows: "Fall Line's repeated failures to perform the Work in accordance with the [Subcontract], abandonment of the project and Fall Line's refusal to comply with the Safety Plan, constitute a Subcontractor Default pursuant to Section 17.2.1 of the [Subcontract]." Id. On the same day the letter was sent to Fall Line, Dominion sent a letter to Strata

7

indicating that it was exercising its right under the Prime Contract to "remove Fall Line Construction" from the Project, "effective immediately." ECF No. 48-2, at 523.

On August 6, 2021, Strata sent a letter addressed to Arch expressly informing Arch "of a Subcontractor Default by Fall Line under the Agreement" and requesting that "Arch Insurance promptly remedy the Subcontractor Default or promptly take other action as specified in Paragraph 4 of the Subcontract Performance Bond." ECF No. 61-44, at 1. The letter reviews the basis for the alleged default and notes that if Arch fails to take appropriate action or denies liability then Strata will exercise its remedies under § 17.2.2 of the Subcontract and will "look to Arch Insurance to recover" costs in excess of the remaining Subcontract balance.[3] Id. The letter to Arch concludes by requesting a conference call with Arch and Fall Line no later than August 9, 2021. Id. at 2.

Strata and Fall Line exchanged additional letters after August 6, 2021, but it is clear from the summary judgment record that Fall Line never resumed work on the Project after August 3, 2021. Thereafter, Strata engaged various replacement contractors to complete the work under the Subcontract, and there is a wide dispute over whether the completion work should have cost as little as $1,000,000 or as much as $6,000,000. As explained in greater

_____

[3] Because Fall Line was paid less than the full price of the Subcontract, it appears undisputed that any properly hired replacement subcontractor would first be paid by Strata out of the remaining Subcontract balance.

detail below, although Arch investigated Strata's allegations of Fall Line's default, Arch did not reach a firm conclusion regarding its liability in the weeks and months that followed, and asserted in a letter dated November 10, 2021, as it does today, that Strata did not provide Arch with a meaningful opportunity to investigate Fall Line's alleged defaults and/or to cure any default that may have occurred.  ECF No. 61-53.

### C. Retaliation Details - Rochambeau

As referenced above, on August 2, 2021, Fall Line sent Strata a letter discussing alleged race-based harassment/targeting on the Project site as well as purported defaults by Strata for failure to pay Fall Line and for creating project delays.  ECF No. 61-14. As to the race-based complaints, the letter first discusses a Strata employee's one-time use of the n-word in the presence of Fall Line's African American site superintendent Rico Harris ("Mr. Harris").  Id. at 1-2.  Facts developed during discovery reveal not only that this incident pre-dated the August 2021 letter by more than seven months, but that Strata contemporaneously addressed the matter through written employee counseling.  ECF No. 71, at 12 ¶ 17.[4]  Furthermore, there is no evidence, or even an

---

[4] Fall Line successfully challenged whether Strata's affiant Sam Sink has personal knowledge of this matter, ECF No. 93, but Fall Line does not dispute, and actually cites to and relies on, the signed document indicating that an epithet was used by a Strata employee and that Strata provided the employee with written counseling, ECF No. 71, at 12 (citing ECF No. 59-2, Ex. B).

allegation, that the one-time use[5] of the epithet was <u>directed at</u> Mr. Harris. Rather, it was allegedly used during a conversation between Mr. Harris and an African American Strata employee who commented that "he has had trouble before working with [n-words]" and "that he prefers not to work with them." ECF No. 59-2, Ex. A; ECF No. 71, at 12 ¶ 16.[6] To be sure, the Court does not suggest that the context of the conversation eliminates the epithet's inflammatory nature, but because context always matters, it is important to distinguish the allegations in this case from cases where a supervisor uses such epithet while verbally attacking or otherwise seeking to degrade a subordinate employee. See <u>Boyer-Liberto v. Fontainebleau Corp.</u>, 786 F.3d 264, 278 (4th Cir. 2015) (indicating that "a supervisor's use of a racial epithet impacts the work environment far more severely than use by co-equals" (cleaned up) (quoting <u>Rodgers v. W.-S. Life Ins. Co.</u>, 12 F.3d 668,

---

[5] Although Fall Line challenged the admissibility of Strata's evidence seeking to establish that the offensive epithet was only used once, and this Court granted Fall Line's motion to strike such evidence, ECF No. 93, the fact remains that after the opportunity for discovery, Fall Line fails to point to <u>any evidence</u> suggesting that race-based comments were made by Strata employees on any other occasion.

[6] Fall Line successfully excluded Mr. Sink's affidavit addressing the racial epithet, ECF No. 93; however, Fall Line does not contest Strata's statement of undisputed fact in support of summary judgment that Mr. Harris sent the email reflected in ECF No. 59-2, Ex. A. See <u>Brown v. Serenity C & C, Inc.</u>, 391 F. Supp. 3d 546, 551 (E.D. Va. 2019) ("[T]he Court may assume that facts identified by the moving party in its listing of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." (quoting E.D. Va. Loc. R. 56(B)). Additionally, the Final Pretrial Order indicates the absence of pending unresolved objections to the email, ECF No. 85, at 3, and that Fall Line's factual contentions rely on the content of the email, <u>id.</u> at 72.

675 (7th Cir. 1993))); Lindsay-Felton v. FQSR, LLC, 352 F. Supp. 3d 597, 603 (E.D. Va. 2018) (noting generally that "a single use of the n-word in the workplace directed at someone other than the complainant is likely insufficient to establish a race-based hostile work environment").

In addition to the rehashed "report" of the seven-month-old incident that Strata was well-familiar with, the letter insinuates that "Mr. Harris and his son," as African Americans, were racially targeted for non-random drug testing. ECF No. 61-14, at 2. The letter further asserts that "Mr. Harris' son . . . [was] outrageous[ly]" accused of providing a fake urine sample and was required to provide a second sample under observation. Id. The letter characterizes this testing as "abusive" and goes on to broadly reference Strata's "harassment" and "intimidation" of Fall Line's crews, but other than the above-described events, specifics are not offered identifying any misconduct directed at a Fall Line crew member based on his or her race. Id.

Based on facts developed during discovery, Strata contends that it has conclusive documentary proof that there was not any "targeting" of Mr. Harris or his son in the summer of 2021. Strata highlights the fact that, as Fall Line admits it was aware, Strata employed an outside drug testing company, ECF No. 59-1, at 6, and that all individuals working on the Project, regardless of whether they were employed by Fall Line or Strata, were contractually

required to submit to random drug testing, ECF No. 59-2 ¶¶ 3-4. Strata asserts, though the Court does not rely on such evidence, that random drug testing began in May of 2021 and that neither Mr. Harris nor his son were selected for testing in May or June. Id. ¶¶ 10, 16-17.

Fall Line disputes the admissibility and evidentiary value of the drug testing records submitted by Strata, but does not offer any affirmative evidence suggesting that Mr. Harris or his son were tested during May or June.[7] In mid-July, both Mr. Harris and his son were selected for "random" testing, id. ¶ 17, though Fall Line maintains its position that the testing was not random because Strata, and not the third-party testing company, ultimately selected the individuals to be tested and singled out the Harrises. ECF No. 11-2 ¶ 27. One week after the Harrises completed the "random" drug test, the entire workforce (all present Fall Line and Strata employees) was tested due to allegations of drug use raised by Fall Line's CEO.[8] ECF No. 59-2 ¶¶ 12-14. During this workforce-wide testing, the third-party drug testing company purportedly required Mr. Harris's son to provide a second

---

[7] Though Fall Line is pursuing a race-based retaliation claim in this case arising from Strata's treatment of the Harrises, it has not provided an affidavit, deposition testimony, or other similar evidence from Mr. Harris or his son.

[8] There is a factual dispute over the nature of the information provided to Strata by Fall Line's CEO, but it is undisputed that Ryan Pounds informed Strata that there was an issue with drug use related to the Project. ECF No. 71-4, at 4. In response, Strata's Sam Sink ordered sitewide testing.

"witnessed" sample because the testing company identified the first sample as being outside of the acceptable temperature range. Id. ¶ 19. Again, Fall Line disputes these facts, maintaining that Strata manipulated the testing and has presented no admissible evidence from the third-party testing company demonstrating that the "re-test" was based on a temperature issue. Fall Line further speculates that workforce-wide testing could be a method to target and harass the Harrises. Fall Line, however, offers limited counter evidence on this entire issue.[9]

A final group of facts relevant to the race-based allegations involves the manner in which work was stopped on August 3, 2021, based on the strongly contested safety incident. It is undisputed that a Dominion employee (Dennis Bradley), not a Strata employee, allegedly witnessed Fall Line's dangerous work practice and called for a temporary work stoppage. ECF No. 11-2 ¶¶ 16-18 (Affidavit of Corey Mitchell). Based on Fall Line's own characterization of events, Dennis Bradley was responsible for "shut[ting] Fall Line down for unsafe work practices." Id. ¶ 16. Furthermore, Fall

---

[9] Though the Court does not wade into resolving factual disputes, it notes that, as the party with the burden to prove retaliation, Fall Line does not point to new evidence developed during discovery seeking to demonstrate that the "random" drug testing was a ruse, nor does it point to admissible evidence establishing that Mr. Harris's son was tested a second time during the same round of drug testing. Rather, Fall Line relies on Corey Mitchell's pre-suit sworn statement that he "observed Rico [Harris] and his son being subjected to drug testing that was not random" as they were "specifically chosen by Strata personnel in lieu of the individuals that originally were chosen randomly but had not been at work on the day of the testing." ECF No. 11-2 ¶ 27. Fall Line does offer an additional unsigned statement from Corey Mitchell dated the same date as the safety incident. ECF No. 44-4.

Line contends that even though Corey Mitchell, a <u>Strata</u> employee
at the time, argued against suspending the Fall Line employee
purportedly responsible for the safety incident (Ben Norton, who
is Caucasian), it was a <u>Dominion</u> employee (Joseph Sullivan) who
decided that Ben Norton should be suspended for three days because
"a message needed to be sent to Fall Line concerning safety."[10]
<u>Id.</u> ¶ 24.

According to Fall Line, some days after the safety incident
occurred, Strata created an "after-the-fact" incident report that,
falsely accused Mr. Harris of being aggressive on the day of the
safety incident.  ECF No. 11-8, at 7.  Fall Line argues that this
characterization of aggression draws from racial stereotypes.  In

---

[10] There is no evidence in the summary judgment record suggesting that
<u>Dominion</u> was aware of the August 2, 2021, letter referencing discrimination
when Dominion stopped Fall Line's work on August 3, 2021, or when, two days
later, Dominion instructed Strata "to remove Fall Line Construction from
the Rochambeau site, effective immediately."  ECF No. 48-2, at 523.  In
fact, Strata has presented affirmative evidence that: (1) Dominion employee
Joseph Sullivan was <u>not</u> aware of such letter or of any issues with the on-
site relationship between Strata and Fall Line prior to his involvement with
the work stoppage and suspension of Ben Norton on August 3, 2021, <u>see</u> ECF
No 59-3, at 3; (2) Dominion's 30(b)(6) representative testified that
Dominion was <u>not</u> aware of the letter at the time of the safety incident;
ECF No. 59-4; and (3) Strata's Vice President of Project Management on the
Rochambeau Project (Sam Sink) stated in his affidavit both that the August
2, 2021 letter "was not provided to Dominion prior to Fall Line's removal
from the site," and that he was "not aware of any discussions between Strata
and Dominion about the August 2 letter or its contents, and certainly not
prior to Fall Line's removal from the project."  ECF No. 59-2 ¶ 20.  Fall
Line is correct that Dominion's 30(b)(6) deponent testified that he did not
know <u>when</u> Dominion first became aware of the letter, but that the first time
he saw it he had been shown the letter by counsel, ECF No. 59-4.  However,
this absence of testimony defining the precise timing: (1) does not undercut
the prior sworn statement that Dominion was not aware of the letter at the
time of the safety incident on August 3, 2021; and (2) is insufficient to
support the <u>reasonable</u> inference that Dominion knew about the letter two
days later when it told Strata to remove Fall Line from the project.

contrast to the statement in the incident report, Fall Line contends that Mr. Harris was actually the subject of Dennis Bradley's aggression during a discussion about the safety incident and Mr. Harris's decision to remove his entire team from the job site. ECF No. 11-2 ¶¶ 25-26. Dennis Bradley, however, is a Dominion employee, not a representative of Strata. The same affiant asserts that "Dominion and Strata" told Mr. Harris that he could not return to the Project site after he had demobilized his crew. Id. ¶ 29. However, clarifying evidence offered by Fall Line reveals that, consistent with the handling of Ben Norton, the direction to remove Mr. Harris came from Dominion, though it was communicated to Mr. Harris and Fall Line through Strata. See ECF No. 44-6 (email from Joseph Sullivan at Dominion to Dale Hohenstein and several other Strata employees on the same day as the safety incident stating that Dominion is requesting the removal of Rico Harris and Ben Norton); ECF No. 44-7 (email from Dale Hohenstein, to Rico Harris and Ryan Pounds sent a little more than an hour after the email from Sullivan to Hohenstein indicating that Dominion asked that both Ben Norton and Mr. Harris "stay off site until further notice" with the exception of returning the next day "to participate in an investigation" of the safety incident).

### D. Post-Suspension Activity - Rochambeau

Reviewing some of the key facts relevant to Strata's claim against the Performance Bond, it is undisputed that Arch was on

notice of both Fall Line's suspension and Strata's declaration of default <u>no later than</u> August 6, 2021, the date the notice of default was formally conveyed to Arch.   ECF No. 61-44.   It is likewise clear that due to Project delays — regardless of who was to blame — Strata was sufficiently concerned with the timeline of the performance of the Subcontract that it started searching for replacement subcontractors by August 4, 2021, at the latest, the same day that Fall Line purportedly "abandoned" the Project.

The undisputed evidence in the record indicates that Arch and Strata were in communication in the weeks following the August 6th declaration of default, and that: (1) subcontractor "Town and Country" began work on the Project on August 23, 2021 (17 days after formal notice to Arch); and (2) subcontractor "Tindol" began work on the Project on September 10, 2021 (35 days after formal notice).   ECF No. 61, ¶¶ 28, 33.   Arch became aware of this work no later than September 13, 2021, when Arch and its investigators conducted a site visit.   ECF No. 61-34.   It does not appear that there is any evidence before the Court suggesting that Arch demanded that Strata instruct the replacement subcontractors to halt their performance.

Both replacement subcontractors were initially hired by Strata on a "time and materials basis."   Although Strata may have <u>negotiated</u> a final contract with each replacement subcontractor by late August or early September, Strata communicated to Arch on

16

September 15, 2021 (more than 6 weeks after notice) that it still had not <u>executed</u> such contracts.   ECF No. 61-50.   Arch does <u>not</u> offer contrary evidence suggesting that final contracts had been entered by that date, and instead presents evidence that final contracts with these subcontractors were "expected" in late September.   ECF Nos. 61-30; 61-31; 61-37; 61-38.   Strata provides evidence demonstrating that the final contracts were executed on October 13, 2021, and November 2, 2021, respectively.   ECF Nos. 67-11; 67-12.

The last chronological piece of the puzzle (at this stage) appears to be a letter from Arch's counsel, dated November 10, 2021.   ECF No. 61-53.   In that letter, Arch's counsel expressly questions whether Fall Line was in breach, but does not admit or deny liability, indicating that Arch "is not in a position to definitively state that one party or the other is correct."   <u>Id.</u> at 3.   As a result, Arch requested a settlement conference or mediation.   <u>Id.</u> at 7.   To place the timing of this letter in context, Strata asserts that while it was communicating with Arch about the need to hire replacement subcontractors in August and September, the scheduled substantial completion date of the <u>Prime Contract</u> was November 22, 2021.   <u>See</u> ECF No. 67, at 2; ECF No. 61-48, at 4.

## II. PROCEDURAL BACKGROUND

The parties did not reach a mediated agreement, and Strata filed the instant suit in late 2022. ECF No. 1.  In response, Fall Line filed an answer and counterclaim, ECF No. 11, and Strata thereafter filed an amended complaint, ECF No. 16.

Strata's amended complaint contains three causes of action: Count One – Breach of Contract Rochambeau Project; Count Two – Breach of Performance Bond (against Arch); and Count Three – Breach of Contract Sycamore Project.[11]  ECF No. 16.

Fall Line's counterclaim advances five causes of action: Count One – Breach of Contract Rochambeau Project; Count Two – Breach of Contract Sycamore Project; Count Three – Declaratory Judgment; Count Four – Racial Discrimination in violation of 42 U.S.C. § 1981; and Count Five – Unlawful Retaliation in violation of 42 U.S.C. § 1981.  ECF No. 11.  On July 20, 2023, this Court entered an Opinion and Order granting Rule 12(c) judgment on the pleadings in favor of Strata as to Count Four of Fall Line's counterclaim, finding that Fall Line failed to advance sufficient facts to plausibly allege contractual harm stemming from race-based discrimination.  Strata Solar, LLC v. Fall Line Constr., LLC, No. 4:22cv106, 2023 WL 4638943 (E.D. Va. July 20, 2023) ("Rule 12(c) Opinion").  The Rule 12(c) Opinion rejected Strata's request

---

[11] To be clear, all references herein to the parties' disputes regarding "the Project" refer to the Rochambeau Project.  None of the summary judgment motions or briefs address the Sycamore Project.

to dismiss the race-based retaliation claim alleged in Count Five. Id. at *13.

Fall Line's motion for partial summary judgment asserts that summary judgment should be granted as to Count One of the amended complaint, as well as Count Two, based on Strata's failure to identify an ongoing safety issue that created an "imminent" threat at the time that Fall Line was suspended from the Project.  ECF Nos. 43, 44.  Strata's cross-motion for partial summary judgment challenges Fall Line's § 1981 retaliation claim.[12]  ECF Nos. 58, 59.  Arch insurance seeks summary judgment as to Count Two of the amended complaint, contending that Arch should be relieved from any obligation under the Performance Bond because Strata did not provide Arch with a genuine opportunity to research Fall Line's alleged defaults and/or to intelligently select its options to cure.  ECF Nos. 60, 61.  All three timely-filed summary judgment motions are fully briefed and ripe for review.

### III. STANDARD OF REVIEW

Rule 56(a) of the Federal Rules of Civil Procedure provides that a district court shall grant summary judgment in favor of a movant if the movant "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

---

[12] Strata's single-page summary judgment motion requests attorney's fees as to Counts Four and Five of Fall Line's counterclaim pursuant to 42 U.S.C. § 1988(b).  ECF No. 58.  However, Strata's summary judgment briefing is devoid of any reference to attorney's fees.  ECF Nos. 59, 73.  Accordingly, the Court does not address attorney's fees at this time.

matter of law." Fed. R. Civ. P. 56(a). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (emphases in original). "A genuine question of material fact exists where, after reviewing the record as a whole, a court finds that a reasonable [factfinder] could return a verdict for the nonmoving party." Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012).

The initial burden on summary judgment falls on the moving party, but once a movant properly presents evidence supporting summary judgment, the nonmoving party may not rest upon the mere allegations in the pleadings, but instead must set forth specific facts in the form of exhibits and sworn statements illustrating a genuine issue for trial. Celotex Corp. v. Catrett, 477 U.S. 317, 322-24 (1986). To successfully defeat a motion for summary judgment, the nonmoving party must rely on more than conclusory allegations, "mere speculation," the "building of one inference upon another," or the "existence of a scintilla of evidence." Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc., 330 F. Supp. 2d 668, 671 (E.D. Va. 2004) (citations omitted). Indeed, "some metaphysical doubt" concerning a material fact is

insufficient to create a genuine issue for trial.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

Although the Court is not "to weigh the evidence and determine the truth of the matter" asserted at the summary judgment phase, the Court is required to "determine whether there is a genuine issue for trial." Tolan v. Cotton, 572 U.S. 650, 656 (2014) (quoting Anderson, 477 U.S. at 249). When assessing whether there is a genuine issue for trial, the Court "must determine whether the evidence . . . 'presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" McAirlaids, Inc. v. Kimberly-Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (quoting Anderson, 477 U.S. at 251-52).  In making its determination, "the district court must view the evidence in the light most favorable to the nonmoving party." Jacobs v. N.C. Admin. Off. of the Cts., 780 F.3d 562, 568 (4th Cir. 2015) (cleaned up) (quoting Tolan, 572 U.S. at 657).

When faced with cross-motions for summary judgment, the Court must "consider each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law." Defs. of Wildlife v. N.C. Dep't of Transp., 762 F.3d 374, 392 (4th Cir. 2014) (quoting Bacon v. City of Richmond, 475 F.3d 633, 638 (4th Cir. 2007)).  In doing so, the Court must "resolve all factual disputes and any competing, rational

21

inferences in the light most favorable to the party opposing that motion." Id. (quoting Rossignol v. Voorhaar, 316 F.3d 516, 523 (4th Cir. 2003)).

## IV. DISCUSSION – FALL LINE'S SUMMARY JUDGMENT MOTION

Fall Line offers four arguments in support of its motion for summary judgment as to Count One of Strata's amended complaint (Breach of Contract). The first asserts that Fall Line was not validly suspended by Strata for "cause." The second related argument asserts that Strata cannot recover contract damages because Strata conceded the absence of an "ongoing" safety risk in early August of 2021. The third and fourth arguments assert that Strata seeks indemnity from Fall Line but failed to comply with the contractual or legal requirements for indemnification. The Court considers each in turn.

### A. Suspension "For Cause"

Fall Line's first and most developed argument contends that Strata cannot demonstrate "cause" for Fall Line's suspension, rendering the suspension, at best, an action taken "for convenience." ECF No. 44, at 16. Whether there was "cause" for the suspension bears directly on whether Strata can recover damages from Fall Line under the Subcontract.

### 1. Relevant Contact Clause

Fall Line argues that it was suspended by Strata based solely on the August 3, 2021, safety incident and that Strata is therefore

22

limited to enforcing the safety subclause contained in the Subcontract provision governing "Suspension with Cause." <u>Id.</u> at 17 (citing Subcontract § 17.4).[13]   Applying such provision, Fall Line contends that there was no valid basis for a "with cause" suspension on August 5, 2021, because Subcontract § 17.4 discusses imminent safety threats in the <u>present tense</u> and any dangerous condition on the Project was no longer in place as of August 5th.[14] <u>Id.</u> at 17-18.   Based on the absence of an ongoing safety risk, Fall Line argues that the suspension must be classified as a suspension "for convenience."

Fall Line's position on this issue can be quickly disposed of.   Though it is true that Strata announces a "for cause" safety-based suspension in its August 5, 2021, letter, the text of the letter undermines Fall Line's contention that Strata is limited to enforcing § 17.4.   Notably, the letter does not cite to § 17.4, nor does it rely exclusively on the safety incident.   Rather the letter alleges defaults as defined in "§ 17.2.1 of the [Subcontract]"[15] to include "repeated failures to perform the Work

---

[13] The Subcontract was submitted to the Court as one part of a several hundred-page exhibit consisting of multiple documents, filed at ECF No. 48-2.   The main body of the Subcontract spans pages 14-45 of that exhibit.   For ease of reference, the Court will cite to the written contract as "Subcontract" followed by the section number.

[14] This argument is referenced in both Fall Line's first and second summary judgment arguments, and it is addressed below in Part IV.B.

[15] As noted by Strata, Fall Line's summary judgment brief provides only limited excerpts from § 17.2 and it omits the language in § 17.2.2 defining available remedies for defaults as defined in § 17.2.1.

in accordance with the [Subcontract]" and Fall Line's "abandonment of the project." ECF No. 48-2, at 527. (emphasis added).

Subcontract § 17.2.1 defines events of default as including "Subcontractor breaches" of any material contract terms, as well as failure "to timely provide a Recovery Plan" and "failure to pay . . . its debts as they become due."[16]  As for remedies, the very first remedy in the event of a default listed in § 17.2.2 is that the Contractor may "suspend Subcontractor's performance, in whole or in part, under this Agreement by delivery of a written notice of suspension to Subcontractor." Subcontract § 17.2.2.[17]  Strata is further authorized to, as it did here, "hire a separate subcontractor to take over and perform any portion or all of the Work as Contractor deems necessary to cure the Subcontractor Default" and may "seek all other remedies at law or in equity, including proceeding against any security given by or for the benefit of Subcontractor for its performance of the Work."  Id. While this same remedy provision indicates that a suspension or termination predicated on a purported default must be treated as a "termination for convenience" in the event that it is "finally

---

[16] Strata's July 28, 2021, letter identifies Fall Line's failure to pay its sub-subcontractors as a default, ECF No. 48-2, at 498, and earlier in the Project, Strata informed Fall Line that it failed to provide a recovery plan upon Strata's request. Id. at 485.

[17] Fall Line's suggestion in its reply brief that Strata's reading of Subcontract § 17.2.2 conflicts with § 17.4 is rejected by the Court as § 17.2.2 requires a qualifying "default," whereas § 17.4 does not. ECF No. 49, at 7.

determined that no Subcontractor Default existed," id. (emphasis added), here, there obviously has yet to be any final determination of whether Fall Line was in default.

Accordingly, Strata's express reference in its August 5, 2021, letter to Subcontractor defaults pursuant to § 17.2.1 is fatal to Fall Line's summary judgment position that Strata's rights are confined to those provided in § 17.4. Whether Fall Line was in default, and what remedies are available, are matters that turn on disputed facts and are therefore reserved for the factfinder. See Tolan, 572 U.S. at 656 (explaining that the Court is not to "weigh the evidence" or resolve genuine factual disputes at the summary judgment stage).

### 2. Safety Incident

To the extent Fall Line offers the sub-arguments that Strata admitted that "there was no safety incident" or fully "cleared" Fall Line to return to work immediately after the safety incident regardless of whether Fall Line agreed to modify its safety procedures, the Court rejects such contentions. See ECF No. 44, at 4 n.12, 18 n.67. The details of the safety incident, and its aftermath, appears to be one of the areas of greatest factual dispute, and the Court will not wade into weighing the credibility of the parties' conflicting versions of events at the summary judgment stage. Additionally, the Court agrees with Strata that while Fall Line's submission of an affidavit from a former Strata

employee demonstrates the existence of disputed facts, it does not represent a binding factual "admission" by Strata.

### 3. Dominion's Suspension Order

Fall Line next argues that Dominion's instruction to Strata to suspend Fall Line from the Project undermines Strata's ability to recover for any of Fall Line's contractual breaches. This argument, like the others, is rejected. Strata appears to highlight Dominion's decision to remove Fall Line from the Project in an effort to counter Fall Line's accusations that Strata "manufactured" the safety incident and/or that Strata behaved in a retaliatory manner. However, even assuming for the sake of argument that Strata only suspended Fall Line because Dominion ordered it to, Fall Line fails to cite to any caselaw or other applicable legal rule demonstrating that such an "order" somehow undercuts Strata's ability to enforce the Subcontract provisions that expressly authorize specific remedies in the event of a default.[18]

\*      \*      \*

For the reasons explained above, Fall Line fails to demonstrate, at the summary judgment stage, that Strata is limited

---

[18] Relatedly, Fall Line fails to demonstrate, at the summary judgment stage, that Dominion was obligated to issue a "change order" to compensate Strata for all cost overruns resulting from Dominion's instruction to remove Fall Line. Resolution of disputed facts regarding whether Fall Line was removed for convenience or because Dominion, Strata, or both were no longer willing to excuse Fall Line's multiple alleged defaults is directly relevant to whether Fall Line and Arch are responsible for any cost overruns.

to enforcing § 17.4 of the Subcontract, or that Strata has otherwise admitted facts demonstrating that there was no safety incident.  Fall Line similarly fails to point to undisputed facts capable of demonstrating that Fall Line's suspension/termination was "for convenience."  Finally, Fall Line does not carry its burden to demonstrate that any involvement Dominion had in removing Fall Line erased Fall Line's then-existing obligations to compensate Strata for Fall Line's defaults.

### B. Ongoing Safety Risk

Fall Line's second argument contends that, pursuant to Subcontract § 17.4, the only valid basis for a suspension with cause is an "ongoing" safety issue creating an "imminent" risk of harm, and that even if Fall Line had previously engaged in dangerous conduct, the fact that it occurred in the past conclusively establishes the absence of an ongoing risk. Relatedly, Fall Line asserts that Strata has conceded that Fall Line could effectively install pipe without standing under the excavator boom, and thus conceded that the safety risk was not "ongoing."

First, as discussed above, the contractual language in § 17.4 requiring a "potential safety issue that is an imminent threat" is not dispositive of Count One in light of the Subcontract § 17.2. Second, even accepting for the sake of argument that Strata's only valid basis for suspending Fall Line "for cause" was the existence

27

of an ongoing safety issue, Fall Line fails to demonstrate that summary judgment is appropriate.   Importantly, one of the key factual disputes in this case is not whether the installation of pipe "could" be performed safely, but rather, whether Fall Line was willing to follow a more restrictive installation plan in the name of safety.   Notably, Fall Line fails to offer any precedent or compelling argument demonstrating that a reasonable jury could not conclude that Fall Line's alleged disregard for safety procedures constituted an "imminent threat" to persons or property.

Drawing from a Dominion employee's direct observations, Strata takes the position that Fall Line not only committed a "[s]erious violation/infraction" as expressly defined by Exhibit E to the Subcontract, ECF No. 48-2 at 330, but that Fall Line refused to acknowledge its mistake and sought to operate going forward without changing its practices, see ECF No. 61-41 (email from Fall Line's CEO indicating that Fall Line was using the "industry standard means and methods" during the safety incident). Additionally, Fall Line's own evidence demonstrates both that it walked off the Project in apparent protest of a Fall Line employee's suspension for engaging in the dangerous practice, ECF

No. 11-2 ¶ 25, and that Fall Line did not appear on site the following day for a "Safety Meeting."[19]  ECF Nos. 44-2 ¶ 6.

Fall Line vehemently disagrees with Strata's characterization of these events, but summary judgment is not the time for resolving these key factual conflicts.  Instead, when considering Fall Line's motion, this Court views the evidence in "the light most favorable to [Strata,] the nonmoving party," Jacobs, 780 F.3d at 568, and after doing so, finds that a factfinder could reasonably conclude that Fall Line demonstrated its unwillingness to follow necessary safety procedures going forward.  Accordingly, even if the Court accepts Fall Line's contention that it could only be validly suspended based on an "ongoing" safety issue, Fall Line's second argument fails to demonstrate that summary judgment is appropriate as to Count One.

### C. Indemnification

Fall Line's final two arguments, which contest Strata's ability to rely on the "indemnification" provisions of the Subcontract, both miss the mark.  In short, as effectively argued by Strata, Strata simply does not seek "indemnity" damages, contractual or otherwise.  Fall Line appears correct that Strata may not recover damages based on the increased costs of replacement subcontractors if the replacements were hired at the election of

---

[19] Fall Line asserts that its failure to appear was due to the fact that Strata would not permit Fall Line's counsel to be present, ECF Nos. 44-2 ¶ 6, but Fall Line does not contest its non-appearance.

Dominion and <u>in the absence of</u> facts supporting a "for cause" suspension/termination.  However, the summary judgment record reveals genuine issues of material fact regarding whether there was a valid basis for a "for cause" suspension.[20]  Fall Line's third and fourth arguments therefore both lack merit.

### D. Summary

In summary, based on the existence of genuine factual disputes regarding the safety incident, Fall Line's alleged contractual breaches as defined in Subcontract § 17.2.1, and several other material issues, Fall Line's motion seeking summary judgment as to Count One is **DENIED**.  Relatedly, Fall Line's cursory contention that summary judgment should also be grated as to Count Two, a Count that is advanced solely against Arch, is summarily **DENIED** both because Fall Line is not named in that Count and because Fall Line relies on the same unavailing arguments it advanced with respect to Count One.

### V. DISCUSSION – ARCH'S SUMMARY JUDGMENT MOTION

Arch asserts that summary judgment should be granted relieving Arch of its obligations pursuant to the Performance Bond. Arch contends that Strata hired replacement contractors almost

---

[20] Contrary to Fall Line's suggestion that Dominion ordered Strata to remove Fall Line from the Project for its convenience (i.e., without cause), Dominion's contemporaneous explanation for its decision was that Fall Line had "ignored safety directives from Strata's and [Dominion's] staff" and had "not complied with the James City County inspector's instructions related to permit compliance."  ECF No. 48-2, at 523.

immediately after Fall Line was removed from the Project, thus robbing Arch of the opportunity to investigate and cure Fall Line's alleged default(s).

Strata opposes Arch's motion, contending that Fall Line's deficient performance had delayed completion of the Subcontract to such a degree that a near-immediate solution to Fall Line's departure was necessary in light of the impending completion date and the impact that further delays would have on the cost to complete the Subcontract and/or Prime Contract. Strata presents evidence illustrating its ongoing communication with Arch about Strata's search for replacement subcontractors and argues that no firm "commitment" was initially made to these companies to avoid cutting off Arch's right to cure.

## A. Opportunity to Cure

The Court agrees with Arch's legal contention that persuasive case law provides that, in most circumstances, a bond issuer is not liable under the bond if a contractor provides the surety no opportunity to investigate and/or to elect its express options under a performance bond.  See Hunt Const. Grp., Inc. v. Nat'l Wrecking Corp., 542 F. Supp. 2d 87, 92 (D.D.C. 2008) ("Courts have consistently held that an obligee's action that deprives a surety of its ability to protect itself pursuant to performance options granted under a performance bond constitutes a material breach, which renders the bond null and void.") (citation omitted); United

31

<u>States for use & benefit of Agate Steel, Inc. v. Jaynes Corp.</u>, No.
2:13cv1907, 2016 WL 8732302, at *5-6 (D. Nev. June 17, 2016)
(finding that the surety's obligations were excused in a case where
the prime contractor did not provide the surety with any "notice
that it was expected to commence performing under the bond" but
"instead decided to immediately employ a different contractor,"
informing the surety of such fact <u>weeks after</u> substitute
performance was completed).  The same result may follow if a
contractor provides a specious opportunity for the surety to cure
and/or to participate in the selection of a replacement contractor.
<u>Int'l Fid. Ins. Co. v. Americaribe-Moriarty JV</u>, 192 F. Supp. 3d
1326, 1333 (S.D. Fla. 2016) (finding that the general contractor
provided the surety with "notice in name only" because no
notice/demand was made on the surety until one day before the
surety was informed that a replacement subcontractor had been
found, with the replacement contractor beginning work the very
next day).  However, the question here is not whether Arch has
identified a beneficial legal standard, but instead, whether the
undisputed facts in the summary judgment record are so one-sided
that they establish that Arch lacked a genuine opportunity to
investigate and elect its remedies.

Determining the scope of a surety's rights begins with the
express language of the bond, which is nothing more than a written
contract.  <u>See</u> <u>Hitachi Credit Am. Corp. v. Signet Bank</u>, 166 F.3d

32

614, 624 (4th Cir. 1999) ("Under Virginia law, courts adhere to the 'plain meaning' rule in interpreting and enforcing a contract.").[21] While the plain meaning of a bond's terms controls, when interpreting a bond it is appropriate to consider that the purpose behind a <u>performance</u> bond is "to guarantee completion of the improvements it covers." <u>Bd. of Sup'rs of Stafford Cnty. v. Safeco Ins. Co. of Am.</u>, 226 Va. 329, 335, 310 S.E.2d 445, 448-49 (1983); <u>see</u> <u>Siegfried Construction, Inc. v. Gulf Ins. Co.</u>, 203 F.3d 822, 2000 WL 123944, at *3 (4th Cir. 2000) (unpublished) ("In Virginia, surety bonds are liberally construed." (citing <u>Fidelity & Deposit Co. v. A.J. Bailey</u>, 145 Va. 126, 128-29, 133 S.E. 797, 797 (1926)).

The terms of the Bond, nearly all of which appear on a single page, require that default "be declared" by Strata, but do not include an express "condition precedent" provision requiring that Strata provide a specific form of written notice to Arch in the event of default.[22] The Bond also does not provide an expressly

---

[21] The parties agree that Virginia law controls interpretation of the Bond and Subcontract.

[22] Although notice to the surety of a default was not required at common law, modern courts generally "imply a duty to provide notice." Martin & Rochwarg, <u>Construction Law Handbook</u> § 32.04[C] (4th ed. 2023). Under Virginia law, "absent a provision [in the bond] requiring giving notice to the surety, there is no general duty on the part of the owner to notify the surety of the contractor's default." 14 Michael A. Branca & Jennifer L. Harris, <u>Virginia Practice Series: Construction Law</u> § 14:21 (2022 ed.) (citing <u>Commonwealth v. Selective Ins. Co. of Am.</u>, 68 Va. Cir. 451, 456 (Loudoun, 2005)). Here, however, Arch not only has express contractual options defined in the Bond following a declaration of default, but for all defaults of a nature that Arch cannot "promptly remedy," the plain terms of

defined "cure" period in the event that a default is declared, rendering the cases cited by the parties that involve cure periods largely inapposite.   Rather, the Bond indicates that when Strata declares Fall Line to be in default, Arch "may promptly remedy the default, or shall promptly" take one of four actions: (1) complete the Subcontract; (2) obtain new subcontractors though formal or informal bidding to complete Fall Line's performance; (3) pay Strata the amount owed as soon as practicable; or (4) deny liability.   ECF No. 61-2 (emphasis added).   As recently explained by another judge of this Court, "[n]otice to a performance bond surety is reasonable when it provides the insurer 'time to respond and exercise its options under the bond.'"   United States ex rel. McKenney's, Inc. v. Leebcor Servs., LLC, 622 F. Supp. 3d 165, 221 (E.D. Va. 2022) (quoting Siegfried Construction, 2000 WL 123944, at *6); cf. Siegfried Construction, 2000 WL 123944, at *6 (finding that the surety "had time to respond and exercise its options under the bond" in a case where: (1) the contractor sent a notice of claim to the surety on July 28 indicating that it was supplementing the subcontractor's workforce due to deficient and untimely performance; (2) the contractor told the surety's investigator in early August that it needed help completing the subcontractor's

---

the Bond require that Arch "shall  promptly" take one of four defined actions.   ECF No. 61-2, at 2 (emphasis added).   Accordingly, the terms of the instant Bond imply the requirement that Arch receive some form of notice that Fall Line is in default before Strata can recover under the Bond.

work; and (3) the project was not completed until the middle of September) (emphasis added).[23]

In addition to providing rights and remedies on the face of the Bond, the instant Performance Bond incorporates the terms of the Subcontract by reference. ECF No. 61-2. Based on the terms of the Subcontract, Arch was expressly on notice that "[t]ime is of the essence with respect to the performance of the Work," Subcontract § 6.2, and that delayed completion of the Subcontract could result in a $10,000 liquidated damages penalty, "per zone, per day, for each day of [Fall Line's/Arch's] delay in completing the work," id. § 6.6.

## B. Factual Disputes

Reviewing the facts relevant to Arch's performance under the Bond, it is undisputed that Arch was formally notified about Fall Line's default on August 6, 2021. However, Arch was copied on written communications detailing the ongoing contract disputes no later than June 29, 2021, and Strata contends that Arch should have protected its own interests by starting a preliminary investigation more than a month prior to August 6, 2021. ECF No. 67 at 11-12. Additionally, there are sufficient facts in the

---

[23] As Arch correctly highlights, the bond in Siegfried differs markedly from the Bond in this case because the terms of the Siegfried bond expressly permitted the contractor to arrange for substitute performance, whereas the instant Bond provides Arch (not Strata) the right to arrange for substitute performance. The case remains relevant, however, because the contractor was only authorized to arrange for substitute performance "after reasonable notice to [the] Surety." Siegfried Construction, 2000 WL 123944, at *1 n.1.

record to support a factfinder's conclusion that Fall Line's default materially contributed to Project delays and that Strata was acting with understandable urgency in August and early September in an effort to avoid late completion of the Prime Contract. To the extent that Arch suggests on summary judgment that Strata's <u>mere communication</u> with potential substitute subcontractors operates to relieve Arch of its obligations under the Bond, such suggestion is flatly rejected because: (1) time was of the essence on the already delayed Subcontract; and (2) nothing prevented Arch, who had been aware of contract disputes for over a month, to deny liability within days of Strata's declaration of default, which would have freed Strata to unilaterally hire completion subcontractors and proceed against the Bond after the Project was completed. Consequently, Strata did not breach the Bond as a matter of law merely because it efficiently investigated potential options.

In this same vein, to the extent that Arch argues that Strata's hiring of two substitute contractors on a temporary "time and materials" basis in the weeks following formal notice to Arch conclusively establishes that Arch had no genuine opportunity to act, the Court again disagrees.[24] As indicated above, Arch was

---

[24] The Court offers no evaluation of the impact of the "time and materials" temporary arrangement with the replacement subcontractors beyond recognizing that these agreements were distinct from a "final" contract that would have bound Strata to use its unilaterally chosen subcontractor(s) to complete Fall Line's scope of work. At a minimum, the current record fails to

contractually bound to make a "prompt" election of its chosen course under a Bond that existed <u>to ensure performance</u> of a construction contract where the deadline for performance was rapidly approaching.[25]   Though Arch has pointed to evidence on which a jury could ultimately find that Arch was acting diligently and promptly during its August investigation and that Strata's actions improperly cut-off Arch's ability to elect among its contractual rights, no such showing has been made at this time.

Notably, based on Strata's evidence, during the weeks following the default notice to Arch, Strata sought to assist Arch's investigation by providing requested materials, and Strata freely informed Arch that it was seeking alternative bids and provided Arch with the cost of the competing bids.   <u>See, e.g.</u>, ECF No. 61-50.   Arch suggests that it was misled by Strata regarding Strata's efforts to unilaterally hire replacement contractors, but such contractors were, at a minimum, visibly present during Arch's site-visit in mid-September.   ECF No. 61-34.   Additionally, Strata's counsel explained in a letter to Arch

---

demonstrate that work performed in late August or early September on either temporary contract prevented Arch from hiring its own chosen replacement subcontractor.

[25] The parties dispute whether "prompt" action can be presumptively defined in a period of days; however, none of the cases cited in their briefs support adopting a presumptive period.   Moreover, Strata's reliance on cases involving cure periods expressly measured in a period of days fail to shed light on the meaning of "prompt" as used in the Bond before the Court.

and its counsel a few days after the site-visit that Strata had
retained one of these subcontractors "to perform the immediate
necessary work, on a time and materials basis, to bring the Site
back into compliance with the permit." ECF No. 61-50, at 1;[26] cf.
Siegfried Construction, 2000 WL 123944, at *6 (explaining that the
contractor's actions "supplementing" the subcontractor's deficient
performance "long before" the written notice to the surety "is
relevant to the amount of damages claimed against [the surety],
[but] has no bearing on whether [reasonable] notice was given").

Accordingly, at this stage of the case, Arch fails to
demonstrate that Strata had materially interfered with Arch's
ability to investigate and/or elect a remedy simply because a new
Subcontractor was temporarily on site 17 days after formal notice
of default was provided.  Though material interference could be
proven by Arch at trial, the factfinder could also conclude that
Arch's failure to act promptly was a decision of its own making.
Notably, as outlined by Arch's counsel in a letter dated November
10, 2021 — a letter authored just weeks prior to the scheduled
completion date of the Prime Contract — even after more than three
months of investigation, Arch was unwilling to commit to a position

---

[26] Strata also maintains that such performance was appropriate and necessary
to avoid further delays and mitigate damages that would result if there was
a multi-month work stoppage while Arch investigated.  See, e.g., ECF Nos.
61-48, 61-50; cf. 14 Michael A. Branca & Jennifer L. Harris, Virginia
Practice Series: Construction Law § 14:26 (2022 ed.) ("Liquidated damages
for delay, if proper under the defaulted contract, are recoverable under
the performance bond.").

on whether Fall Line was in default. ECF No. 61-53. One reasonable interpretation of the evidence is that Arch had elected the "Do-Nothing Option" following Strata's notice of default. Martin & Rochwarg, Construction Law Handbook § 32.04[E][5] (4th ed. 2023) (describing such option as "the surety simply does nothing, waits until the dust settles and the obligee makes a demand for payment"); see also 14 Michael A. Branca & Jennifer L. Harris, Virginia Practice Series: Construction Law § 14:22 (2022 ed.) ("Upon the triggering of its obligation to perform, the surety is faced with several choices, the first of which is whether to perform at all.").

### C. Summary

In summary, the Court need not delve further into the parties' detailed arguments, regarding whether Arch should be discharged as a matter of law from its obligations under the Bond, because there are material factual disputes that undercut Arch's ability to prevail on summary judgment. Arch is correct that some evidence suggests that Strata expected Arch to elect an option under the Bond at an unreasonable speed, and that Strata hired substitute subcontractors without regard to Arch's right to make an election. However, other evidence suggests that Arch failed to act promptly in a situation that required expedited action, to include Arch's alleged failure to apprise itself of the details of the performance disputes throughout July and the first week of August such that it

39

was prepared to respond promptly if a performance default was
formally declared by Strata.  Cf. Commonwealth v. Selective Ins.
Co. of Am., 68 Va. Cir. 451, 456 (Loudoun, 2005) (indicating that,
when as here, the surety and the contractor are "jointly and
severally" bound, the surety is obligated to perform if the
contractor defaults and the Bond therefore "at least gives rise to
a duty on the part of [the surety] to inquire as to the status of
the Project and [the contractor's] performance").[27]  There is,
however, simply no way to resolve the competing interpretations of
events without weighing the evidence.  To better illustrate such
fact, the Court notes that the complexity of the issues created by
a claim on a subcontractor performance bond are well known in the
field, with one construction treatise explaining the situation as
follows:

> Various difficulties and complexities arise for a
> performance bond surety once the obligee issues a
> declaration of default because it triggers the surety's
> bond obligations.  If the principal contests the
> default, the surety finds itself in a difficult
> position.  In fact, the surety is squarely in the middle,
> with the principal and obligee tugging in opposite

---

[27] To be clear, the Court does not conclude that Virginia law mandates that,
upon execution of the Bond, Arch had a duty to take affirmative steps to
actively monitor Fall Line's performance on the Project.  However, the
undisputed facts reveal that on June 29, 2021, Strata copied Arch on a
letter disclosing Fall Line's alleged responsibility for Project delays,
failure to comply with contract requirements, failure to adequately staff
the Project, and failure to provide qualified supervisors on the job site.
ECF No. 61-4, Ex. 2.  As argued by Strata, this advanced notice to Arch of
the deteriorating situation is relevant to whether Arch had adequate time
to investigate, and it is for the jury to weigh whether Arch should bear
any responsibility for not beginning its investigation earlier in a case
where the performance deadline was approaching and Arch had "joint and
several" liability to ensure timely performance of the Subcontract.

directions with very different expectations from the surety. The obligee will claim that because the default was proper and justified, <u>the surety must immediately honor its bond obligations and complete the project</u>. Aware of its exposure under the indemnification agreement with the surety, <u>the principal will insist that its surety support its position that the default was improper and, furthermore, that because of the obligee's breach of the construction contract, the obligee is not entitled to the surety's performance</u>. Added to the mix is the surety's parochial desire to minimize its own costs. . . .

. . . While it is certainly difficult for a trial judge to determine if a construction contract was breached, even with the benefit of expert testimony and hindsight, <u>parties to a problem-ridden construction project are afforded neither hindsight nor time</u>. . . .

After the obligee takes the initial step of defaulting the principal, <u>the ball drops in the surety's court</u>. . . . In general, a performance bond surety <u>is obligated to conduct an investigation of a default claim quickly</u>. This investigation should include possible claims by the obligee against the principal and vice versa, as well as any claims involving the principal and third parties. Essentially, the investigation should seek to determine whether the default termination was proper and what options the surety may have available in determining how and whether to cure the default while minimizing the surety's own costs.

Before responding to the obligee's declaration of default, <u>the surety's investigation does not need to be a searching inquiry into every possible issue</u>. Rather, the benchmark used by courts in evaluating the adequacy of a surety's investigation is whether it was "reasonable" under the circumstances. Not surprisingly, the decisions do not offer nor could they contain a precise definition of what a reasonable investigation would encompass in all cases. Rather, it is a fact-sensitive inquiry measured against the unique facts and circumstances of each particular case. . . .

Martin & Rochwarg § 32.04[E][5] (emphasis added). Here, the fact-

sensitive inquiry presents matters for the factfinder regarding

whether Arch's cure period was genuine and whether it offered a "prompt" response to a declaration of default after previously receiving notice of performance disputes and concerns about Project deadlines. Arch's summary judgment motion is therefore **DENIED**.[28]

## VI. DISCUSSION – STRATA'S SUMMARY JUDGMENT MOTION

Strata seeks summary judgment as to Fall Line's retaliation counterclaim (Count Five), arguing that the summary judgment record demonstrates that: (1) Fall Line's August 2, 2021, letter did not qualify as "protected activity," a necessary element of a 42 U.S.C. § 1981 retaliation claim; and (2) Fall Line cannot demonstrate that its protected activity was a "but for cause" of Fall Line's suspension. Because, after an opportunity to complete discovery, Fall Line fails to advance evidence on which a reasonable jury could conclude that the purported protected activity was a "but for cause" of Fall Line's suspension, the Court finds that summary judgment in Strata's favor is appropriate as to Count Five.

### A. Protected Activity

As explained in this Court's Rule 12(c) Opinion, protected activity includes "complaints about both 'employment actions

---

[28] To the extent that Strata ultimately pursues recovery from Arch based on a relatively small amount of work allegedly performed within Fall Line's work scope by other subcontractors prior to Strata's declaration of default and suspension of Fall Line, it appears that Arch is correct that recovery from Arch would be barred if the work pre-dated notice to Arch. Arch has not, however, demonstrated at this time that any such work constituted a material breach of the Bond.

actually unlawful under § 1981' and those actions the complainant 'reasonably believes to be unlawful' under § 1981." Strata Solar, 2023 WL 4638943, at *10 (quoting Ali v. BC Architects Eng'rs, PLC, 832 F. App'x 167, 172 (4th Cir. 2020)). Although, at the pleading stage, this Court found that Fall Line plausibly alleged "that it engaged in 'protected activity' by writing a letter . . . complaining about [two types of] race-based discrimination," id. at *11, facts developed during discovery arguably serve to undermine Fall Line's position on this issue.

As to the first type of discrimination (one-time use of the n-word), Fall Line's August 2021 "report" about the use of a racial epithet merely re-reported a seven-month-old incident that Strata was well aware of and had already addressed through written counseling. Additionally, the context of the months-old incident, which occurred once, was closer in kind to an offhand (though facially offensive) comment than to a verbal attack.

As to the second type of discrimination (non-random drug testing), the Court likewise has doubts as to whether Fall Line could have reasonably believed that it was accurately complaining about unlawful activity. Notably, Fall Line was fully aware that random drug testing on the Project was contractually required and that Strata employed a third-party drug testing company to perform such testing. Furthermore, Fall Line was, or should have been, aware that there was "site-wide" drug testing in July of 2021 that

43

applied to all Fall Line and Strata employees, regardless of their race.  After the benefit of discovery, Fall Line offers no new evidence suggesting that Mr. Harris or his son were "targeted" for drug testing based on their race, nor does Fall Line point to any potentially admissible evidence suggesting that a "retest" of Mr. Harris's son was race-based.  Furthermore, when the "complaint" about the drug testing is read in the context of the parties' well-documented and months-long deteriorating contractual relationship — which involved in-house and outside counsel and Fall Line's counsel's contemporaneous threat to demobilize if new commitments on payments and scheduling were not received from Strata — the claims of race-based discrimination appear to be "an afterthought in a laundry list of other" contract related issues.  Buchhagen v. ICF Int'l, Inc., 650 F. App'x 824, 829 (4th Cir. 2016).

Nevertheless, because this Court cannot weigh evidence at this stage, and because Fall Line offers at least some limited evidence disputing the randomness of Strata's drug testing regime,[29] "for purposes of efficiently adjudicating this case, [this Court] will assume that [Fall Line] engaged in protected

---

[29] As discussed above in Part I, Fall Line challenged the admissibility of Strata's evidence on the subject of drug testing through a motion to strike. ECF No. 69.  Although the Court found that such challenge lacked merit, ECF No. 93, at 6-7, the Court elected not to rely on the most facially suspect portions of Strata's evidence (including details surrounding the dates and manner that Mr. Harris and his son were selected for drug testing) as the dispute over such facts was not material to the Court's resolution of Strata's summary judgment motion.

activity as required" to support its retaliation claim and will "move on to the remaining element in contention" — whether there is a "causal connection" between the protected activity and Fall Line's suspension.[30]    Id.

## B. Causal Connection

It is undisputed that a "but for" causation standard governs whether Fall Line's § 1981 retaliation claim can survive summary judgment. Ali, 832 F. App'x at 172-73.  Importantly, however, the burden to prove causation at the summary judgment stage differs from the showing necessary to survive a Rule 12 motion.  As explained by this Court in its Rule 12(c) Opinion, at that early stage in the case, Fall Line was only required to "allege facts that, if accepted as true, allow the court to draw a reasonable inference as to the legal requirements for a § 1981 [retaliation] claim."  Strata Solar, 2023 WL 4638943, at *12 (cleaned up).  As a result, "very little evidence of a causal connection is required to establish a prima facie case of retaliation; temporal proximity

---

[30] Though the Court assumes, for purposes of this motion, that Fall Line engaged in protected activity, its showing on this issue is marginal even when the facts are construed in its favor, with the same letter that raised the race-based allegations also including a detailed discussion of the failing contractual relationship and allegations that Strata was delaying work and improperly withholding nearly $350,000.  ECF No. 61-14; cf. Buchhagen, 650 F. App'x at 829-30 (raising questions as to whether the plaintiff could demonstrate protected activity when she had a prior history of various complaints unrelated to her age followed by a single age-based complaint).  Although the Court assumes that this prong of the test is satisfied for purposes of adjudicating the present motion, the marginal nature of the protected activity renders it far less likely that such conduct motivated a retaliatory response.

between the protected activity and the employer's adverse action alone will suffice." Burgess v. Bowen, 466 F. App'x 272, 283 (4th Cir. 2012) (cleaned up); see Strata Solar, 2023 WL 4638943, at *12 (agreeing with Strata that "the inference of retaliation is 'weakened'" by Fall Line's alternative theory that Strata was using Fall Line as a scapegoat for Strata's own performance failures but finding that "Strata fails to demonstrate that such fact 'weakens' the inference of retaliation to such a degree that Count Five fails at the pleading stage") (emphasis added).  In contrast to the plaintiff-friendly Rule 12 burden, at the summary judgment stage, a plaintiff must point to evidence, not pleadings, and the evidentiary force of mere temporal proximity is reduced.  S.B. ex rel. A.L. v. Bd. of Educ. of Harford Cnty., 819 F.3d 69, 79 (4th Cir. 2016).

Because Fall Line did not initially allege, nor does it now advance, any direct evidence of retaliation, Fall Line must proceed under the familiar three-step McDonnell Douglas burden-shifting framework.  Foster v. Univ. of Maryland-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973)).  To establish a prima facie case under the first step of this framework, Fall Line must point to evidence on which a reasonable jury could conclude that Fall Line engaged in protected activity, suffered an adverse action, and that "a causal relationship existed between the protected activity and the

46

adverse employment activity." Id. (citation omitted). If Fall
Line makes such threshold showing, "[t]he burden then shifts to
[Strata] to show that its purportedly retaliatory action was in
fact the result of a legitimate non-retaliatory reason." Id. If
Strata offers evidence supporting a legitimate non-retaliatory
reason for its actions, "the burden shifts back to [Fall Line] to
rebut [Strata's] evidence by demonstrating that the . . . purported
nonretaliatory reasons were not [Strata's] true reasons, but were
a pretext" seeking to conceal the true retaliatory motive. Id.
(citation and quotation marks omitted).

Although this three-step procedure is frequently labeled a
"burden shifting" framework, the burden to prove "but for"
causation ultimately falls on the plaintiff. See Guessous v.
Fairview Prop. Invs., LLC, 828 F.3d 208, 217 (4th Cir. 2016)
(explaining that, at the third McDonnell Douglas step, the
"plaintiff's burden to show pretext merges with the plaintiff's
ultimate burden of persuading the [factfinder] that she was a
victim of intentional [retaliation]" (quotation marks omitted)).
Moreover, although "temporal proximity" between protected activity
and the alleged retaliatory act "may be sufficient to make an
initial prima facie showing of causation, timing alone generally
cannot defeat summary judgment once [a defendant] has offered a
convincing, nonretaliatory explanation" for its conduct. S.B. ex
rel. A.L., 819 F.3d at 79 (emphasis added) (citations omitted).

47

### 1. Prima Facie Case

Here, Fall Line has pointed to sufficient evidence to support a prima facie case of retaliation by identifying evidence establishing a close temporal proximity between the adverse action (the suspension of Fall Line) and the August 2, 2021, letter that included, among other things, a complaint presumed to be protected activity. The Court therefore turns to whether Strata has offered a compelling nonretaliatory explanation for its conduct, and if it has, whether Fall Line has pointed to evidence capable of demonstrating <u>both</u> that Strata's explanation is pretextual and that the "real reason" Fall Line was suspended in early August was Strata's "retaliatory animus." <u>Foster</u>, 787 F.3d at 250.

### 2. Non-Retaliatory Explanation

Having reviewed Strata's evidence seeking to explain its conduct, the Court finds that the evidence at the second stage of the framework is "so one-sided" that it establishes a legitimate and convincing non-retaliatory explanation for Strata's actions. <u>McAirlaids</u>, 756 F.3d at 310 (quoting <u>Anderson</u>, 477 U.S. at 251-52). In reaching this conclusion, the Court notes parallels between the instant facts and the facts in <u>Buchhagen v. ICF Int'l, Inc.</u>, 650 F. App'x 824 (4th Cir. 2016).

In <u>Buchhagen</u>, the Fourth Circuit discussed the summary judgment evidence confirming that the plaintiff had engaged in "continued insubordination" at work and that the defendant

48

.

demonstrated a "clear and long train of frustration with [plaintiff's] non-compliance" to the point where the defendant "lost trust in [the plaintiff's] ability to perform her job." Buchhagen, 650 F. App'x at 829-30. Additionally, "the record detail[ed] [the defendant's] growing dissatisfaction with [the plaintiff's] work ethic prior to" receiving any complaints constituting protected activity. Id. at 830. Finally, the plaintiff had been placed on a Process Improvement Plan ("PIP") and warned of the results of non-compliance before she engaged in protected activity. Id. Although, like in the instant case, the retaliation claim in Buchhagen overcame a Rule 12 motion, the Fourth Circuit affirmed the district court's summary judgment ruling in the defendant's favor, finding that the "temporal proximity" between the adverse action and the protected activity was "insufficient to persuade a reasonable jury" that the plaintiff experienced retaliation because of her protected activity. Id. at 827, 830.

Here, Strata has presented similar facts. Contemporaneous evidence from the summer of 2021 reveals that Strata was "frustrated" with Fall Line's deficient performance more than a month prior to the protected activity. Similarly, the Court need not resort to "weighing" the evidence to recognize that Strata "lost trust in [Fall Line's] ability to perform [its] job," to include dissatisfaction with Fall Line's staffing levels, work

ethic, and progress toward completion <u>before</u> Fall Line sent the August 2nd letter. <u>Buchhagen</u>, 650 F. App'x at 829-30; <u>see</u> ECF No. 61-4 (discussing the County-initiated work stoppage due to Fall Line's installation of circular risers, Fall Line's failure to adequately staff the project, Fall Line's failure to maintain the Project schedule, Fall Line's failure to adequately supervise its workers, Fall Line's poor quality and inefficient work as observed by the County, Dominion, and Strata, and Fall Line's failure to provide a detailed Recovery Plan as requested more than six weeks prior). Finally, somewhat similar to the PIP in <u>Buchhagen</u>, here, Strata declared Fall Line to be in default prior to the protected activity, asserting on July 28, 2021, that Fall Line had repeatedly failed to submit invoices that comply with the Subcontract and failed to pay Fall Line's sub-subcontractors. ECF No. 61-12.

A few days after Strata announced default, Fall Line wrote the August 2, 2021, letter containing the presumed "protected activity," though that same letter accused Strata of non-payment and Project delays, concluded by threating to demobilize Fall Line's entire workforce unless Strata made <u>nearly $350,000 in payments</u>, and committed to scheduling changes. ECF No. 61-14. Fall Line's outside counsel made a similar threat to demobilize to Strata's outside counsel on August 2, 2021 "unless Strata allows work to proceed and begins paying." ECF No. 61-13.

The day after Fall Line's letter was received, and immediately after the Dominion-initiated safety stand down, Fall Line left the job site at Mr. Harris's direction in protest of Ben Norton's safety-based suspension. ECF No. 11-2 ¶ 25.  In the days that followed, Strata formally suspended Fall Line, expressly invoking several of the previously articulated business-related reasons, including Fall Line's: (1) alleged past failures to perform in accordance with the Subcontract (as documented long before the protected activity); (2) staffing of the Project with inadequate manpower (as documented long before the protected activity); (3) disregard of safety procedures (a matter raised and pursued by Dominion); and (4) abandonment of the Project following the safety stand down.

In addition to the non-discriminatory reasons for Strata's actions announced long before Fall Line was suspended, Dominion's initiation of the safety stand down on August 3, 2021, establishes another valid non-discriminatory reason for Strata (or Dominion) to suspend Fall Line.  Notably, while Fall Line's pleadings expressly allege that Strata "contrived the pre-textual 'safety incident'" in response to the protected activity, ECF No. 11 ¶¶ 142-44, Fall Line's own evidence establishes that Dominion ordered the safety stand down and that Dominion elected to suspend Fall Line employee Ben Norton after the incident over the objection of

on-site Strata employee Corey Mitchell, ECF No. 11-2 ¶¶ 16-18, 24.[31]

Fall Line's affiant further asserts that after Dominion insisted that Ben Norton be suspended, Fall Line's site superintendent Rico Harris stated that "he'd remove his entire team from the site" if the suspension stood, and because it did, he "told his entire team to stage equipment at the laydown area and leave the site." Id. ¶ 25 (emphasis added) Fall Line's purported abandonment of the multi-million-dollar Subcontract and failure to return the next day to participate in a safety investigation further bolstered Strata's race-neutral basis for its conduct. The Court acknowledges the factual conflict over whether Fall Line had a valid reason for not returning to work on August 4th and August 5th, but it is undisputed that Fall Line did not work on these dates, creating a basis for Strata to act unrelated to race-based retaliation.

In light of Strata's well-documented race neutral justifications for its decision to suspend Fall Line, the burden shifts back to Fall Line.

---

[31] Contrary to its evidence, Fall Line appears to maintain this position on summary judgment, arguing in a brief that "Strata fabricated a safety incident" and that "[t]here is no dispute that Strata immediately retaliated against Fall Line, directing Rico Harris to leave the site on August 3, 2021." ECF No. 49, at 3. Counsel's unsworn arguments in a brief, of course, are not evidence. Frankel v. United States, 358 F. Supp. 3d 537, 539 (E.D. Va. 2019) (citing Kulhawik v. Holder, 571 F.3d 296, 298 (2d Cir. 2009)).

### 3. Pretext

Fall Line fails to offer sufficient evidence, direct or circumstantial, on which a jury could find that Strata's race-neutral justifications for suspending Fall Line were pretext for race-based retaliation. See Foster, 787 F.3d at 252 (indicating that to carry the "ultimate burden" of proving intentional retaliation, "a plaintiff must establish both that the employer's reason was false and that retaliation was the real reason for the challenged conduct") (emphasis added) (cleaned up).[32]

With respect to Fall Line's alleged performance issues, these concerns were both contemporaneously documented by Fall Line and expressly disclosed to Fall Line and its counsel prior to the protected activity. Although Fall Line carries the ultimate burden to prove retaliation, it does not point to evidence suggesting that Strata's reliance on deficient performance was pretextual, and at best proffers a close temporal proximity along with various speculative statements, which are insufficient to rebut Strata's

---

[32] Fall Line argues that this Court's Rule 12(c) Opinion created a "blueprint" for Strata to follow to prove that it contemplated suspending Fall Line prior to the protected activity and that Strata failed to follow the blueprint. This argument, however, falls flat. While a defendant can defeat a retaliation claim by proving post-complaint conduct in conformity with the defendant's pre-existing plan, the absence of a firm pre-existing plan does not preclude summary judgment. Cf. Fry v. Rand Constr. Corp., 964 F.3d 239, 248 (4th Cir. 2020) (stating that an employer "proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality" (emphasis added) (quoting Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 272 (2001)). Rather, it is Fall Line, not Strata, that must point to evidence that could lead a reasonable jury to conclude that the "real reason" for the adverse action was the protected activity. Here, Fall Line fails to do so.

showing at step two of the framework.  See S.B. ex rel. A.L., 819 F.3d at 79 (explaining that "timing alone generally cannot defeat summary judgment once an employer has offered a convincing, nonretaliatory explanation"); Whitaker v. City of Hopewell, No. 3:19cv923, 2020 WL 7246593, at *8 (E.D. Va. Dec. 9, 2020) (granting summary judgment on a retaliation claim in case where the employer offered "convincing, nonretaliatory reasons" for terminating the plaintiff and the plaintiff relied on the temporal proximity between the email he sent to the defendant and his termination the next day); Cook v. Prince George Cnty. Sch. Bd., No. 3:22cv129, 2023 WL 2250479, at *10–11 (E.D. Va. Feb. 27, 2023) (granting summary judgment on a retaliation claim, explaining that "a personal conflict alone does not constitute retaliation" and that the plaintiff at best "establish[ed] a temporal proximity between her protected activity and her termination") (citations omitted); see also Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 358–59 (2013) (explaining, in the course of the Supreme Court's analysis rejecting a lesser standard of proof than "but for" causation, that a more lenient standard could "contribute to the filing of frivolous" retaliation claims as an employee "who knows that he or she is about to be fired for poor performance . . . might be tempted to make an unfounded charge of . . .

discrimination," only to allege "retaliation" when "the unrelated employment action comes").[33]

Similarly, as to the safety issue, Fall Line fails to offer evidence capable of demonstrating that the safety incident was a ruse by Strata to conceal a retaliatory motive.  Simply put, it was <u>Dominion</u> that directly observed the alleged dangerous behavior, ordered the work stoppage, and suspended Ben Norton and Rico Harris.  Critically, Fall Line fails to point to any evidence in the record capable of demonstrating that Dominion was aware of the protected activity when it acted on August 3, 2021.  Fall Line likewise presents no basis for concluding that Dominion's instructions to Strata two days later is evidence of pretext or Strata's retaliatory motive.  Even accepting as true Fall Line's contention that the safety incident was exaggerated, or that Strata somehow leveraged the Dominion-initiated safety incident to justify suspending Fall Line, Fall Line offers nothing beyond

---

[33] The fact that the protected activity here was <u>a company</u>'s complaint about conduct unrelated to any imputed racial identity of the company, but instead involving two of the company's many employees, arguably further undercuts the strength of the "proximity" evidence, especially when the claimed adverse action is the cancellation of a multi-million-dollar contract, not the termination of a single employee as is often the case in § 1981 actions. Similarly, other than the months-old incident involving the epithet, Fall Line, even after the benefit of discovery, never identifies who at Strata purportedly engaged in the discriminatory conduct, weakening any inference that there was a desire to retaliate based on the somewhat vague drug testing allegations referenced in Fall Line's August 2, 2021, letter.

speculation that the "real reason" to exaggerate/leverage this incident was race-based retaliation.[34]

Dominion's direct involvement in the safety issue drives a wedge between the presumed protected activity and the "but for" cause of Strata's decision to suspend Fall Line. Dominion's independent and intervening actions surrounding the safety incident differentiates this case from typical employer/employee disputes over alleged retaliation and, here, Fall Line fails to point to any evidence suggesting that Strata's business-related justifications for its actions, even if allegedly misguided, mistaken, or devious, were pretext for unlawful retaliation. Instead, after months of discovery, Fall Line fails to identify any evidentiary link, other than purportedly "suspicious timing," between the presumed protected activity and the adverse action that followed.

Finally, Fall Line fails to demonstrate that Strata's reliance on Fall Line's "abandonment" of the project was a pretextual justification to hide retaliatory motives. Though occurring after the protected activity, Fall Line's own evidence is that Mr. Harris instructed his crew to leave the Project on

---

[34] To the extent Fall Line maintains that Mr. Harris was falsely described as being aggressive on August 3, 2021, in order to leverage a racist stereotype about African American males, this contention is also pure speculation. Moreover, Fall Line does not effectively link this evidence to Strata as the allegation of aggression arises out of an interaction between Mr. Harris and Dennis Bradley of Dominion. ECF No. 11 ¶¶ 80-83; ECF No. 11-2 ¶ 26; ECF No. 11-9, at 4.

August 3, 2021, and Fall Line did not return to work the next two days. As previously noted, the Court does not "weigh" evidence relevant to why Fall Line decided not to return on August 4, 2021, see ECF No. 71-4, at 2, finding instead that Fall Line's absence in the days after Mr. Harris ordered his team to leave the worksite bolsters Strata's business-related justification to suspend Fall Line.[35]

Therefore, even when considering the summary judgment record in the light most favorable to Fall Line, Fall Line fails to demonstrate that a "jury reviewing this evidence, on its own [could] . . . find it more probable than not that [Strata's] proffered reasons were merely an excuse to distract from their [retaliatory] motives." Dawson v. Washington Gas Light Co., No. 19-2127, 2021 WL 2935326, at *5 (4th Cir. July 13, 2021); see CoreTel Va., LLC v. Verizon Va., LLC, 752 F.3d 364, 370 (4th Cir. 2014) ("[I]t is ultimately the nonmovant's burden to persuade [the Court] that there is indeed a dispute of material fact," and to do that the nonmovant "must provide more than a scintilla of evidence — and not merely conclusory allegations or speculation — upon which a jury could properly find in its favor."). Critically, Fall Line

---

[35] Arch presents evidence suggesting that Fall Line was willing and able to resume work at a later date, but Fall Line's subsequent desire to resume work, accepted by the Court as genuine, does not undermine the impact of Fall Line's past acts on the contractual relationship and Fall Line's perceived reliability, especially when facially significant performance and staffing problems were documented by Strata months prior.

must do more than demonstrate that a jury could find Strata's justifications to be pretextual, it must demonstrate that a jury could also reasonably find that the "real reason" for Strata's actions was retaliation rather than an effort to avoid liability for Strata's own contractual defaults.  That is a finding the current record simply cannot bear, with the absence of evidence of pretext rendering this issue "so one-sided that [Strata] must prevail as a matter of law." McAirlaids, 756 F.3d at 310 (quoting Anderson, 477 U.S. at 251-52).

A jury will, of course, decide which party, if any, is responsible for failing to conform to the Subcontract, and there are myriad factual disputes that could ultimately support a jury finding that Fall Line's performance did not qualify as a "default," or that the safety incident was exaggerated, or that Fall Line did not "abandon" the project.  However, there is no reliable evidentiary link between these disputed events in this contentious contract action and race-based retaliation.

In summary, when Fall Line's burden to prove pretext is merged with its ultimate burden to prove that retaliation was a "but for cause" of Fall Line's suspension or the timing of the suspension, Fall Line fails to point to evidence that even inferentially suggests pretext.  Temporal proximity, of course, remains relevant to the pretext analysis, but on this record, the proximity alone is insufficient to support a verdict in Fall Line's favor.  Because

58

"no reasonable jury could conclude [that Fall Line] was [suspended] for any reason other than [Strata's] . . . business interests," Buchhagen, 650 F. App'x at 829, summary judgment is **GRANTED** in favor of Strata as to Count Five of the counterclaim.

## VII. CONCLUSION

As explained in detail herein, Fall Line's motion for summary judgment and Arch's motion for summary judgment are **DENIED** due to the existence of genuine disputes of material facts directly relevant to the issues raised in such motions.  ECF Nos. 43, 60. Strata's partial motion for summary judgment, which is limited to Count Five of Fall Line's Counterclaim, is **GRANTED**.  ECF No. 58. The Clerk is **DIRECTED** to forward a copy of this Opinion and Order to all counsel of record.

**IT IS SO ORDERED.**

_____
/s/ Mark S. Davis
Mark S. Davis
CHIEF UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
October **24** , 2023